EXHIBIT B

STATE OF NEW YORK
SUPREME COURT COUNTY OF ONONDAGA

---

SHAUN ATKINSON and VENESSA ATKINSON,

Plaintiffs,

vs. **Index No. 004808/2018**
**RJI No. 33-19-1064**

EILERSON DEVELOPMENT CORPORATION a/k/a EDC; CAMERON GROUP, LLC; MOVIE TAVERN THEATERS, LLC; SOUTHERN THEATERS, LLC; HINSDALE ROAD GROUP, LLC; VERONIS SUHLER STEVENSON; DIAMOND CASTLE HOLDINGS, LLC; HOTEL @T5, LLC; NES RENTALS HOLDING, INC.; UNITED RENTALS, INC.; and "JOHN DOE MANUFACTURING CORPORATION INC/LLC",

Defendants.

---

UNITED RENTALS (NORTH AMERICA), INC. i/p/a UNITED RENTALS, INC., and NES RENTALS HOLDINGS, INC.,

Defendants/Third-Party Plaintiffs,

vs.

C&D LAFACE CONSTRUCTION, INC.,

Third-Party Defendant.

---

EILERSON DEVELOPMENT CORPORATION a/k/a EDC,

Fourth-Party Plaintiff,

vs.

C&D LAFACE CONSTRUCTION, INC.,

Fourth-Party Defendant.

---

**Joseph Goethe**

# A P P E A R A N C E S

FOR PLAINTIFFS: SNYDER LAW FIRM, PLLC
6876 Buckley Road
Syracuse, New York 13212
BY: DAVID B. SNYDER, ESQ.
CAREY KNAPP, ESQ.

FOR DEFENDANT: (Eilerson) LIPPMAN O'CONNOR
300 Olympic Towers
300 Pearl Street
Buffalo, New York 14202
BY: GERARD E. O'CONNOR, ESQ.

FOR DEFENDANTS: (Camerson, Hinsdale) SUGARMAN LAW FIRM, LLP
211 West Jefferson Street
Suite 20
Syracuse, New York 13202
BY: STEPHEN A. DAVOLI, ESQ.

FOR DEFENDANTS: (Movie Tavern, Southern Theaters) LAW OFFICES OF SANTACROSE & FRARY
One Columbia Circle
Albany, New York 12203
BY: KEITH M. FRARY, ESQ.

FOR DEFENDANTS: (United Rentals, NES Rentals) RUPP, BAASE, PFALZGRAF, CUNNINGHAM, LLC
1600 Liberty Avenue
Buffalo, New York 14202
BY: THOMAS P. CUNNINGHAM, ESQ.

FOR DEFENDANT: (C&D LaFace) NASH CONNORS, P.C.
344 Delaware Avenue
Suite 400
Buffalo, New York 14202
BY: ANDREW J. KOWALEWSKI, ESQ.

ALSO PRESENT: Cara Nelson, Esq.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

CAMERON GROUP, LLC, and
HINSDALE ROAD GROUP, LLC,

Plaintiffs,

vs. **Docket No. 5:19-CV-00285**

EILERSON DEVELOPMENT CORPORATION,
AMERISURE INSURANCE COMPANY, and
AMERISURE MUTUAL INSURANCE COMPANY,

Defendants.

vs.

SELECTIVE INSURANCE GROUP, INC. d/b/a
SELECTIVE INSURANCE COMPANY OF
AMERICA, and C&D LAFACE CONSTRUCTION,
INC.

Additional Defendants.

---

Examination Before Trial of **JOSEPH GOETHE**, taken remotely via Zoom Video Conferencing before Annette M. Burton, Court Reporter and Notary Public in and for the State of New York, held on August 25, 2020.

**A P P E A R A N C E S**

FOR PLAINTIFFS: SUGARMAN LAW FIRM, LLP
211 West Jefferson Street
Suite 20
Syracuse, New York 13202
BY: STEPHEN A. DAVOLI, ESQ.

FOR DEFENDANT: (Eilerson) CALLAHAN & FUSCO, LLC
40 Exchange Place
18th Floor
New York, New York 100005
BY: RYAN P. HELLER, ESQ.

FOR DEFENDANT: (Amerisure) GERBER, CIANO, KELLY, BRADY, LLP
350 Main Street
Suite 2400
Buffalo, New York 14202
BY: DANIEL W. GERBER, ESQ.

FOR DEFENDANT: (Selective) HURWITZ & FINE, P.C.
Liberty Building
Suite 1300
Buffalo, New York 14202
BY: JENNIFER A. EHMAN, ESQ.

# I N D E X O F T E S T I M O N Y


| | Page |
|---|---|
| EXAMINATION OF JOSEPH GOETHE | |
| BY MR. SNYDER: | 11 |
| BY MR. O'CONNOR: | 93 |
| BY MR. FRARY: | 96 |
| BY MR. KOWALEWSKI: | 102 |
| BY MR. SNYDER: | 106 |
| BY MR. O'CONNOR: | 109 |
| BY MS. EHMAN: | 114 |

## I N D E X O F E X H I B I T S


| Exhibit | Description | Page Marked |
|---|---|---|
| A | AIA Document A101 - 2007 - Standard Form of Agreement between Owner and Contractor | 9 |
| B | Lease between Hinsdale Road Group, LLC and Movie Tavern Theaters, LLC | 9 |
| C | AIA Document A201 - 2007 - General Conditions of the Contract for Construction | 9 |
| D | Subcontract Agreement between EDC and C&D LaFace | 9 |

# I N D E X O F R E Q U E S T S


| Description | Page |
|---|---|
| Signed contract - AIA Document A201 - 2007 General Conditions of the Contract for Construction | 81 |

**S T I P U L A T I O N S**

IT IS HEREBY STIPULATED AND AGREED by and among the Attorneys for the respective parties hereto, that:

All rights provided by the CPLR, and Part 221 of the Uniform Rules for the Conduct of Depositions including the right to object to any question, except as to form, or to move to strike any testimony at this examination is reserved; and in addition, the failure to object to any question or to move to strike any testimony at this examination shall not be a bar or waiver to make such motion at, and is reserved to the trial of this action. It is further agreed that an objection by one is an objection by all.

This deposition may be sworn to by the witness being examined before a Notary Public virtually, other than the Notary Public before whom this examination was begun.

IT IS FURTHER STIPULATED that the witness is to read and sign the transcript, certifying it as to its accuracy and that the filing of the original of this deposition is waived.

IT IS FURTHER STIPULATED that a copy of this examination shall be furnished to the attorney for the witness being examined without charge.

IT IS FURTHER STIPULATED AND AGREED, that the parties agree that this deposition will have the same effect as an examination conducted pursuant to CPLR Section 3113 and that this deposition may be used for all purposes provided in CPLR Section 3117 and for all motion practice.

For the purposes of CPLR 3113(d) "the place of the deposition" shall be deemed to be the location where the "officer administering the oath" is physically present. The parties agree that all participants may participate electronically by telephone or other remote electronic means, including but not limited to video conference software.

*GOETHE - SNYDER*

(Whereupon, Exhibit No. A, B, C, and D marked for identification.)

(Whereupon, JOSEPH GOETHE, called as a witness, having been duly sworn, testifies as follows:)

MR. SNYDER: Just for the record, can we get everyone's appearances before we begin. This is Attorney David Snyder representing the plaintiff. There's a number of people on this call, so I'd like to get everyone on the record and who's appearing.

MR. DAVOLI: Sure. I guess I'll start. This is Steve Davoli from Sugarman Law Firm. We're representing Cameron Group, Hinsdale Road Group, producing the witness today.

MR. FRARY: Keith Frary from Santacrose & Frary. I represent Movie Tavern Theater and Southern Theater.

MR. KOWALEWSKI: Andrew Kowalewski from Nash Connors representing C&D LaFace.

MR. O'CONNOR: Gerry O'Connor, Lippman O'Connor. I have EDC.

*GOETHE - SNYDER*

MR. CUNNINGHAM: Tom Cummingham from Rupp, Baase. I have NES and United Rentals.

MR. GERBER: Dan Gerber from Gerber, Ciano, Kelly & Brady, and I have with me Cara Nelson from my firm, representing Amerisure in the Federal Court action.

MS. EHMAN: Jennifer Ehman from Hurwitz & Fine, representing Selective in the Federal Court action.

MS. KNAPP: Carey Knapp from the Snyder Law Firm, representing the plaintiff in the action.

MR. HELLER: Ryan Heller, Callahan & Fusco, monitoring Counsel for Eilerson on behalf of Amerisure Insurance.

THE WITNESS: Could I ask a question? I just missed who was representing EDC.

MR. O'CONNOR: Gerry O'Connor.

THE WITNESS: Oh, thanks, Gary. Sorry about that.

MR. FRARY: Gerry.

MR. O'CONNOR: Gerry.

THE WITNESS: Or Gerry.

*GOETHE - SNYDER*

EXAMINATION BY
MR. SNYDER:

Q Okay. Sir, can you please state your full name?

A Joseph Goethe.

Q And, Mr. Goethe, what is your home address?

A 111 East Lake Road, Skaneateles, New York, 13152.

Q And do you reside there with anyone else?

A Yes, my family.

Q Are you married?

A Yes.

Q Who's your wife?

A Diana.

Q And how long have you been married?

A Why are you putting me on the spot like that?

MR. FRARY: We didn't ask you the date.

Q I'm not asking the date.

A 20 years.

Q And do your children live at home with you as well?

A Yes.
Q How many children?
A Quite a bit nowadays.
Q How many children do you have?
A Two.
Q And what are their names and ages?
A Alex 17, Drew 16.
Q Besides the property on -- in Skaneateles, do you own any other properties personally?
A Yes.
Q What are those properties?
A Why is that relevant, may I ask?
Q I'm just getting background information.
A 1709 Russells Landing, Skaneateles, New York.
Q Anything else?
A No.
Q Sir, are you from the Syracuse area?
A East Syracuse? No.
Q No, the Syracuse area.
A From Skaneateles.
Q Skaneateles. Were you -- where were you born, then?
A Bronxville, New York, Tucker Hill Road.

Q And where did you go to high school?
A Skaneateles and Suffield Academy.
Q And did you attend college?
A Union College.
Q What was your degree in and what year did you graduate?
A Economics, major of economics, 1990.
Q And after that time, did you do any postgraduate education?
A Yes, I did, at Syracuse University.
Q What did you -- what degree did you get from Syracuse?
A I did not.
Q Okay. How long were you at Syracuse?
A I can't remember. I was one class shy of my degree, so however long that took. It took a while. I was working. I was full-time and then part-time.
Q And when -- when was that?
A I think it started in '92.
Q You are -- so were you working at the same time that you were going to school the entire time or was it something else?
A I was working and going to school, not the

*GOETHE - SNYDER*

entire time.

Q Where were you working while you were going to Syracuse University?

A Multiple places.

Q Do you remember --

A I did construction work. I did -- I worked at Pyramid Companies. Pretty much those two.

Q When you say construction work, what exactly were you doing in construction?

A Byrnes Brothers Concrete, I was forming and pouring concrete exactly and forming and pouring walls.

Q And how long were you with Byrnes Brothers?

A I worked with them in the summers for -- I don't know how long. You're testing my memory. I'm too old to remember that.

Q Well, when did you start with them approximately?

A High school and college.

Q And when did you first start working for Pyramid?

A Same time period for the summers.

Q And what were you doing for Pyramid?

A Multiple internships.
Q Can you give me examples of internships you had with Pyramid?
A Tenant coordination, finance, leasing, management, sweeping hallways, opening shopping centers, whatever it took.
Q And how long were you employed with Pyramid?
A Full-time employment or -- I think it was ten years.
Q When you say full-time, when did you start full-time with Pyramid?
A I think it was '91. Yeah, '91 to 2001.
Q Mr. Goethe, before I ask you any more questions, I didn't really go over the ground rules here, which I normally do, but this format kind of makes me want to start asking questions.
I just ask, and I'm sure your attorney told you, that you have to wait for my whole question before you answer them, and if you need -- if I ask a question in such a way that you don't understand it, I ask that you let me know that you don't understand the question and -- and I will rephrase it. If you answer the question, I'm going

to assume that you understood my question, okay?
A Okay.
Q And I think your attorney also probably told you that we need all answers to be verbal, so.
All right. So you were with Pyramid. What was your final position with Pyramid?
A I was in leasing.
Q And you ended with them in approximately what year?
A 2001.
Q And did you have employment immediately afterwards or --
A We started Cameron Group.
Q The -- the Palisades Center, was that in connection with your employment at Pyramid?
A Yes.
Q And was your job with them, at Palisades, was that the final job you had or was that something else?
A I don't remember if that was the end or if I was back focused on the portfolio.
Q Okay. Now, you said you started Cameron. What year did you start Cameron?
A 2001.

Q And were you the founding principal or were there other people involved with the founding of Cameron Group?

A There were others.

Q Who else was involved in the founding of Cameron Group?

A My current partner Tom Valenti, Larry Adler, Eric Alderman, and Tim Kelley.

Q Now, you said your current partner Thomas Valenti, are the other people that you mentioned no longer members of Cameron Group?

A Correct.

Q And when did those people leave Cameron Group?

A I don't know. I mean --

Q Was it --

A -- it was over a period of time. I don't remember.

Q When you started Cameron Group, was there a capital contribution required by each of the members?

A We had some contributions. Some of it was furniture, others cash. We had to get started, yeah.

*GOETHE - SNYDER*

Q Do you know what your personal contribution was to start Cameron Group?

A No, I don't remember.

Q Currently who are the principals of Cameron Group?

A Tom Valenti and myself.

Q Is Eric Alderman still a principal of Cameron Group?

A No.

Q And what is -- is there a percentage ownership between you and Mr. Valenti?

A Yes.

Q And what -- how is that distributed?

A 50/50.

Q How many employees does Cameron Group have presently?

A It's only eight, I think.

Q When you started Cameron Group, what was the purpose of -- of the business?

A To acquire underperforming and closed shopping centers, redevelop them.

Q And your -- who is the current secretary for Cameron Group?

A We don't really have a secretary.

*GOETHE - SNYDER*

Q Do you record -- do you have corporate meetings annually or some other time period?

A We are not a corporation, so we do not have corporate meetings.

Q Mr. Alderman, when was the last time he was involved with your company?

A With Cameron Group?

Q Correct.

A I don't remember when he left. It was a while ago.

Q Okay. Are there any other shareholders besides you and Mr. Valenti at this point in time?

A No.

Q In 2015, were there any other shareholders besides you and Mr. Valenti?

A 2015, I think Larry was still involved then, but I can't be completely sure.

Q Is Mr. Alderman involved with the business now?

A No. And when I said Larry, I mean Larry Adler. Eric Alderman and Larry Adler. I don't know if you confused the two.

Q Okay. Is Mr. Adler involved with the business now?

A No.

Q So the accident in this case was at the construction of the Movie Tavern; is that your understanding?

A That's what I was told, yes.

Q And your company is responsible for the development of Township 5; is that an accurate statement?

MR. DAVOLI: I'll object to the form of the question.

MR. FRARY: Yeah, he's representing two companies here, it's my understanding, correct, Steve?

MR. DAVOLI: That's the basis of my objection, yes.

MR. SNYDER: Okay.

MR. FRARY: Hinsdale and Cameron, so you might want to separate those, David, when you're talking about that.

MR. SNYDER: Sure. Yep. Thank you. I will -- I will do that.

Q So to clarify, then, Hinsdale Road Group, LLC, when did that first come into existence?

A I believe it was 2005.

*GOETHE - SNYDER*

Q And who are the -- are there more than one -- are there any principals for Hinsdale Road Group?

A There are multiple principals for Hinsdale Road Group. There are multiple members of the LLC.

Q And who are the members of the LLC?

A Myself, Tom Valenti, Jonathan Dower, Kevin Eldred, and then I think we made a couple smaller ones, I can't remember who we added in, kind of as an incentive.

Q When you said you added a couple other ones, what do you mean by that?

A We like to be an employee-owned company, so what we do is we make partner -- we add -- when people achieve a certain level, they are allowed to become part of an LLC and become members. So there's some membership -- some membership percentage that is usually set aside and distributed to people who are focused on the project. So I just don't remember who from our company is part of that one-, two-percent piece.

Q In 2005, when you started it, what percentage did you own of Hinsdale Road Group?

A I don't remember what it was. It's

been changed since then.

Q What is the relationship between Hinsdale Road Group and Cameron Group?

A Hinsdale Road Group is the leasing and manager for -- Cameron Group is leasing and manager for Hinsdale Road Group.

Q And what was the purpose of Hinsdale Road Group for the formation of it?

A To develop Township 5.

Q And whose idea was it to start Township 5?

A It was collectively. We bring a project in and we all look at it, and I don't remember who brought it in.

Q When -- as far as the ownership of the land where Township 5 is located, when did you acquire or when did -- who owns the land as of today? Let's start there.

A Now you're testing my knowledge. It's Onondaga County Industrial Development Agency land, so we -- we being Hinsdale Road Group, acquired it, and then I believe the deed is under Onondaga County, because then we lease it 'cause it's part of a PILOT agreement. So the underlying land, I think it's OCIDA. I don't know what entity from the IDA.

*GOETHE - SNYDER*

Q When did -- is it fair to say that Hinsdale Road Group has control over the premises of Township 5 at this point in time?

A I don't know what you mean by control.

MR. DAVOLI: I'll object to the form of the question. Go ahead, David.

Q If -- as far as the ownership of the buildings, who owns the buildings within Township 5? Let's start there.

A Well, essentially it's all owned by the bank. We have a mortgage and a construction loan with -- the lead bank is Berkshire.

Q And does Berkshire hold the mortgages for all of the properties on -- within Township 5?

A Within the shopping center proper, correct.

Q And is the mortgagee Hinsdale Road Group?

A Yes.

Q And when -- when did you -- or when did Hinsdale Road Group get funding from Berkshire Hathaway initially?

A It wasn't Berkshire Hathaway.

Q Who was it initially, then?

A Berkshire -- Berkshire Bank. Well, they

used to be Beacon -- they used to be Beacon Federal Credit Union and now they're Berkshire Bank. When did we originally get funding from them?

Q Correct.

A We had a development loan -- we had a development loan from them, I don't remember the date, but it was after we acquired the land, we took out our -- the bank that we used to acquire the land, and Beacon Federal Credit Union was part of the land loan that we had.

Q And when did you acquire the land?

A 2005. I believe we closed in 2005. We had it under contract then anyways.

Q Okay. So presently as -- aside from you and Mr. Valenti, are there any other members of Hinsdale Road Group that are also members of Cameron Group?

A No.

Q With -- you said you acquired in 2005, was there anything on the site at that time?

A The main parcel, no.

Q And when you say main parcel, there were other parcels that you had to acquire besides the main parcel?

A Correct.
Q And were there other structures on those parcels?
A Yes.
Q And did those get demolished eventually?
A Most of them.
Q And who was responsible for the -- for demolishing those structures?
A I don't remember who the contractor was.
Q Would Hinsdale Road Group have contracted with someone to have those structures removed?
A Yes.
Q Richard Bunnell, how long has he been employed with Cameron Group?
A Who?
Q Richard Bunnell. B-U-N-N-E-L-L.
A Okay. I thought you threw an "R" in there. I wasn't sure if you were talking about someone else. He was hired, I want to say, two years ago. I think it was 2018. I don't know. Time's going by quickly now. Well after this. He wasn't involved in this at all.
Q Okay. With respect to the Township 5 construction, when did the first building within

Township 5 start?

A 2012 or 2013, somewhere there.

Q So between 2012 and 2013 -- excuse me, 2005 and 2012, what was being done by Hinsdale Road Group during that time period?

A Fighting through multiple recessions to get the project going.

Q So in 2012, you were able to acquire the funding necessary to actually begin the construction or was -- did you need to have tenants, what was the main delay between 2005 and 2012?

A Well, I don't know if it was a delay from 2005 to 2012. I would call it more of a delay from 2007 to 2012, when the recession hit. We lost our tenants. We had to go reinvent ourselves, which we did, and we landed Costco.

Q And was Costco the first tenant that you were going to have within Township 5?

A Well, I just stated that we lost tenants. So the first tenants we were going to have, we lost. So the first tenant for the new project, Costco, yes, that we got and signed the deal and opened.

Q So there were other tenants who signed before Costco that backed out of the deal due to the

recession at that time; is that accurate?
A Correct. Yes.
Q And Costco -- who was the company that you used for the building of Costco?
A I did not use anybody.
Q Okay.
A I did not build them. We did not build them.
Q Okay. So can you explain the relationship between Costco and Hinsdale Road Group and the development of that, who was -- who was responsible for the actual construction of the Costco?
A They hired a general contractor.
Q And at any point in time did you -- were you involved with the construction of the Costco?
A The building itself? No.
Q Correct. Do you have a lease agreement with Costco presently?
A Yes.
Q And what -- what is the structure of that agreement?
A I don't understand what you're asking.
Q Well, for instance -- I'll ask this question. Is it fair to say that Movie Tavern does

not own the land that Movie Tavern is built on; is that -- is that a fair statement?

A Yes.

Q And they actually have a lease with Hinsdale Road Group for the land --

A Correct.

Q -- that they're on? Is that a similar relationship with Costco?

A Yes.

Q So --

A They have a lease.

Q Okay. How long is the lease term for Costco?

A From inception, 25 years, I believe.

Q And when you say inception, is that from the date Costco actually takes control of the premises --

A I don't --

Q -- or something else?

A I do not remember. I'm sorry, I didn't let you finish. I do not remember the details of the lease.

Q So is it Cameron Group that is responsible for finding the tenants on the Hinsdale Road

property?
A Yes.
Q And who within Cameron Group first approached Movie Tavern to have a Movie Tavern built?
A I don't remember who the individual was.
Q Within the property of Township 5, how many tenants do you currently have?
A I don't know the number.
Q Has Township 5 been fully developed?
A It is nearing completion.
Q When you say nearing completion, what -- what needs to be done for completion of the Township 5 project?
A Taking occupancy of the last building that's under construction currently on the site.
Q And what building is that?
A Building M1.
Q And what is the purpose of Building M1?
A To -- the purpose of it is to house tenants.
Q Is there -- do you have a tenant lined up for that building?
A Yes. There are multiple tenants lined up

for that building.

Q Do you know which tenants are going into that building?

A I do.

Q Who is it?

A We're one of them, Lead Fitness, and there's a few others that are lined up.

Q Now, going back to Movie Tavern, you indicated that you weren't sure who first approached Movie Tavern. What was your involvement with the selection of Movie Tavern as a tenant?

A My involvement? I worked very hard to get them into the site. I don't remember -- you asked me specifically who was the first person to approach Movie Tavern, and I do not remember. My involvement, I worked very hard to get them into the site.

Q And was there someone specifically at Movie Tavern that you worked with to get them into the site?

A Multiple people.

Q And are you familiar with Southern Theaters?

A Yes. They're the parent company of Movie

Tavern.

Q Were you working with someone at Southern Theaters when you were trying to get Movie Tavern into the site?

A I don't know who they were -- who they got their paycheck from. They were all kind of blended. So if they were Movie Tavern, Southern Theaters, I don't know who they specifically worked with or for.

Q Now, when you say they, what are the names of employees of either Movie Tavern or Southern Theaters that you worked with to secure their lease?

A We worked with the CFO. I don't remember his name. We worked with Jim Davis. Jim Davis? I don't know, this was -- Jim something, he was the COO, and we worked with their real estate rep, Cade Pitman. It wasn't Jim Davis. I can't remember his last name. He was the CEO or COO.

Q When did the negotiations for Movie Tavern take place?

A I don't recall when we started with them.

Q When were they -- when was the contract finalized between Hinsdale and Movie Tavern?

A I don't know. Like I said, I don't have the lease in front of me, and I don't remember all

of those dates.

MR. SNYDER: Keith, can you put up Exhibit B, the lease between Hinsdale and Movie Tavern. I believe page -- it's around 27 is the signature page.

For the record, we are showing Mr. -- the witness what's been marked for identification as Exhibit B, and we are now looking at the page after Page 26, it's an unnumbered page, it appears to be a signature page.

Q Can you identify who signed this -- this document?

A Yes.

Q And who was that?

A Myself and Jim Wood. Now I remember his last name.

Q And it's dated May 1, 2015. Is that the date that the contract was finalized?

A Yes.

Q Did you have counsel when you were drafting this agreement?

A Yes.

Q And who was your attorney at the time this

agreement was -- or who was the attorney for this agreement? Excuse me.

A I don't remember who the attorney was on this, but I'm sure it's back up a couple pages, under the notification.

Q I think it's Page 19.

MR. O'CONNOR: It might be 20.

MR. SNYDER: Yep.

A There you go.

Q Drawing your attention to Page 20, would Stephen Etoll have been the attorney representing Hinsdale Road Group?

A Yes.

Q Now, it does say Cameron Group in this agreement. It says c/o Cameron Group. Do you see that on Page 19?

A Yes.

MR. FRARY: Just note my objection to the form. That's the notification page, not the --

THE WITNESS: Yeah.

MR. FRARY: -- provision.

Q So is it fair to say that Cameron Group was aware of the provisions within the agreement

between Hinsdale Road Group and Movie Tavern?

A Yeah.

Q And did Cameron Group formally have to approve the agreement between Hinsdale Road Group and Movie Tavern?

A No.

Q And Movie Tavern was also represented by counsel, it appears to be a Keith Colvin; is -- is that correct?

A I don't know.

Q Did you personally meet with Jim Wood during the contract negotiations?

A Yes. When you -- you mean this lease right here?

Q Correct.

A Yes.

Q And the lease -- can you explain the terms of the lease agreement to your understanding?

A What terms? There's a lot of them.

Q Well, we -- we mentioned before that Movie Tavern was leasing the land. To your recollection, do you know how long the land was going to be leased to Movie Tavern?

A Movie Tavern's leasing the building and

*GOETHE - SNYDER*

the land.

Q When did the contract terms start to your understanding?

A It's spelled out in the lease. After we've acknowledged that it's May 1st, 2015 that was the execution date, so it's spelled out in the lease after that. I cannot bring from memory everything. If you'd like to walk through the lease, we can go to the top and I'd gladly spend our time going through that.

So if it's the effective date of 2015, then you go through the term and do the math and add on the dates and -- I do not recall when they got their permit, so the term commencement date would have been sometime after that.

Q The tenant in this case, drawing your attention to Article 3.10 --

A Yes.

MR. FRARY: Do you have -- do you want to go to that?

MR. SNYDER: Yeah, that would be great. Thank you.

MR. FRARY: 3.10.

Q So as far as the funding goes for the

actual construction of the project, can you explain who was providing the funding for the building -- of the building Movie Tavern?

A We were providing it through our construction loan.

Q And --

MR. FRARY: Hang on a second, who's the we, is that Hinsdale or Cameron?

MR. SNYDER: Thank you.

THE WITNESS: You're correct, it's Hinsdale Road Group. I apologize.

MR. FRARY: That's all right.

Q So you had the construction loan, and that was secured through -- was it Berkshire?

A Hinsdale Road Group had a construction loan secured through Berkshire Bank, which was -- they also had -- they have other banks with them. I don't recall who was with them.

Q What was the amount of the construction loan for the construction of the Movie Tavern?

A You know what? I have to correct myself. At some point we had Berkshire and someone else, and I don't remember the timing of when it switched, but -- I'm sorry, can you -- Berkshire was always

involved. So what was -- what was your question?

Q Just -- I guess redirect that statement. So there was another bank involved in the loan for the construction?

A Yes. Prior to our current group of banks, there was another bank involved, and I cannot recall when that transition occurred, whether it was before or after Movie Tavern started.

Q So is it fair to say since the inception of the Township 5 construction, Berkshire Bank has always been involved with the funding of the construction of that project?

A Yeah. Yes.

Q And -- but there have been other banks involved with -- that have come and gone since that time?

A Yes. And there still are other banks involved right now.

Q Do you know how much the construction loan was for the construction of the Movie Tavern?

A It was part of the overall loan, and I don't remember what our total number was now, and I don't recall what the number was for Movie Tavern, but I'm sure we can get it here.

*GOETHE - SNYDER*

Q And the tenant pursuant to 3.1, I was trying to understand the difference here, it mentions a line of credit. What was the purpose of the line of credit for the tenant?

MR. FRARY: Are we still on 3.10?

MR. SNYDER: Correct.

Q If you need to go to a different line, please just let Mr. Frary know.

A So can you ask your question again now that I've read it?

Q Sure. What was the purpose of the line of credit for the tenant within the -- the agreement?

A I'm not sure what you mean. This -- this agreement is asking us -- is asking tenant to confirm that they have in place a revolving line of credit. What is the purpose of the language within the lease or what is the purpose of the line of credit?

Q What is the purpose of the line of credit?

A Our expectation during the negotiation was they have the funds to finish the buildout of the building to operate a dine-in Movie Tavern beyond the dollars we were providing to build the structure. We insisted that they provide a letter

from their letter confirming that they have the funds to do so.

Q And so if my understanding is clear, I think I understand that the actual building itself was being constructed by Hinsdale Road Group and -- okay, you're shaking your head. Can you let -- what is -- who was actually constructing the building -- or responsible for the construction of the building?

A This deal is what you call a reverse build-to-suit, where we provide the land and the building pad, they -- they being tenant do the construction of the building. We provide the funding to build the shell of the building. When they are complete and get their CO, the building reverts to our ownership.

Q So you mentioned the shell of the building. The shell was part of the -- the responsibilities that Hinsdale had to Movie Tavern was to complete the shell?

A Incorrect. Let me see if I can say it more clearly. We gave them the money to build the shell. They built the shell.

Q The funding for the shell, did you have any requirements for how that shell was to be

constructed?

A No.

Q So you did not have any requirements within any of the documents that Hinsdale had with Movie Tavern to -- as to the nature and size of the building?

A Yes.

Q So they -- you did have some requirements that were -- that Hinsdale Road Group had upon Movie Tavern as to the size of the building; is that -- is that accurate?

A As spelled out in the lease, correct.

Q Okay.

MR. DAVOLI: David, rather than continually objecting to form, if you could please try to -- rather than use the term you, just try to be precise, 'cause he -- again, you know, the two entities.

MR. SNYDER: Yes. Thank you. I will --

MR. DAVOLI: I don't want to be disruptive, I just want to try to --

MR. SNYDER: No, no. Thank you.

Q So Hinsdale Road Group, is it fair to say,

had requirements for the size of the building that was going to be placed or the -- within the lease; is that accurate?

A Yeah. Yes.

Q And the purpose of that being an 11-screen theater within the Township 5 and specifically the Movie Tavern project; is that accurate?

A Yes.

Q And they were supposed to have a bar as well inside of the Movie Tavern?

A Yes.

Q And so Movie Tavern as part of their promises to you also had to assure that they were actually going to be able to do the buildout within the building to actually complete the 11-theater Movie Tavern and restaurant/bar area?

A Yes.

Q How -- all right. So when was construction completed on the Movie Tavern shell to your understanding?

A I do not recall. I don't remember.

Q Do you know when Movie Tavern opened?

A No, I don't. I mean, I can't remember if it was -- I don't remember. I'd have to look at --

we have a track -- we have a sheet that shows what it is.

Q Now, would you agree that -- strike that. There were other businesses operating during the construction of Movie Tavern; is that accurate?

A Yes.

Q And there was a common parking lot that was between where the Movie Tavern was being built and different structures within Township 5; is -- is that accurate?

A No. There was a drive aisle on either side -- frankly, surrounding all of the Movie Tavern site and their laydown area. It's their staging area where they stage their equipment and materials. So there was actually roads -- drive aisles surrounding all of those. They did not have immediate adjacent parking.

Q The other tenants within Township 5, were they all tenants of Hinsdale Road Group?

A Yes.

Q And you also have lease agreements with those other tenants?

A Yes.

Q When I say you -- excuse me, all these

questions are in reference to Hinsdale Road Group. And Hinsdale Road Group's various leases, is it fair to say that those various lessees would have customers who would be going to those businesses during the construction of the Movie Tavern?

A Yes.

Q And that parking lot --

MS. KNAPP: Actually, Mr. Frary, can you pull up -- I think it was Exhibit C or D from the -- do you have those other exhibits available from the plaintiff's deposition? Look at that. Okay. Actually, I think it was -- that's probably the best one. Four is probably a good example. Thank you.

MR. FRARY: This one or the next one?

MR. SNYDER: I think the next one. Okay. I'm showing the witness what was marked during the plaintiff's deposition as Exhibit 4.

Q I'm going to represent this to you as a photograph from the construction site. Does this picture fairly and accurately represent where the Movie Tavern would have been constructed?

A No.

Q What -- what do you see in Exhibit 4?

A I see a piece of equipment, a man, and I see there -- standing in the laydown area I was describing, that's not where Movie Tavern was built. Movie Tavern is not across the parking lot from Buffalo Wild Wings.

Q So this is what you called the laydown area?

A Yes. It's where they stored materials.

Q And the -- there is a parking lot in the picture there where you can see the Buffalo Wild Wings that you just mentioned. Who -- was there any direction as to who had use of that parking lot?

A I don't -- is there any direction? I'm not sure what you're asking.

Q Sure. Who was using the parking lot that we see in the picture of Exhibit 4 in front of the Buffalo Wild Wings, who had access to that?

A Everybody had access, but when we have a contract with a tenant, we typically limit where their construction workers -- and they typically violate it, but -- where they can sit. So everyone had access to that. It's a common lot. There's no

specific, except for where labeled by signs in our parking lot, restrictions on parking.

Q So as we are looking at this picture of a number of cars to the right of the equipment below the Exhibit 4 sign, it's possible that those cars belonged to patrons of Buffalo Wild Wings?

A I have no idea who they belonged to.

Q Okay.

A And I don't know why someone would park all the way -- it's a deceiving photo. That's four rows away, and you can see multiple empty spaces. So I'm not sure why -- I mean, when you pull in -- unless it's all those people wanted to get their steps in, they were counting. It's a long way from the front door of Buffalo Wild Wings if you go to the site and look.

Q This area -- now, the staging area that you mentioned, what is there now?

A Upstate Medical.

Q And when was Upstate Medical constructed?

A We just opened them last summer. I'm -- I'm -- I'm sorry, I'm foggy with the COVID time period we have. I think it was last fall we opened them. They're just going on a-year-old now.

Q How much was the Upstate Medical construction cost?

A I'm not sure. I don't even know why that was relevant.

Q Would the Upstate Medical job or construction cost have been less than the Movie Tavern cost?

A I don't know. I'd have to look at the numbers. They're two completely different concepts.

Q The parking area that you see there now in that Exhibit 4 picture, has additional parking been extended within Township 5 to service the Movie Tavern and Upstate Medical as it's laid out now?

A The parking has not been reconfigured, if that's what you're asking.

Q Okay. Within Township 5, you -- Hinsdale -- I keep saying you, Hinsdale has a -- has a number of these tenants, and is it fair to say that you -- or Hinsdale Road Group would not be allowed to interfere with those businesses with the construction of any other buildings within Township 5?

MR. GERBER: I'm going to object to the form.

MR. DAVOLI: Object to the form, but Joe, you can go ahead and answer if you understand the question.
A I was going to -- it depends on what the nature of the construction is.
Q When Movie Tavern was being constructed, is it fair to say that Movie Tavern -- the construction of that was not to interfere with the operation of the businesses that we see in the picture there, that being -- it looks like Buffalo Wild Wings, a GNC, and another business I can't identify --
A Again, that's a -- yes, I'm sorry, go ahead and finish.
Q -- is that an accurate statement?
A It is our intention to never interfere with other people's businesses, but you have an exhibit up here that is a very deceptive exhibit. It is a long way between -- you know, I don't know what you're trying to get at, but that construction site is nearly a hundred yards from the Buffalo Wild Wings space. There's no interference between the two.
Q In this picture -- were you ever present

on the site during the construction of the Movie Tavern personally?

A Yes.

Q When were you present during the construction of the Movie Tavern?

A You want me to list every time I was there?

Q Well, was it -- was it frequently that you were at the site of the Movie Tavern construction site?

A No. No. I was on -- I probably went once a week. That was it.

Q And when you were going there once a week, were you having meetings at the site?

A No.

Q What was the purpose of you going to the site?

A Determining how far along they were.

Q Now, going back to the document, the lease, is it accurate to say that Movie Tavern selected the architect for the Movie Tavern?

A Yes.

Q And did you have any control over which architect they were selecting?

A No.

Q Did you have any meetings with the architect, you being -- actually you personally?

A No, I don't recall ever meeting with the architect. I don't even remember who it was.

Q The selection of the contractor, what was your involvement, if any, with the selection of EDC?

A None.

Q Did you ever have any meetings with any employees of or agents of EDC?

A Yes.

Q When would you have met with employees or agents of EDC?

A Primarily prior to turnover, when we turned over the pad for them to do construction.

Q And when you say turnover of the pad, what -- who constructed the pad?

A Well, I mean, it's -- a pad is just -- it's just a site with runner crush on it, so there's -- we graded and put the stone down, and then once it was to the spec -- specification, we turned over the pad to them. We did that with our site contractor.

Q Who was your site contractor?

*GOETHE - SNYDER*

A Lan-Co.
Q I'm sorry, I couldn't hear you.
A Lan-Co.
Q Lan-Co.
MR. DAVOLI: Joe, I'm going to do the same thing I did to David. When you say we, can you just clarify for David who we is?
THE WITNESS: I'm sorry.
A Hinsdale Road -- Hinsdale Road Group contracted with Lan-Co, and then Hinsdale Road Group turned over the pad.
Q And Lan-Co, who is -- who is your contact at Lan-Co?
A Paul Joynt.
Q Would Paul Joynt have been involved with the construction of the pad for the Movie Tavern?
A I doubt it. He's the owner.
Q Okay. Would the -- I've noticed there's a site plan that does not appear very well in the documents. Your Hinsdale Road Group, is it fair to say that they determined which areas of use that the Movie Tavern was going to be allowed to access to construct the building?

MR. DAVOLI: Object to the form, but go ahead and answer if you can.

A We determined, yes, their access and where they were allowed to use, yes. The space they were allowed to use, yes.

Q In the lease agreement, it mentions barricade installation. I believe it's Article 3.2(d). Are you aware of whether or not there were any barricades placed during the construction of the Movie Tavern?

A I don't remember if there was or not. It was only a requirement -- if it was a requirement of the town. I don't even remember if it was a requirement of the town.

Q When you say the town, was there anyone at the Town of Camillus that you personally would have been in contact with concerning the construction of the Movie Tavern?

A No. You mean during the construction? No.

Q Prior to the construction, would you -- or Hinsdale Road Group have worked with anyone in the Town of Camillus concerning the site plan?

A Yes.

*GOETHE - SNYDER*

Q Who was it in the Town of Camillus that you were working with?

A The planning board.

Q Was there an inspector specifically assigned from the Town of Camillus to the Movie Tavern project?

A I -- I mean, there's a town inspector, a codes enforcer who comes by, you know. When you say were they specifically assigned, I don't know what their -- how they do their assignments.

Q Did you have any contact with the site inspector?

A Again, I don't know of a site inspector. Are you specifically asking about the codes enforcement person -- officer at the Town of Camillus?

Q We can -- yeah, let me -- I'll rephrase the question. Within the Town of Camillus, did you have any contact with the codes enforcement officer during the construction of the Movie Tavern?

A I don't remember if I talked to him specifically during that time period.

Q With -- let me draw your attention to -- with respect to the lease with Movie Tavern, going

to -- you can correct me if I'm wrong, but it's my understanding that there was a minimum amount of rent that would have been owed to Hinsdale Road Group; is that an accurate statement?

A Yes.

Q And what was the minimum amount of rent that would have been owed to Hinsdale Road Group annually?

A I don't remember.

MR. FRARY: Object to form.

Q Do you know what the minimum amount of rent due to Hinsdale Road Group would have been?

A No. I don't remember the number.

Q The Hinsdale Road Group, after the minimum amount of rent was paid, would have received additional monies from Southern -- or excuse me, the Movie Tavern?

A Again, I don't understand what you're asking. Would have been paid?

Q So --

A Go ahead. I don't understand what your -- how you're -- what you're asking.

Q Hinsdale Road Group had a minimum amount of rent owed to it by Movie Tavern; is that

accurate?

A Throughout the term of the lease.

Q Okay.

A So when you say we had and would have been paid, it's a continuously operating contract. They owe us minimum rent every year broken down to monthly payments.

Q And pursuant to that contract, besides the minimum rent that was due, their -- Hinsdale Road Group would have also received gross receipts -- a percentage of their gross receipts for ticket sales and -- or total sales; is that accurate?

A Yeah, if -- I think we have a percentage rent clause in here. If we do, then yes, if they hit a number.

Q And are you aware of what the number is within the contract?

A The break point?

Q Correct.

A The percentage rent sales break point? No, I don't know what it is.

Q After the Movie Tavern is opened, so since 2016 to date, has the Movie Tavern reached the break point during any of those years in operation?

A I know they did one year.
Q And which year was that?
A I don't remember.
Q Obviously they're not reaching their breaking point right now; is that -- is that accurate?
A No. Thank you, Governor Cuomo.
Q And is the -- or is Movie Tavern still paying rent to you at this point in time -- or excuse me, Hinsdale Road Group?
A Currently? I'm not sure where we stand with them currently. We've been working with tenants, and I don't know where we stand with this one specifically.
Q I'm going to have to ask you to speak up. I can barely hear you.
A I'm not sure where we stand -- where Hinsdale Road Group stands currently with the receipt of payments from Movie Tavern. We've been working with tenants, and I just don't know where this one stands right now.

MR. DAVOLI: David, do you have a lot more in this area?

MR. SNYDER: I have a few more

minutes. We can take a break.

MR. DAVOLI: Well, I guess my -- my issue is not the time. You can have as much time as you want. I just -- it feels like we're getting very far astray from what the issues are in the case. I'm not -- I don't -- maybe you see something I don't.

I'm not really sure what all this financial stuff has to do with this accident. If -- you know, I'm not telling you that you can't ask the questions, 'cause I don't -- you know, it's -- we have deposition rules, but I think we're getting into areas that are pretty irrelevant as I see them, but if you're -- you know, if you're buttoning this up, then -- then finish it up, go ahead, but if you got a lot more in this area, I guess I just would want to know that.

MR. SNYDER: Okay. No, I do not have a lot more in this area.

MR. DAVOLI: Okay. I mean, I'll just -- go ahead.

MR. SNYDER: Steve, if we could take a few-minute break at this point in time, I have to use the facilities.

MR. FRARY: Can we do that?

MR. DAVOLI: Ten minutes, if that works for everybody.

MR. O'CONNOR: We'll be back at 11:30. I have 11:18, but why not 11:30?

MR. SNYDER: 11:30. Very good. Thank you.

(Whereupon, a short recess was taken.)

BY MR. SNYDER: (Cont.)

Q Okay. Mr. Goethe, so Lan-Co built the pad. Do they -- did they build all the pads within Township 5 or did you have other contractors who did those as well?

A They did -- they did most of them. I don't think -- I'm not sure they did all of them. I mean, there's a different structure on all the deals.

Q The barricade, going back to that, would that have been an agent of Hinsdale Road Group that would have been in contact with the Town of Camillus

as to whether or not a barricade was required on the Movie Tavern project site?

A No. It would have been the party that submitted for building permit.

Q Was Hinsdale Road Group involved with the submission of the building project for -- to the Town of Camillus for the Movie Tavern?

A I think you misspoke. You said was Hinsdale Road Group involved with the building project for --

Q Excuse me. Yeah, well, the submission of the -- or the approval of the building project with the Town of Camillus for the -- the site plan?

A As I stated before, we were part of the approval process through the planning board.

Q After the planning board, did agents of Hinsdale Road Group have additional contact with the Town of Camillus?

MR. DAVOLI: Object to the form, but go ahead and answer if you can, Joe.

A The agents from Hinsdale Road Group are constantly in touch with the Town of Camillus.

Q And when you say constantly in touch, this is with respect to the construction of the Movie

Tavern or do you mean continuously as in ongoing to this day?

A It was not in -- I did not mean in -- you didn't ask specifically for -- in relationship to the construction Movie Tavern. As it related to Movie Tavern, we went to the planning board, received the right to build using the drawings generated by the architect, the architect that Movie Tavern retained. Once that was done, Movie Tavern then submitted the drawings to the town for building permit. I'm assuming they did that with -- through EDC. It's the general contractor that typically will go and submit that. I do not recall who specifically because I did not do the building permit for them. They were responsible for that.

MR. O'CONNOR: Objection.

Q You mentioned EDC --

MR. SNYDER: I'm going to have Mr. Frary put up the AIA Document A101. Okay. Mr. Frary, just -- can you scroll down to the last page of the -- I just want to see like what -- what we're looking at here as opposed to what I'm looking at at my desk, and if there's a

*GOETHE - SNYDER*

way to --

MR. FRARY: These have the two -- there's an agreement and a standard, I think, forms and conditions as well. These are combined. There's a signature line for this one and then you have the second one is this one, the General Conditions of the Contract for Construction. So which -- which one do you want?

MR. SNYDER: Let's look at the first one. I just want to see I guess if what I'm looking at is the same as we're all looking at now, I mean, on my desk. So we'll start with the first one.

MR. FRARY: Okay. Where do you want to go?

MR. SNYDER: Let's go to the very first page. Okay. What's been shown here was marked for identification as Plaintiffs' Exhibit A, I believe. It is a -- according on the screen, it's a 62-page document. I'm not sure how many pages I have in front of me, but it states

AIA Document A101 - 2007.

Q Do you see that document?

A Yes.

Q And do you recognize that document?

A Yeah. It's a standard AIA contract.

Q And this -- this document that we're looking at, the AIA contract, who is the doc -- who is this agreement between?

A Movie Tavern Theaters, LLC, and Hinsdale Road Group, LLC.

Q And within the AIA document, this is to have EDC serve as the contractor for the construction of the Movie Tavern; is that an accurate statement?

MR. O'CONNOR: Objection.

MR. DAVOLI: Joe, you can answer if you -- if you can.

THE WITNESS: I did -- oh, I'm sorry. I said yes.

MR. DAVOLI: Oh, okay.

MR. SNYDER: Sometimes it cuts out between when people are talking, so -- yeah, just have to -- yeah, if there's a long silence, sometimes it's because we're

waiting because we couldn't understand or hear you.

Q So Movie Tavern as the lessee and Hinsdale Road Group as the land owner, and collectively they are referred to within the document as owner; is that -- is that an accurate statement?

A Yeah. Yes.

Q And EDC, pursuant to your contract, your contract being Hinsdale Road Group's contract with Movie Tavern, was to be selected by Movie Tavern?

A Yes.

Q Did you -- or excuse me, did Hinsdale Road Group participate in the bidding process for the selection of EDC?

A No.

Q Are you aware who at Movie Tavern, if any, was involved with the selection of EDC as the contractor?

A I do not know.

Q Prior to the execution of the AIA document, did anyone from Hinsdale Road Group have discussions with EDC?

A I -- I -- I don't know. I don't recall.

Q Prior to the execution of the document,

*GOETHE - SNYDER*

did you have conversations with any employees or agents of EDC?

A Again, I don't recall.

Q Okay. The --

MR. SNYDER: Actually, Mr. Frary, can you scroll down to the Movie Tavern proposal?

MR. FRARY: Sure.

MR. SNYDER: I think it's about 14 or 15 pages in.

MR. FRARY: That's what you're looking for?

MR. SNYDER: Correct.

Q Was -- showing you a page from Exhibit A captioned Movie Tavern proposal, do you see that?

A Yes.

Q Would you have been involved -- or excuse me, would have Hinsdale Road Group been involved with the creation of the Movie Tavern proposal?

A I'm not quite sure what this is.

MR. SNYDER: Mr. Frary, can you scroll down so that he can --

MR. FRARY: Sure. If you stop calling me Mr. Frary, if you call me

Keith.

MR. SNYDER: Oh, I'll call you Keith. Thank you.

MR. FRARY: Thank you. If you need it further down, just let me know.

A I'm sure we reviewed this.

Q Why would Hinsdale Road Group have reviewed that?

A Well, it has some obligations for us, as we've referenced during this whole discussion, about what we were providing.

Q And would that document have been created by the architect or someone else, if you know?

A I have no idea who created this.

MR. SNYDER: Keith, can you scroll up to Article 10?

MR. FRARY: Sure.

Q Okay. So the -- I'm drawing your attention to the signature page of this, which is approximately Page 8 of the document under Article 10. Is that your signature on that page?

A Yes.

Q And you executed this agreement on behalf of Hinsdale Road Group?

A Yes.
Q And it says -- again, the document itself says c/o Cameron Group. What is your understanding as far as the relationship between Cameron Group and the Hinsdale Road Group when it comes to this contract?
A As it relates to this document?
Q Correct.
A There's none.
Q You do agree that Cameron Group is listed as care of, or c/o, in the document?
A Yeah.
Q Do you remember seeing that on the first page?
A Yeah.
Q Why is Cameron Group being copied on the document or being sent the document then?
A We're kind of just like a holding tank for the facility for all -- all of our LLCs and documents, but as it relates to the construction and the relationship between Hinsdale Road Group, it was -- there's really no connection to this -- this document.
Q The document that we are looking at here,

the AIA document, is this for the construction of the shell of the building; is that -- is that accurate?

A I'm sorry. I'm not sure how -- how deep this document went. I'm not sure if they had a separate contractor for the fixturing. I'm not sure where the cutoff was in terms of the construction of their building.

Q Pursuant to Article 4, the contractor is receiving $8.26 million for the construction of -- of the building -- or the project in relationship to the AIA document that we're looking at here; is that accurate?

MR. O'CONNOR: Objection.

A Yes.

Q And the progress payments that were made pursuant to the contract, who would the progress payments have come from for the work as it was being performed?

A We provided the -- we being Hinsdale Road Group provided the progress payments.

Q And that would have been in conjunction with Berkshire?

A Again, I think that's -- yes, we were with

Berkshire.

Q And would you agree that pursuant to this agreement that Hinsdale Road Group had the ability to terminate the agreement with EDC?

A I'm not sure.

Q I'm going to draw your attention to Article 7. Do you see the provision titled termination or suspension?

A Yes.

Q Do you want to take a moment to read that?

A It says we can terminate.

Q Okay. And as part of the agreement, this is -- now, this is a general question for --

A Yeah, I'm sorry, I'm sorry, can I -- you asked me specifically can we terminate.

Q Sure.

A This says we can terminate as provided in Article 14, you know, and I'm not sure what's in Article 14, but we can -- we can terminate based on that document and what's in Article 14.

Q Generally as a -- when Hinsdale Road Group is performing construction projects, who actually specifically -- excuse me, I'll rephrase the question, Mr. Goethe. Who was responsible for

securing insurance for the project?

MR. O'CONNOR: Objection.

A I'm sorry, when Hinsdale Road Group was responsible --

Q Was building the Movie Tavern, who was responsible for securing insurance for the project?

A Hinsdale Road Group did not build the Movie Tavern.

THE WITNESS: I'm sorry, my stepfather's in the hospital, and my mother's calling me right now, can I take a two-minute break?

MR. SNYDER: Yeah, absolutely.

MR. O'CONNOR: Take as much time as you need.

(Whereupon, a short recess was taken.)

MR. SNYDER: All right. Can you read the last question? I'm sorry, I lost my train of thought where we were.

(Whereupon, the requested portion of testimony was read back by the court reporter.)

BY MR. SNYDER: (Cont.)

Q As part of the agreement between Hinsdale Road Group, Movie Tavern, and EDC, is it fair to say that EDC was required to secure insurance for the project?

A Yes, I think that's what it said down on the contract.

MR. O'CONNOR: Objection.

MR. GERBER: Form.

Q The -- did Hinsdale Road Group maintain its own insurance for the Township 5 project generally?

A Yes.

Q And who was that through?

A I don't know.

Q Does Township -- is Township 5 -- excuse me, rephrase that. Does Hinsdale Road Group still maintain insurance for the property of Township 5?

A Yes.

Q Do -- does Hinsdale Road Group operate any other -- this is probably something I did not ask earlier. Does Hinsdale Road Group operate any other projects or own any other property besides the Township 5 property?

A We do not operate any other projects. No,

I don't think -- no, we don't own any other property.

Q So when we're talking about Hinsdale Road Group, that is specifically in relationship to the area known as Township 5 and all of the buildings and -- that are associated with that?

A Correct.

Q And just so that it's clear that -- Township 5 is a mixed-use development; is that an accurate statement?

A Yes.

Q 'Cause there's a number of buildings that are on that property, including the Costco and the Movie Tavern as well as some medical buildings and other commercial properties; is that -- is that accurate?

A Yes.

Q Okay. Going back to the signature page there --

MR. FRARY: Okay. Of the --

MR. SNYDER: Of the first document. I think it was Page 8 or 9.

Q The lessee, it says Jerry Passmore. Are you familiar with Mr. Passmore?

A Yes.
Q And who is Mr. Passmore?
A The director of construction.
Q And who was Jerry Passmore working for, if you're aware?
A I don't know if it was Movie Tavern or Southern Theaters or if he was a consultant. I don't know specifically, but he was -- would have been retained by them.
Q Did you meet with Mr. Passmore in person?
A A couple of times.
Q And Christopher M. Johnson, do you see his signature there?
A Yes.
Q And he is a representative of EDC; is that -- is that accurate?
A As far as -- I mean, as far as this document that I'm looking at states.
Q Did you have meetings with Mr. Johnson prior to the signature of this -- of this document?
A No.
Q What would you have met with Mr. Passmore about prior to the signing of this document?
A I don't recall if I met with him prior to

or after the signing of this document, but -- actually, we did, we met during my visit down there. I was introduced just so we would know each other going forward prior to.

Q Was there an employee of Hinsdale Road Group assigned to oversee the Movie Tavern project?

A I don't recall. It was a time when we did have Doug Moses on, but I can't remember what -- he had -- he had left, he trans -- he moved up to Vermont for another -- and I can't remember when he did that, so it was before or during this construction.

Q And Doug Moses was an employee of Hinsdale Road Group?

A I'm not sure where -- if -- yeah, I think he was an employee of Hinsdale Road Group.

Q What was his position when he was with the company?

A Construction manager.

Q If you recall, was Mr. Moses involved in the construction of any other projects that Hinsdale Road Group was involved with?

A Yes. I just don't -- again, I don't remember the time period of when he was there.

Q Do you recall approximately when Mr. Moses left Hinsdale Road Group?
A No, I -- no, that's why I'm saying it's -- I have a vague recollection of it was around the start maybe of this one.
Q Was Mr. Moses employed with Cameron in any capacity?
A I do not believe so. I'm pretty sure it was just Hinsdale Road Group.
Q Approximately how long did Mr. Moses work for Hinsdale Road Group?
A I don't remember.
Q Was it months or years or something else?
A Somewhere between 12 and 24 months.
Q To your understanding, how long was the Movie Tavern project supposed to take to complete from -- I guess from the time you turned over the pad to the time that Movie Tavern opened?
A It would just be a guess. I mean, it's in the lease and what their obligation was to finish construction.
Q Now, you mentioned in the lease, Hinsdale Road Group in that lease, is it accurate to say that they had -- they agreed to the construction

timetables with Movie Tavern?

A Correct.

Q And you mentioned earlier about you going to the site approximately weekly to see the progress going. Are you aware of whether or not any other Hinsdale Road Group employees went to the site at any time during the construction?

A No, I'm not aware.

Q Would you have expected the project manager -- or construction manager to go to the site during the construction of the Movie Tavern?

A I'm sorry, can you state that again?

Q Would you have expected Hinsdale Road Group's construction manager to go to the site during the construction of the Movie Tavern?

A Once Doug left, I was that person. We didn't hire a construction manager to replace Doug for a number of years.

Q Is that construction manager now Mr. Bunnell, is it?

A He's head of operations and that falls under his purview.

Q So does that refresh your recollection as to when Mr. Moses was there, your statement that you

*GOETHE - SNYDER*

would have taken over going to the site, ensuring the timetables are being -- or were being followed?

A I would have been to the site regardless, but I'm -- again, I don't -- I mean, I can ask. I can find out. I don't recall the specific time period that Doug left. I believe it was before Movie Tavern.

Q When you were on site with -- or during those time periods, would you have met with any employees of EDC?

A Maybe in passing. I mean, having a meeting, not really.

Q Who was your primary contact at EDC during the construction of the Movie Tavern?

A I don't remember who the CM was at that time. Again, I didn't have a ton of interaction with them, but I don't -- I don't recall what his name was. He was the CM or the construction manager or project manager. They all name them differently.

Q Okay. Drawing your attention to the AIA Document A201 --

MR. FRARY: Where you want to go?

MR. SNYDER: I think it's the second document within here.

MR. FRARY: Oh, got you.

MR. SNYDER: Just so the record's clear, we marked this as one document, but it sounds like there's two separate documents.

MR. FRARY: They're two separate, correct. Let me just find it.

MR. SNYDER: Annette, for the -- for the record, can we actually -- let's -- so it's clear for the record, let's mark AIA Document A201 Exhibit C. Can you -- can you do that for me afterwards?

THE COURT REPORTER: Yes.

MR. GERBER: Which -- could I just have that again, what are we marking as C?

MR. SNYDER: The AIA Document A201, the second part of that 62-page document.

MR. GERBER: Okay. Sure. All right. Thank you for clarifying.

Q Okay. Drawing your attention to AIA Document A201, General Conditions of the Contract for Construction. Do you recognize this document?

A Yes.

Q And what is this document?

*GOETHE - SNYDER*

A It's an AIA contract document for the construction of Movie Tavern.

Q And Hinsdale Road Group again is listed as the land owner within the document?

A Yes.

Q And once the document is -- is -- once you're past the first page of the document, Hinsdale Road Group and Movie Tavern Theaters, LLC, as the lessee, together listed as the owner within the document; is that accurate?

A I don't know.

Q Drawing your attention to the page right here that says the lessee and the land owner together here and referred to as owner, do you see that line there?

A Oh, yes, yes, I do see that.

Q Okay.

MR. SNYDER: And let's go to the signature page for this.

MR. FRARY: I don't think mine has the signature page. For some reason mine doesn't have the signature page on this. Hang on a sec. Can we just take a second here?

*GOETHE - SNYDER*

MR. SNYDER: Sure.

(Whereupon, a short recess was taken.)

BY MR. SNYDER: (Cont.)

Q Mr. Goethe, are you aware of whether or not there would have been a signature page to document A201?

A I have no idea.

Q Okay. This was produced by the parties as I guess contracts relating to the construction of the Movie Tavern. Do you agree that this document represents the general conditions between the owners being Hinsdale Road Group and Movie Tavern, LLC, and the architect?

A That's what this page states that you're showing me.

MR. DAVOLI: Object to the form of that question.

MR. O'CONNOR: I'll join in that objection.

Q Did you have contact with JKR Partners, LLC?

A No.

Q Did any employees of Hinsdale Road Group

*GOETHE - SNYDER*

have any contact with JKR Partners, LLC?

A No.

Q Drawing your attention to Section 2.3, pursuant to this document, do you agree that pursuant to Section 2.3 that Hinsdale Road Group had the right to stop the work?

MR. DAVOLI: Object to the form of the question.

A That's what this paragraph says in this document.

Q And the next paragraph also says that Hinsdale Road Group could have exercised its right to carry out the work beyond the contractor if the work was stopped pursuant to Section 2.3?

A Correct, that's what that section states.

Q And pursuant to the contract, are you -- there was supposed to be a supervisor assigned to the Movie Tavern project. Are you aware of that provision?

A No.

Q Do you know if there was a project supervisor assigned to the Movie Tavern project?

A Supervisor by whom? Assigned by whom?

Q Assigned by Hinsdale Road Group.

A I'm sorry, backing up, you stated that pursuant to the contract, Hinsdale Road Group would have a supervisor assigned to the project.

Q Pursuant to the contract, it's my understanding that Hinsdale Road Group had the authority to appoint a supervisor for the Movie Tavern project. Are you --

A I don't know where that's stated in this contract. We had -- but your question of if we had the authority, I'm not sure, number one. Number two, did we assign a supervisor to look -- to supervise the construction of the Movie Tavern building? No.

Q Drawing your attention to 3.4.3, do you see that section?

A Yes.

Q What is your understanding of that section?

MR. O'CONNOR: Objection.

A I mean, it's pretty straightforward. The contractor's not going to permit unfit persons to work on site, basically. I don't know what unfit means.

Q Pursuant to the contract, do you agree

that Hinsdale Road Group had the ability to end the contract, to terminate the contract, if that provision was not being followed?

A You're asking about this specific unsigned document?

Q Yes.

A This document spells that out, but I don't know how enforceable that is.

MR. SNYDER: I guess I'm going to -- I'll make a request on the record for the signed -- if there is a signed document of AIA A201 - 2007 General Conditions for the -- of the Contract for Construction.

MR. DAVOLI: Just so everyone is aware of the way they work, general conditions are not ever signed. They are incorporated by reference from the original AIA Document, so they're just --

MR. FRARY: If you look in Article 1 here, the contract documents consist of this agreement, which is the agreement that is signed, the conditions of the contract as amended and attached, and drawings and specifications. The

*GOETHE - SNYDER*

conditions of the contract are incorporated and the contract documents consist of all of those things.

MR. DAVOLI: So the signature on the original AIA contract is operative for all of the documents listed in the contract documents.

MR. FRARY: They're incorporated by reference as part of -- as a group as a -- the contract.

MR. DAVOLI: Exactly.

THE WITNESS: Thank you.

Q So I guess the question then is, is did you -- does this document that you're looking at here, the second document we're referencing marked as Exhibit C for identification --

MR. FRARY: Conditions.

Q -- the conditions, is this an accurate copy of the conditions for the contract between Movie Tavern, LLC, Hinsdale Road Group, LLC, and the contractor EDC?

A I assume so, yeah.

Q As well as the conditions with the architect; is that accurate as well?

*GOETHE - SNYDER*

A I'm not sure what you mean by the conditions with the -- do you mean as the architect as listed --

Q As listed, yeah, in the second document we were referencing --

A Yes.

Q -- correct?

A Yes.

Q On site, who from EDC did you ever meet with during the construction of the Movie Tavern?

A As I stated, it was either the construction manager or project manager, and I do not recall his name.

Q Okay. Drawing your attention to 3.15 of this general conditions document, it's listed as Page 17 on here. Do you see the section entitled cleaning up?

A Yes.

Q Can you please read that to yourself?

A Okay.

Q Do you agree that as part of the contract that the contractor, being EDC, was to keep the area free of waste materials or rubbish?

A Yes.

Q And would you -- I guess would it make sense to you that the -- if the waste materials and rubbish were not removed from the site or if it was unsatisfactory, that the owner, being Hinsdale Road Group and/or Movie Tavern, had the right to have the architect assign a portion of the bill for the removal of those waste products?

A I'm -- I'm not sure what you're asking. The architect --

MR. DAVOLI: Object to the form. I don't understand the question either.

Q Sure. I'll -- drawing your attention to 6.3, do you see that section entitled owner's right to clean up?

A Yes.

Q Can you take a moment to read that section?

A Okay.

Q Do you agree that Hinsdale Road Group had the right to clean up the site and have the architect assign costs to the -- any contractors who left the site I guess with materials or rubbish after the project was completed; is that an accurate statement?

MR. DAVOLI: Object to the form. Go ahead and answer if you can.

A Yeah, I'm not sure what you mean by assign it to any contractors. This agreement is between the contractor and the owners, the owners being Movie Tavern and Hinsdale Road Group. What this states basically is if we see the site needs cleaning up, we can clean it up, and then the architect will allocate a cost to those responsible, which I would imagine is the contractor.

MR. O'CONNOR: Objection.

Q Drawing your attention to Article 6.1, would you agree that Hinsdale Road Group, pursuant to Article 6.1, had the right to perform construction -- or operations related to the project?

MR. DAVOLI: Object to the form. David, just -- just so you understand my objection to all these questions, you're asking him what Hinsdale Road Group's rights were, and I think that in order to, you know, know those rights, this has to be read in conjunction with the rights and responsibilities under the lease, which

may divvy those responsibilities up between Hinsdale Road Group and Movie Tavern.

So we'll concede that these -- the contract says what it says and gives the owner the rights and responsibilities that -- that are listed in here, and you're -- you're -- you have a right to ask as many questions about the contract as you want, but if it makes it easier -- I mean, this is the contract, we agree that it says what it says, you know. I'm not sure how much more of this you plan on doing, but -- I mean, we don't dispute that this is the contract and that these are the rights and responsibilities that the parties had, you know, within it.

MR. SNYDER: Okay.

Q During your visits to the site, did you ever have any interactions with employees of C&D LaFace?

A No.

Q Prior to the construction beginning or handing the pad site over, were you present for any

meetings between EDC and any subcontractors?
A No.
Q Prior to the construction or handing over the site to EDC, did you have a meeting with EDC?
A Did I specifically? I don't remember. I'm sure we probably had a conversation it's ready.
Q Did an agent of Hinsdale Road Group have a meeting with EDC at any point in time prior to the handing over of the -- the site?
A I don't recall.
Q All right. This case -- when were you made aware of an accident involving a Shaun Atkinson?
A I was made aware of this accident shortly after it happened. I was told that the site was shut down because of an accident. I didn't know who, what, what was involved. I just said it was shut -- they -- I was just told it was shut down because of an accident.
Q Who contacted you to tell you that?
A It was the project manager.
Q Do you recall the project manager's name?
A Again, no, I do not.
Q After the accident, did you have any other

conversations besides the project -- the conversation you had with the project manager?

A Yeah. I went down to the site, I asked them what -- what they were planning on doing. I asked about the well-being of the individual. We -- we spoke, and EDC seemed to be handling it, he was handling it very well, and, you know, I was hopeful that people would recover and be healthy.

Q Prior to the accident of record, did you ever have any conversations with OSHA concerning the construction of the Movie Tavern?

A No, I never had a conversation with OSHA.

Q And now -- I guess that's a followup question. Did you ever have a conversation with OSHA at any point in time concerning the construction of the Movie Tavern?

A No.

Q Did Hinsdale Road Group have any employees who had conversations with the -- with OSHA?

A Not that I'm aware of.

Q After -- you said you had some conversations with the project manager at the site, was it after you were made aware of it?

A Correct.

*GOETHE - SNYDER*

Q Who else was present during those conversations?

A I don't know. I don't recall.

Q Were there other people that were there?

A I honestly don't recall. I mean, there were people on the site, but I don't know if anyone was within earshot of his and my conversation.

Q Are you familiar with Giovanni LaFace?

A The company or the individual?

Q The individual.

A No, I don't think I've ever met him.

Q Are you familiar with the company C&D LaFace?

A Yes.

Q And how are you familiar with C&D LaFace Construction?

A They've done a lot of work around our area, just by reputation.

Q So you had done work with C&D LaFace -- or C&D LaFace had done work on other projects for Hinsdale Road Group; is that accurate?

A I don't know. Well, have we contracted with C&D LaFace? I -- I'm -- I don't know. I'm unaware if we did or not.

Q You expressed --
A They're typically a subcontractor who works for our general contractor, so I have no idea if they were a sub on any of our projects.
Q You expressed that you had some knowledge of C&D LaFace. How would you have had knowledge of C&D LaFace?
A They're -- they're in our business. I mean, I tend to have knowledge of most of the people operating in the area in our business.
Q Following the accident, did you have any conversations with C&D LaFace, any --
A No.
Q -- or any representatives of C&D LaFace?
A No.
Q Did you have any -- after that initial day on the site, did you have additional conversations with EDC concerning the accident?
A Just to ask him about the well-being of the individual and what his course of action was going forward.
Q And what did he say?
MR. O'CONNOR: Objection.
A He -- he told me that he's in the

hospital. He's -- I can't remember the exact words that he used, but -- and he said that going forward, they're working closely with OSHA and doing what they need to do to get the project up and running again.

Q To your knowledge, how long was the project shut down following the accident?

A I don't remember.

Q How did you learn that the project was going to be starting up again?

A I think I saw it when I drove by.

Q Did you have conversations with any representatives of Movie Tavern following the accident?

A I'm sure I did. I honestly don't recall.

Q Would -- as I guess the lessee, would you have informed them that there was a delay of the project following the accident?

A No. That would have been the responsibility of EDC.

MR. SNYDER: Okay. Let's take five to look over my notes really quick to see if I have any other questions, and then we can decide whether we'll take a break for

lunch, if anyone else has any questions, but if we can take five right now.

(Whereupon, a short recess was taken.)

MR. SNYDER: Okay. Just a couple of quick followups here.

BY MR. SNYDER: (Cont.)

Q At any point in time did you have any conversations with the department of safety and health, the New York State department of safety and heath?

A I don't recall ever having a conversation with them regarding this project.

Q Did you ever request a site consultant on the Movie Tavern project from the department of safety and health?

A I don't believe I ever did, no.

Q Are you aware --

A I'm not quite sure what you mean -- I'm not sure -- quite sure what you mean by a site consultant.

Q Okay. Are you aware of whether or not any employees of the Hinsdale Road Group had any conversations with the department of safety and

health during the Movie Tavern project?

A No, I'm not aware of that.

Q Following the accident, did any employees have any conversations with the department of safety and health concerning the project and the accident of record?

A No, I don't recall that.

MR. SNYDER: Okay. I think that's all I have. Thank you.

MR. FRARY: Gerry, I think you're up.

MR. O'CONNOR: Okay. I need 10 -- I don't know if you heard the doorbell ring, but my painter is here. I need 10 minutes now. I'm sorry about this.

MR. FRARY: Okay. Cup of coffee time.

(Whereupon, a short recess was taken.)

EXAMINATION BY
MR. O'CONNOR:

Q Sir, I just have a few followup questions. When you went to the site, you said that you were there approximately once a week. Did you keep any

records of your site visits?
A No.
Q Did you attend any type of safety meetings on site?
A No.
Q Do you know if Movie Tavern had a construction manager on site?
A A representative working under the employment of Movie Tavern?
Q Yes.
A I don't know.
Q Does the name Brian mean anything to you, first name Brian?
A Brian. I mean, there's a lot of Brians. I don't know.
Q But on this particular site, not --
A No. I -- well, I'm not sure.
Q Okay. Other than you, who else from Hinsdale would have been on site except for your construction manager?
A Various people might have stopped by to see what it -- you know, what was going on, but no one was there -- I was primarily responsible for going and monitoring the progress.

Q Okay. So you would go and check on progress and other Hinsdale -- either principals or employees would just go to kind of satisfy their curiosity?

A Yeah, exactly.

Q And while you were on site, those weekly visits on site, did you have conversations with anybody from Movie Tavern about construction?

A I didn't know if anybody was specifically from Movie Tavern stationed on site. It was primarily just the EDC rep --

Q Okay.

A -- the project manager.

Q Okay. And you don't have any recollection of conversations that you had with EDC in substance, correct?

A Yeah, it was -- it was mostly in passing and, you know, how -- are you guys going to get done in time, 'cause we want rent.

Q Now, do you know if there were any contract safety professionals supplied by either Cameron, Hinsdale, or Movie Tavern, or Southern that were on site to do safety inspections?

A I know that we didn't contract anybody.

Q How about --

A I don't know about the others. I have no idea about the others.

MR. SNYDER: I'm sorry, when you say we, who are you referring to?

THE WITNESS: I'm sorry, Hinsdale Road Group. Hinsdale Road Group, Cameron Group, Joe Goethe, none of us contracted with somebody.

MR. O'CONNOR: I think those are all my questions. Thank you.

THE WITNESS: You're welcome.

EXAMINATION BY
MR. FRARY:

Q Mr. Goethe, my name is Keith Frary. I represent Movie Tavern Theaters and Southern Theaters. We've actually met once before, sir. I don't anticipate you remember that.

A I do remember, Keith.

Q You do. Well, I'm a memorable guy.

A Yeah.

Q Mr. Goethe, it's my understanding, and I think you alluded to this, that Onondaga County

Industrial Development Agency has a ground lease with Hinsdale for this property; is that fair?

A Yeah. Well -- yes. Yes.

Q The industrial -- the IDA actually owns the land and then has a ground lease through this -- well, it was a PILOT program, I don't know if it's still called that.

A It still is. It's a -- so we have the ground lease with the IDA.

Q Okay. But the IDA is actually the owner of the land itself; is that fair?

A Yes --

Q Okay.

A -- for the period of the PILOT.

Q And this is -- my recollection is this is about 67 acres, is the entire plot the township -- what do we call it, Township 5?

A Yes. You have a good memory.

Q And then Hinsdale has a lease with Movie Tavern Theaters, I think we looked at that once before; is that fair?

A Yes.

Q Now, this is -- this is not a ground lease, correct?

A Correct.
Q And I believe -- I'm sorry, I forget what you called it, 'cause it reverts back, what did you call it?
A I called it a reverse build-to-suit.
Q Okay. And that would be because once the -- the building is complete, it then reverts back to ownership of Hinsdale, and Movie Tavern Theaters just becomes a lessee; is that fair?
A Yes.
Q For lack of a better term, Hinsdale in this arrangement, despite the IDA, is a sole purpose LLC, it's just there to -- to own the property, correct?
A Yes.
Q Now, as I look at this lease, and I hope it's still -- is it still up on your screen?
A Yes.
Q The lease -- Cameron Group is not a party to this lease, correct?
A Correct.
Q And, in fact, if I flip up -- and I think this is kind of obvious, but let's go to it anyway, the standard form agreement, the A101 - 2007

agreement, Cameron Group is not a party -- is not a signatory to this agreement in the contract documents, correct?

A Yes.

Q Now, we've seen references and, in fact, there's one up on the screen right now, care of Cameron Group, LLC, that's for purposes of notice, for lack of a better term, correct?

A Yes.

Q So if somebody needs to be contacted for notice reasons for the lease or the contract documents, they would contact -- actually contact the Cameron Group; is that fair?

A Yes.

Q Cameron Group has no agreement with any tenants or subcontractors on these projects; is that fair?

A Yes.

Q They don't -- they're not a signatory to leases, to subcontract agreements, to agreements with contractors, any of that, right?

A Correct.

Q Is -- is there an operating agreement between Cameron Group and Hinsdale?

*GOETHE - FRARY*

A No, not an operating agreement.
Q Okay. Is there some type of property management agreement or something similar to that?
A Yes, there's a management contract.
Q When does the management contract kick in, for instance -- well, strike that. Let me ask you this. Is there a management contract for the Movie Tavern theater property?
A I'm sorry, I -- something broke -- we're getting a storm out here right now, something broke up. You said when does --
Q No, let me -- let me -- let me reask the question. I'll withdraw that. Let me reask it.
When does the management contract kick in for the Movie Tavern theater, is it after the construction is complete?
A Primarily, yes. We are tasked with operating and managing the shopping center.
Q Okay. Is it broken up into specific properties, just a general shopping center management?
A General -- Township 5 overall.
Q Okay. So as -- and I think it's fair that on this particular property you talked about the

Costco building, and there's a Movie Tavern theater building, there's other medical buildings. As each piece of construction is complete, is that just something new that's added to the management agreement, they manage that new construction?

A Yes, it gets -- yeah. Anything that's built on the property, it becomes part of Township 5. We're -- so yes.

Q But I guess my question is, is it wouldn't become the responsibility as part of that management agreement until after construction is complete and that building opens?

A Well, the maintenance -- the maintenance of the property, no. It -- I mean, it's just a building pad, so yeah, until there's a building there, it doesn't -- there's really no -- there's not really much to do.

Q And the common areas, that would be a part of that management agreement, common areas designated in the shopping center?

A Yes. Yes.

Q Just out of curiosity, did you review anything before you testified here today?

A No. I figured that would be obvious. No,

I did not.

Q No, not necessarily. I wouldn't expect you to memorize everything, but.

MR. FRARY: I think that's all I got. Thank you.

THE WITNESS: You're welcome.

EXAMINATION BY
MR. KOWALEWSKI:

Q Hello, Mr. Goethe. My name is Andrew Kowalewski. I represent C&D LaFace. I just have a couple questions for you.

A Okay.

Q So Hinsdale Group did not have any contracts directly with C&D LaFace for the project; is that right?

A No.

MR. O'CONNOR: Objection.

Q Are you aware of any type of OSHA inspections occurring at the job site prior to plaintiff's accident?

A No.

Q You testified before that you went to the job site once you learned of the accident?

A Yes.
Q Did you go on that day?
A Yes.
Q Okay. Did you see the location of the accident?
A No. Actually, I was surprised -- well, no, I did not.
Q Okay. Did you see the forklift involved in the accident?
A I don't recall. I may have.
Q Do you recall approximately what time of day, you know, whether it was in the afternoon, evening, middle of the day, what time --
A No.
Q -- you went to the accident scene?
A No, I don't remember.
Q Was it still daylight outside?
A Yeah. The job was still on -- was still going, so it was during the weekday. It wasn't in the evening for sure.
Q Do you know what time the workday would typically last until?
A No. I didn't have any idea what they were doing there.

Q Did you take any photographs or video of what you observed at the job site when you arrived that day?

A No.

MR. KOWALEWSKI: Keith, can you pull up the exhibits that were marked at plaintiff's deposition?

MR. DAVOLI: Andrew, can I stop you for one second?

MR. KOWALEWSKI: Yes.

MR. DAVOLI: The very first question you asked had a double negative in it, and I think -- I think you got -- I think you guys got twisted up, and I think when we go back and read it, it's not going to come out correct.

It was the question you asked about whether Hinsdale Road Group had any contracts with -- you said they didn't have any, is that correct, and then he said no, and I think that's going to read wrong.

MR. KOWALEWSKI: Oh, okay.

THE WITNESS: I'm sorry.

*GOETHE - KOWALEWSKI*

MR. DAVOLI: You may want to clarify that just so we have it clear on the record.

MR. KOWALEWSKI: Okay. Let me -- let me -- let me ask it a different way.

Q Did Hinsdale have a contract directly with C&D LaFace for work at the job site?

A No.

MR. O'CONNOR: Objection.

A No.

MR. GERBER: Object to form.

MR. SNYDER: Same objection.

MR. DAVOLI: I liked the question.

MR. KOWALEWSKI: Thanks, David, appreciate it. Can you pull up Exhibit 3, Keith?

MR. FRARY: Will do.

Q Sir, I'm showing you what's been marked as Exhibit 3 at plaintiff's deposition. Do you recall whether Exhibit 3 refreshes your recollection about what you saw at the job site that day?

A Yeah, I -- I didn't even -- that's the laydown area, the -- I believe what's to the right is the Movie Tavern building, and I went into the

Movie Tavern, so I never saw any of this.

Q Okay. That's what I wanted to confirm. So you don't -- you don't have any personal recollection one way or the other of where the forklift was on the day of the accident or anything like that, right?

A Right. I was in the building and it was -- I can't remember who from EDC that I was talking with.

MR. KOWALEWSKI: All right, sir, that's all the questions I have. Thank you.

THE WITNESS: Thank you.

MR. O'CONNOR: Anybody else? I have a couple followup after Andrew, but is anybody going to go before me?

MR. SNYDER: I think I can ask just a couple quick questions.

MR. O'CONNOR: Oh, sure.

EXAMINATION BY
MR. SNYDER:

Q Mr. Goethe, you expressed that you had met Mr. Frary before. In what context did you remember

meeting Mr. Frary?

A I thought it was during our lease negotiation.

Q And Mr. Frary was present for -- for whom?

MR. FRARY: I can assure you, David, it was not during lease negotiations.

A So then I don't --

MR. FRARY: That's way too sophisticated for me.

A So then I don't -- so then I don't recall exactly when --

Q Okay.

A -- but I do recognize the face.

Q Would you have met Mr. Frary in the context of any discussions with Mr. Atkinson or the accident involving Mr. Atkinson?

A Atkinson? I don't recall, obviously.

Q And as -- actually, do you still see what was previously marked as Exhibit 3 on your screen?

A Yes.

Q So just so we're clear, you recognize the building on the right of that photograph to be what you believe is the Movie Tavern?

A Yes.

Q And this is the prep area for the construction of that building?

A Yes.

Q And you agree that this area here would be to the left side of the building as you're facing the building from the parking lot?

A Yes. More specifically, it's to the west of the building.

Q When you were in -- you said you were in the building earlier, was the building closed on the front at the time of the accident when you went to the site following the accident?

A I don't recall. I don't think it was. I think that came in later, because they had the big facade that they had to do. It was just pretty much open steel.

Q Where would you have met with anyone -- you said you met with the construction foreman or -- that's not the correct word that you used, a representative of EDC who was at the site following the accident. Where would you have met in relationship to this photograph, if you don't recall the actual building being closed at that time?

A It was -- it was in the building, so to

the right of this photo is the front of the building and I -- we stepped in 10, 15 feet.

Q Did any --

A I believe --

Q Sorry, go ahead, finish your statement.

A I just said and I believe it was open.

Q Did any representatives of EDC tell you where the accident took place?

A No. They just told me what -- I think they just said there was an accident with the lift, and that was it.

Q Did you have any other conversations with anyone that you now know would have been from C&D LaFace at that time?

A No. As I stated before, I haven't spoken with anyone from LaFace.

MR. SNYDER: I think that's all I have. Thank you.

THE WITNESS: You're welcome.

MR. O'CONNOR: I just have a couple.

EXAMINATION BY

MR. O'CONNOR:

Q You were asked by Mr. Kowalewski about any

*GOETHE - O'CONNOR*

direct contracts between Hinsdale and C&D LaFace. Have you ever had a chance to look at or read the subcontract agreement between EDC and C&D LaFace?

A No.

Q Okay. I'm going to read from that, it's not marked as an exhibit, but I'll submit it as an exhibit, and it spells out that the contract documents include the subcontract agreement between C&D LaFace and EDC, but it also includes the contract, including general conditions and supplemental conditions and addenda, between the owner and the contractor, the contractor's safety rules, but at the subcontract at one -- 1.9 under the work, it says the subcontractor shall be bound by the terms of the specifications, general conditions and supplemental conditions and addenda in the contract between the contractor and the owner, and shall conform to and comply with the drawings and specifications and addenda, and shall assume toward the contractor all the obligations and responsibilities that the contractor assumes toward the owner.

By reading that, do you now believe that C&D LaFace did owe Hinsdale, Movie Tavern Theaters,

Cameron, and Southern contractual obligations based on the incorporation of the documents that I just read into the subcontract?

MS. EHMAN: Form.

MR. KOWALEWSKI: Object to the form.

MR. SNYDER: Same objection. Go ahead.

A I am not very good at listening that closely. I would need to read that to give you whatever my opinion is.

Q Okay.

A I mean, if you put it up there and I read it, I'll -- and then ask your question, I can -- I'd be glad to, but.

MR. O'CONNOR: I don't know if anybody has that fed in. Keith, you don't, do you?

MR. FRARY: I'm sorry, what was the question?

MR. O'CONNOR: Do you have the subcontract agreement between EDC and C&D LaFace scanned in?

MR. FRARY: I -- it will take me two seconds to do it.

MR. O'CONNOR: I would appreciate it.

MR. FRARY: Well, let me say, being a man of my critical thinking, it will be longer than two seconds, but not -- not that long. Hang on.

MR. SNYDER: We have full confidence in your abilities.

MR. GERBER: Yeah. I may have it as well.

THE WITNESS: I'm sorry for my lack of retention.

(Whereupon, a short recess was taken.)

BY MR. O'CONNOR: (Cont.)

Q Okay. Have you ever seen a copy of this subcontract agreement?

A No.

Q Okay.

MR. O'CONNOR: Keith, could you scroll down to the bottom of that first page? Right there.

MR. FRARY: And if you need me to enlarge it, sir, I can do that as well.

THE WITNESS: That would be helpful.

*GOETHE - O'CONNOR*

Q Okay. Do you see the portion of the subcontract agreement that lists contract documents?

A Yes.

Q And I want you to just take a quick look at those.

A Okay.

MR. O'CONNOR: Now, Keith, if you could go to the next page, particularly Section 1.9.

Q Can you read Section 1.9?

A Yes.

Q Okay. Have you read Section 1.9?

A I'm reading it now. Okay.

Q Okay. Now, after you've read that, where particularly it says that shall assume toward the contractor all the obligations and responsibilities that the contract assumes towards the owner, is it still your belief that there's no contract between C&D LaFace and Hinsdale movie theater -- or Movie Tavern?

MS. EHMAN: Form.

MR. KOWALEWSKI: I'll object to the form.

A Well, the way I read this is that EDC is

the contractor who's contracted with the subcontractor LaFace and EDC is responsible and LaFace has the -- EDC's responsibility under the contract.

MR. O'CONNOR: Thank you. I don't have anything further.

MR. FRARY: I'm all set.

MR. GERBER: No questions.

MS. EHMAN: I just have a few very brief questions.

EXAMINATION BY
MS. EHMAN:

Q Hello, my name is Jen Ehman, and I represent Selective in the Federal Court action. I'm just going to, just real quick, ask you a few followups on this subcontract.

Beyond what you're looking at today, do you have any independent knowledge of this agreement?

A No.

Q Is your testimony today entirely related to -- or entirely based on what you're reading today?

MR. DAVOLI: Object to the form. You can answer, Joe.

MR. GERBER: Form.

A I'm sorry, I didn't -- you're asking if my entire testimony is based on what I'm reading strictly today? I didn't understand your question.

Q No problem. Withdrawn. Is your testimony concerning this subcontract entirely related to your review of the contract?

MR. GERBER: Form.

A Yes.

MR. SNYDER: Same, form.

MS. EHMAN: That's all I have.

MR. CUNNINGHAM: I don't have any questions.

MR. KOWALEWSKI: No questions for me.

MR. SNYDER: I think that's everyone.

MR. DAVOLI: All right.

(Whereupon, the proceedings concluded at 1:30 p.m.)

**C E R T I F I C A T I O N**

I, Annette M. Burton, a Certified Court Reporter and Notary Public in and for the State of New York, DO HEREBY CERTIFY that I attended the foregoing proceeding remotely via Zoom Conferencing, took stenographic notes of the same, and that this transcript is a true and accurate record of the proceedings.

I further certify that I am not an attorney or counsel of any parties, nor a relative or employee of any attorney or counsel connected with this action, nor financially interested in same.

As witness my hand and notarial seal this 4th day of October 2020.

________________________
Annette M. Burton
Court Reporter

**ERRATA SHEET**

Dear **Mr. Goethe**:

Accordance with the rules of procedure governing depositions, you are entitled to read and correct your deposition before it is filed. Accordingly, please carefully read your deposition and, on this Errata Sheet, make any changes or corrections in form or substance to your deposition that you feel should be made. You may add additional sheets, if necessary. You are to identify these changes/corrections by page and line number, give the correction or change desired, and state the reason therefor, or the word, none.

Please, do not mark the transcript. After completing this, sign at the conclusion of such changes/corrections, both before a Notary Public. Then kindly return this Errata Sheet and the transcript to the individual charged with filing the transcript with the Court.

| PAGE | LINE NO. | CHANGE/CORRECTION | REASONS THEREFOR |
|---|---|---|---|

_________________________
**Joseph Goethe**

Sworn to before me this ______day

of ______________, 2020.

________________________
Notary Public

STATE OF NEW YORK:

COUNTY OF _________________:

Subscribed and sworn to before me on this ________ day of ___________________, 2020, by ____________________________ proved to me on the basis of satisfactory evidence to be the person who appeared before me.

_____________________________

(seal)

**MR. CUNNINGHAM: [2]** 10/1 115/15
**MR. DAVOLI: [30]** 9/14 20/10 20/15 23/6 40/15 40/22 47/1 50/6 51/1 55/23 56/3 56/24 57/6 58/20 61/17 61/21 78/18 79/8 81/15 82/5 82/12 84/11 85/1 85/18 104/9 104/12 105/1 105/14 115/1 115/19
**MR. FRARY: [41]** 9/19 10/23 11/20 20/12 20/18 33/19 33/23 35/20 35/24 36/8 36/13 38/6 43/17 53/11 57/5 60/3 60/17 63/9 63/12 63/24 64/5 64/18 70/21 75/23 76/1 76/7 77/21 81/20 82/9 82/18 93/11 93/16 102/5 105/18 107/6 107/9 111/19 111/24 112/3 112/23 114/8
**MR. GERBER: [10]** 10/5 46/24 69/9 76/15 76/19 105/12 112/9 114/9 115/4 115/11
**MR. HELLER: [1]** 10/15
**MR. KOWALEWSKI: [10]** 9/22 104/6 104/11 104/24 105/5 105/15 106/11 111/6 113/23 115/17
**MR. O'CONNOR: [28]** 9/24 10/20 10/24 33/8 57/8 59/17 61/16 66/15 68/3 68/15 69/8 78/20 80/20 85/12 90/24 93/12 96/11 102/19 105/10 106/15 106/20 109/21 111/16 111/21 112/1 112/20 113/8 114/6
**MR. SNYDER: [47]** 9/7 20/17 20/21 32/3 33/9 35/22 36/10 38/7 40/20 40/24 43/18 55/25 56/22 57/1 57/10 59/19 60/12 60/19 61/22 63/6 63/10 63/14 63/22 64/3 64/16 68/14 68/19 70/22 75/24 76/3 76/9 76/17 77/19 78/1 81/10 86/19 91/22 92/6 93/9 96/5 105/13 106/18 109/18 111/7 112/7 115/13 115/18
**MS. EHMAN: [5]** 10/9 111/5 113/22 114/10 115/14
**MS. KNAPP: [2]** 10/12 43/9
**THE COURT REPORTER: [1]** 76/14
**THE WITNESS: [17]** 10/18 10/21 10/25 33/22 36/11 50/10 61/19 68/10 82/13 96/7 96/13 102/7 104/25 106/14 109/20 112/11 112/25

**$**

**$8.26 [1]** 66/11
**$8.26 million [1]** 66/11

**'**

**'91 [2]** 15/14 15/14
**'92 [1]** 13/21
**'cause [6]** 22/23 40/18 56/14 70/13 95/20 98/4

**0**

**00285 [1]** 3/6
**004808/2018 [1]** 1/5

**1**

**1.9 [4]** 110/14 113/10 113/11 113/13
**10 [5]** 64/17 64/22 93/12 93/14 109/3
**100005 [1]** 4/8
**1064 [1]** 1/6
**11-screen [1]** 41/6
**11-theater [1]** 41/16
**111 [1]** 11/9
**11:18 [1]** 57/9
**11:30 [3]** 57/9 57/9 57/10
**12 [1]** 73/15
**12203 [1]** 2/15
**1300 [1]** 4/15
**13152 [1]** 11/10
**13202 [2]** 2/12 4/5
**13212 [1]** 2/4
**14 [4]** 63/10 67/19 67/20 67/21
**14202 [5]** 2/8 2/18 2/22 4/12 4/15
**15 [1]** 65/11
**15 feet [1]** 109/3
**16 [1]** 12/8
**1600 [1]** 2/18
**17 [2]** 12/8 83/17
**1709 [1]** 12/15
**18th [1]** 4/8
**19 [2]** 33/7 33/17
**1990 [1]** 13/8
**1:30 [1]** 115/21
**1st [1]** 35/6

**2**

**2.3 [3]** 79/4 79/6 79/15
**20 [5]** 2/11 4/4 11/23 33/8 33/11
**2001 [3]** 15/14 16/11 16/25
**2005 [8]** 20/25 21/23 24/13 24/13 24/20 26/5 26/12 26/14
**2007 [7]** 6/5 6/9 7/5 26/15 61/2 81/13 98/25
**2012 [7]** 26/3 26/4 26/5 26/9 26/12 26/14 26/15
**2013 [2]** 26/3 26/4
**2015 [5]** 19/15 19/17 32/19 35/6 35/12
**2016 [1]** 54/24
**2018 [2]** 1/5 25/21
**2020 [4]** 3/22 116/18 117/23 118/6
**211 [2]** 2/11 4/4
**221 [1]** 8/5
**24 [1]** 73/15
**2400 [1]** 4/11
**25 [2]** 3/22 28/15
**26 [1]** 32/10
**27 [1]** 32/6

**3**

**3.1 [1]** 38/2
**3.10 [3]** 35/18 35/24 38/6
**3.15 [1]** 83/15
**3.2 [1]** 51/9
**3.4.3 [1]** 80/15
**300 [2]** 2/7 2/8
**3113 [2]** 8/19 8/21
**3117 [1]** 8/20
**33-19-1064 [1]** 1/6
**344 [1]** 2/21
**350 [1]** 4/11

**4**

**40 [1]** 4/7
**400 [1]** 2/21
**4th [1]** 116/17

**5**

**50 [1]** 18/15
**50/50 [1]** 18/15
**5:19-CV-00285 [1]** 3/6

**6**

**6.1 [2]** 85/13 85/15
**6.3 [1]** 84/14
**62-page [2]** 60/24 76/18
**67 acres [1]** 97/17
**6876 [1]** 2/4

**A**

**A101 [4]** 6/5 59/20 61/2 98/25
**A201 [8]** 6/9 7/5 75/22 76/12 76/17 76/22 78/8 81/13
**abilities [1]** 112/8
**ability [2]** 67/4 81/2
**able [2]** 26/9 41/15
**about [23]** 10/22 20/20 25/19 52/15 63/10 64/11 70/4 71/24 74/4 81/5 86/10 88/6 90/20 93/15 95/9 96/2 96/3 96/4 97/17 100/25 104/18 105/21 109/25
**absolutely [1]** 68/14
**Academy [1]** 13/3
**access [5]** 44/20 44/21 44/25 50/24 51/4
**accident [27]** 20/3 56/12 87/13 87/15 87/17 87/20 87/25 88/10 90/12 90/19 91/8 91/15 91/19 93/4 93/6 102/22 102/25 103/6 103/10 103/16 106/6 107/17 108/12 108/13 108/22 109/9 109/11
**Accordance [1]** 117/5
**according [1]** 60/23
**Accordingly [1]** 117/6
**accuracy [1]** 8/14
**accurate [27]** 20/8 27/2 40/12 41/4 41/8 42/6 42/11 47/16 48/21 53/5 54/1 54/13 55/7 61/15 62/7 66/4 66/14 70/11 70/17 71/17 73/24 77/11 82/19 82/25 84/24 89/22 116/11
**accurately [1]** 43/24
**achieve [1]** 21/16
**acknowledged [1]** 35/6
**acquire [6]** 18/21 22/17 24/9 24/12 24/24 26/9
**acquired [3]** 22/21 24/8 24/20
**acres [1]** 97/17
**across [1]** 44/7
**action [7]** 8/9 10/8 10/11 10/14 90/21 114/16 116/15
**actual [4]** 27/13 36/1 39/5 108/24
**actually [20]** 26/10 28/5 28/17 39/8 41/15 41/16 42/16 43/9 43/14 49/4 63/6 67/23 72/3 76/10 96/19 97/5 97/11 99/13 103/7 107/19
**add [3]** 21/15 35/13 117/8
**added [3]** 21/10 21/12 101/5
**addenda [3]** 110/12 110/17 110/20
**addition [1]** 8/7
**additional [6]** 3/15 46/12 53/17 58/18 90/18 117/8
**address [1]** 11/8
**adjacent [1]** 42/18
**Adler [4]** 17/9 19/22 19/22 19/24
**administering [1]** 8/22
**after [23]** 13/9 24/8 25/22 32/10 35/5 35/8 35/16 37/9 53/15 54/23 58/17 72/2 84/24 87/16 87/25 88/22 88/24 90/17 100/16 101/12 106/16 113/15 117/10
**afternoon [1]** 103/13
**afterwards [2]** 16/13 76/13
**again [17]** 38/10 40/19 47/14 52/14 53/19 63/4 65/3 66/25 72/24 74/13 75/5 75/17 76/16 77/4 87/24 91/6 91/11
**Agency [2]** 22/20 97/2
**agent [2]** 57/24 87/8
**agents [5]** 49/11 49/14 58/17 58/22 63/3
**ages [1]** 12/7
**ago [2]** 19/11 25/21
**agree [13]** 8/18 8/23 42/4 65/11 67/3 78/12 79/5 80/25 83/22 84/20 85/14 86/12 108/5
**agreed [4]** 8/4 8/9 8/18 73/25
**agreement [41]** 6/5 6/11 22/24 27/18 27/22 32/23 33/1 33/3 33/16 33/25 34/5 34/19 38/13 38/15 51/7 60/4 61/9 64/24 67/4 67/5 67/13 69/2 81/22 81/22 85/5 98/25 99/1 99/3 99/16 99/24 100/2 100/4 101/6 101/12 101/20 110/4 110/9 111/22 112/17 113/3 114/21
**agreements [3]** 42/22 99/21 99/21
**ahead [11]** 23/7 47/3 47/15 51/3 53/22 56/19 56/25 58/21 85/3 109/6 111/8
**AIA [19]** 6/5 6/9 7/5 59/20 61/1 61/6

**A**

**AIA... [13]** 61/8 61/12 62/21 66/2 66/13 75/21 76/11 76/17 76/21 77/2 81/13 81/19 82/6
**aisle [1]** 42/12
**aisles [1]** 42/16
**Albany [1]** 2/15
**Alderman [5]** 17/9 18/8 19/6 19/19 19/22
**Alex [1]** 12/8
**all [47]** 8/5 8/10 8/20 8/20 8/23 16/5 16/6 22/13 23/11 23/15 25/23 31/7 31/25 36/13 41/19 42/13 42/17 42/20 42/25 45/11 45/14 56/10 57/16 57/20 57/21 60/14 65/20 65/20 68/19 70/6 75/20 76/19 82/4 82/6 85/20 87/12 93/10 96/11 102/5 106/11 106/12 109/18 110/21 113/17 114/8 115/14 115/19
**all right [7]** 16/6 36/13 41/19 68/19 87/12 106/11 115/19
**allocate [1]** 85/10
**allowed [5]** 21/16 46/21 50/24 51/5 51/6
**alluded [1]** 96/25
**along [1]** 48/19
**also [10]** 2/24 16/4 24/17 34/8 36/18 41/14 42/22 54/11 79/12 110/10
**always [2]** 36/25 37/12
**am [2]** 111/9 116/13
**amended [1]** 81/24
**AMERICA [2]** 1/12 3/14
**AMERISURE [5]** 3/8 3/9 4/11 10/8 10/17
**among [1]** 8/4
**amount [6]** 36/20 53/3 53/7 53/12 53/16 53/24
**ANDREW [5]** 2/22 9/22 102/11 104/9 106/16
**Annette [4]** 3/21 76/9 116/6 116/20
**annually [2]** 19/3 53/9
**another [4]** 37/4 37/7 47/12 72/11
**answer [8]** 15/21 15/25 47/3 51/3 58/21 61/17 85/3 115/3
**answers [1]** 16/5
**anticipate [1]** 96/20
**any [89]** 8/6 8/7 8/8 8/8 12/10 13/9 15/15 19/12 19/15 21/3 24/16 27/15 39/25 40/4 40/5 44/14 44/16 46/22 48/24 49/3 49/8 49/10 49/10 51/10 52/12 52/20 54/25 62/17 63/2 69/20 69/22 69/23 69/25 70/2 72/22 73/7 74/6 74/8 75/10 78/25 79/2 84/22 85/5 86/21 86/25 87/2 87/9 87/25 88/11 88/16 88/19 90/5 90/12 90/13 90/15 90/17 91/13 91/24 92/2 92/9 92/9 92/23 92/24 93/4 93/5 93/25 94/4 95/15 95/21 99/16 99/22 102/15 102/20 103/24 104/2 104/19 104/21 106/2 106/4 107/16 109/4 109/8 109/13 109/25 114/20 115/15 116/14 116/15 117/7
**anybody [7]** 27/6 95/9 95/10 95/25 106/15 106/17 111/17
**anyone [9]** 11/11 51/16 51/23 62/22 89/7 92/2 108/18 109/14 109/17
**anything [7]** 12/17 24/21 94/13 101/7 101/24 106/6 114/7
**anyway [1]** 98/24
**anyways [1]** 24/14
**apologize [1]** 36/12
**appear [1]** 50/21
**appearances [1]** 9/8
**appeared [1]** 118/8
**appearing [1]** 9/13
**appears [2]** 32/11 34/9
**appoint [1]** 80/7
**appreciate [2]** 105/16 112/2
**approach [1]** 30/15
**approached [2]** 29/5 30/10
**approval [2]** 58/13 58/16
**approve [1]** 34/5
**approximately [8]** 14/20 16/9 64/21 73/2 73/11 74/5 93/25 103/12
**architect [14]** 48/22 48/25 49/4 49/6 59/9 59/9 64/14 78/15 82/25 83/3 84/7 84/10 84/22 85/10
**are [70]** 11/13 11/18 12/7 12/12 12/19 13/22 17/11 18/5 19/4 19/12 21/2 21/2 21/3 21/5 21/6 21/7 21/16 21/20 24/16 24/17 29/25 30/3 30/8 30/23 31/10 32/7 32/9 37/18 38/6 39/15 43/2 45/4 51/9 52/15 54/17 56/7 56/16 58/22 60/6 61/23 62/6 62/17 65/25 70/7 70/14 70/24 74/6 75/3 76/16 78/6 79/17 79/19 80/8 81/17 81/17 82/2 86/8 86/17 89/9 89/13 89/16 92/19 92/23 95/19 96/6 96/11 100/18 102/20 117/5 117/8
**area [20]** 12/19 12/21 41/17 42/14 42/15 44/5 44/10 45/18 45/18 46/11 55/24 56/20 56/23 70/6 83/23 89/19 90/11 105/24 108/2 108/5
**areas [4]** 50/23 56/16 101/19 101/20
**around [3]** 32/6 73/5 89/18
**arrangement [1]** 98/13
**arrived [1]** 104/3
**Article [12]** 35/18 51/8 64/17 64/21 66/10 67/8 67/19 67/20 67/21 81/20 85/13 85/15
**as [103]** 8/7 8/14 8/19 9/4 9/6 11/25 21/10 22/15 22/15 22/17 23/8 23/8 24/15 30/12 32/9 35/25 35/25 40/6 40/11 40/13 41/10 41/13 43/21 43/22 44/15 45/4 46/14 56/4 56/5 56/17 57/18 58/1 58/15 59/2 59/6 59/24 60/5 60/14 60/21 61/13 62/4 62/5 62/6 62/18 64/10 65/5 65/5 65/8 65/12 65/21 66/19 67/13 67/18 67/22 68/15 68/15 69/1 70/6 70/15 70/15 71/18 71/18 71/18 71/18 74/24 76/4 76/16 77/4 77/9 77/10 77/15 78/10 81/24 82/10 82/10 82/10 82/17 82/24 82/24 82/25 83/3 83/4 83/5 83/12 83/16 83/22 86/10 86/11 91/17 98/17 100/24 101/3 101/11 105/19 107/19 107/20 108/6 109/16 110/7 110/7 112/9 112/24 116/17
**as listed [1]** 83/4
**aside [2]** 21/19 24/15
**ask [21]** 10/18 11/20 12/13 15/15 15/19 15/22 15/23 27/24 38/10 55/16 56/13 59/5 69/21 75/5 86/10 90/20 100/7 105/6 106/18 111/14 114/17
**asked [7]** 30/14 67/16 88/4 88/6 104/13 104/18 109/25
**asking [14]** 11/22 15/18 27/23 38/15 38/15 44/17 46/16 52/15 53/20 53/23 81/5 84/9 85/21 115/5
**assign [4]** 80/12 84/7 84/22 85/4
**assigned [8]** 52/6 52/10 72/7 79/18 79/23 79/24 79/25 80/4
**assignments [1]** 52/11
**associated [1]** 70/7
**assume [4]** 16/2 82/23 110/21 113/16
**assumes [2]** 110/22 113/18
**assuming [1]** 59/12
**assure [2]** 41/14 107/6
**astray [1]** 56/6
**ATKINSON [6]** 1/3 1/3 87/14 107/16 107/17 107/18
**attached [1]** 81/24
**attend [2]** 13/4 94/4
**attended [1]** 116/8
**attention [13]** 33/11 35/18 52/24 64/20 67/7 75/21 76/21 77/13 79/4 80/15 83/15 84/13 85/13
**attorney [10]** 8/16 9/9 15/19 16/4 32/25 33/2 33/9 33/12 110/13 116/15
**Attorneys [1]** 8/4
**August [1]** 3/22
**authority [2]** 80/7 80/11
**available [1]** 43/12
**Avenue [2]** 2/18 2/21
**aware [18]** 33/25 51/9 54/17 62/17 71/6 74/6 74/9 78/6 79/19 81/16 87/13 87/15 88/21 88/24 92/19 92/23 93/3 102/20
**away [1]** 45/12

**B**

**B-U-N-N-E-L-L [1]** 25/17
**BAASE [2]** 2/17 10/3
**back [11]** 16/22 30/9 33/5 48/20 57/8 57/23 68/23 70/19 98/4 98/9 104/16
**backed [1]** 26/25
**background [1]** 12/14
**backing [1]** 80/2
**bank [9]** 23/12 23/13 23/25 24/3 24/9 36/17 37/4 37/7 37/11
**banks [4]** 36/18 37/6 37/15 37/18
**bar [3]** 8/8 41/10 41/17
**barely [1]** 55/17
**barricade [3]** 51/8 57/23 58/2
**barricades [1]** 51/10
**based [4]** 67/20 111/2 114/24 115/6
**basically [2]** 80/23 85/8
**basis [2]** 20/15 118/7
**be [45]** 8/8 8/11 8/16 8/19 8/22 8/22 16/5 19/18 21/14 24/2 24/2 29/14 32/11 33/8 34/9 34/23 35/22 39/25 40/18 40/22 41/3 41/15 43/5 46/20 50/24 57/8 62/11 73/20 79/18 85/24 88/7 88/9 91/11 98/7 99/11 101/19 101/25 107/23 108/5 110/15 111/15 112/4 112/25 117/7 118/8
**Beacon [3]** 24/2 24/2 24/10
**because [8]** 22/23 59/15 61/25 62/2 87/17 87/20 98/7 108/15
**become [3]** 21/17 21/17 101/11
**becomes [2]** 98/10 101/8
**been [38]** 9/5 11/17 22/1 25/14 29/11 32/8 33/12 35/16 37/12 37/15 43/25 46/7 46/12 46/15 50/17 51/18 53/4 53/8 53/13 53/20 54/5 55/13 55/20 57/24 57/25 58/4 60/20 63/18 63/19 64/13 66/23 71/10 75/4 78/7 91/20 94/20 105/19 109/14
**been changed [1]** 22/1
**before [25]** 3/19 3/20 8/11 8/12 9/8 15/15 15/21 26/25 34/21 37/8 58/15 72/12 75/7 96/19 97/22 101/24 102/24 106/17 106/25 109/16 117/6 117/11 117/22 118/5 118/9
**begin [2]** 9/9 26/10
**beginning [1]** 86/24
**begun [1]** 8/12
**behalf [2]** 10/17 64/24
**being [27]** 8/11 8/17 22/21 26/5 39/6 39/12 41/6 42/9 47/7 47/11 49/4 62/10 65/17 65/18 66/19 66/21 75/3 75/3 78/14 81/4 83/23 84/5 85/6 88/6 90/20 108/24 112/3
**belief [1]** 113/19
**believe [16]** 20/25 22/22 24/13 28/15 32/5 51/8 60/22 73/9 75/7 92/18 98/3 105/24 107/24 109/5 109/7 110/24
**belonged [2]** 45/7 45/8
**below [1]** 45/5
**Berkshire [14]** 23/13 23/14 23/21 23/23 23/25 23/25 24/3 36/15 36/17 36/23 36/25 37/11 66/24 67/1
**besides [7]** 12/9 19/13 19/16 24/24 54/9 69/23 88/2
**best [1]** 43/15
**better [2]** 98/12 99/9

**B**

**between [34]** 6/6 6/7 6/11 18/12 22/3 26/4 26/12 27/11 31/23 32/4 34/1 34/5 42/9 47/20 47/23 61/9 61/23 65/5 65/22 69/2 73/15 78/13 82/20 85/5 86/3 87/2 99/25 110/2 110/4 110/9 110/12 110/18 111/22 113/19
**beyond [3]** 38/23 79/14 114/19
**bidding [1]** 62/14
**big [1]** 108/15
**bill [1]** 84/7
**bit [1]** 12/4
**blended [1]** 31/7
**board [4]** 52/4 58/16 58/17 59/7
**born [1]** 12/24
**both [1]** 117/11
**bottom [1]** 112/21
**bound [1]** 110/15
**BRADY [2]** 4/10 10/6
**break [7]** 54/19 54/21 54/24 56/2 57/3 68/13 91/25
**breaking [1]** 55/6
**Brian [3]** 94/13 94/14 94/15
**Brians [1]** 94/15
**brief [1]** 114/11
**bring [2]** 22/12 35/8
**broke [2]** 100/10 100/11
**broken [2]** 54/7 100/20
**Bronxville [1]** 12/25
**Brothers [2]** 14/11 14/15
**brought [1]** 22/14
**Buckley [1]** 2/4
**Buffalo [12]** 2/8 2/18 2/22 4/12 4/15 44/8 44/13 44/20 45/7 45/16 47/11 47/22
**build [10]** 27/8 27/8 38/24 39/11 39/14 39/22 57/16 59/8 68/8 98/6
**building [57]** 4/14 25/25 27/5 27/17 29/16 29/18 29/19 29/20 29/24 30/2 30/4 34/25 36/3 36/4 38/23 39/5 39/8 39/9 39/12 39/13 39/14 39/15 39/18 40/7 40/11 41/2 41/16 50/25 58/5 58/7 58/10 58/13 59/11 59/15 66/3 66/9 66/12 68/6 80/14 98/8 101/2 101/3 101/13 101/16 101/16 105/25 106/8 107/23 108/3 108/6 108/7 108/9 108/11 108/11 108/24 108/25 109/2
**buildings [7]** 23/9 23/9 46/22 70/6 70/13 70/15 101/3
**buildout [2]** 38/22 41/15
**built [7]** 28/2 29/6 39/23 42/9 44/6 57/15 101/8
**Bunnell [3]** 25/14 25/17 74/21
**Burton [3]** 3/21 116/6 116/20
**business [6]** 18/20 19/19 19/25 47/12 90/9 90/11
**businesses [5]** 42/5 43/5 46/21 47/10 47/18
**buttoning [1]** 56/18
**Byrnes [2]** 14/11 14/14

**C**

**c/o [3]** 33/16 65/4 65/12
**Cade [1]** 31/16
**call [7]** 9/11 26/14 39/10 63/25 64/3 97/18 98/5
**CALLAHAN [2]** 4/7 10/15
**called [5]** 9/4 44/9 97/8 98/4 98/6
**calling [2]** 63/25 68/12
**came [1]** 108/15
**CAMERON [44]** 1/7 3/3 9/16 16/14 16/23 16/24 17/4 17/7 17/12 17/14 17/20 18/3 18/6 18/9 18/16 18/19 18/24 19/8 20/18 22/4 22/6 24/17 25/15 28/24 29/4 33/15 33/16 33/24 34/4 36/9 65/4 65/5 65/11 65/17 73/7 95/23 96/8 98/20 99/2 99/8 99/14 99/16 99/25 111/1
**Camerson [1]** 2/11
**Camillus [11]** 51/17 51/24 52/2 52/6 52/17 52/19 57/25 58/8 58/14 58/19 58/23
**can [65]** 9/7 11/4 15/3 27/10 32/3 32/13 34/18 35/9 36/2 36/25 37/25 38/10 39/7 39/21 43/9 44/13 44/24 45/12 47/3 50/8 51/3 52/18 53/2 55/17 56/2 56/4 57/5 58/21 59/21 61/17 61/18 63/6 63/22 63/23 64/16 67/12 67/15 67/16 67/18 67/20 67/20 68/12 68/19 74/13 75/5 75/6 76/10 76/12 76/12 77/24 83/20 84/17 85/3 85/9 91/25 92/3 104/6 104/9 105/16 106/18 107/6 111/14 112/24 113/11 115/3
**can't [11]** 13/16 19/18 21/10 31/17 41/24 47/12 56/13 72/9 72/11 91/2 106/9
**cannot [2]** 35/8 37/7
**capacity [1]** 73/8
**capital [1]** 17/21
**captioned [1]** 63/16
**Cara [2]** 2/24 10/7
**care [2]** 65/12 99/7
**carefully [1]** 117/6
**CAREY [2]** 2/5 10/12
**carry [1]** 79/14
**cars [2]** 45/5 45/6
**case [4]** 20/3 35/17 56/7 87/12
**cash [1]** 17/24
**CASTLE [1]** 1/9
**center [5]** 16/15 23/16 100/19 100/21 101/21
**centers [2]** 15/7 18/22
**CEO [1]** 31/18
**certain [1]** 21/16
**Certified [1]** 116/6
**certify [2]** 116/8 116/13
**certifying [1]** 8/14
**CFO [1]** 31/13
**chance [1]** 110/3
**change [2]** 117/9 117/14
**CHANGE/CORRECTION [1]** 117/14
**changed [1]** 22/1
**changes [3]** 117/7 117/8 117/11
**changes/corrections [2]** 117/8 117/11
**charge [1]** 8/17
**charged [1]** 117/12
**check [1]** 95/2
**children [3]** 11/24 12/3 12/5
**Christopher [1]** 71/13
**CIANO [2]** 4/10 10/6
**Circle [1]** 2/14
**clarify [3]** 20/23 50/8 105/2
**clarifying [1]** 76/20
**class [1]** 13/16
**clause [1]** 54/15
**clean [3]** 84/15 84/21 85/9
**cleaning [2]** 83/18 85/9
**clear [6]** 39/4 70/9 76/4 76/11 105/3 107/22
**clearly [1]** 39/22
**closed [4]** 18/21 24/13 108/11 108/24
**closely [2]** 91/4 111/10
**CM [2]** 75/16 75/19
**CO [8]** 39/15 50/1 50/4 50/5 50/12 50/14 50/15 57/15
**codes [3]** 52/9 52/15 52/20
**coffee [1]** 93/16
**collectively [2]** 22/12 62/5
**college [3]** 13/4 13/5 14/21
**Columbia [1]** 2/14
**Colvin [1]** 34/9
**combined [1]** 60/6
**come [4]** 20/24 37/16 66/19 104/17
**comes [2]** 52/9 65/6
**commencement [1]** 35/15
**commercial [1]** 70/16
**common [4]** 42/8 44/25 101/19 101/20
**companies [2]** 14/8 20/19
**company [12]** 3/8 3/9 3/13 19/7 20/7 21/14 21/21 27/4 30/25 72/19 89/10 89/13
**complete [8]** 39/15 39/20 41/16 73/17 98/8 100/17 101/4 101/12
**completed [2]** 41/20 84/24
**completely [2]** 19/18 46/10
**completing [1]** 117/10
**completion [3]** 29/12 29/13 29/14
**comply [1]** 110/19
**concede [1]** 86/5
**concepts [1]** 46/10
**concerning [7]** 51/18 51/24 88/11 88/16 90/19 93/6 115/9
**concluded [1]** 115/20
**conclusion [1]** 117/10
**concrete [2]** 14/11 14/12
**conditions [20]** 6/9 7/5 60/5 60/9 76/22 78/13 81/13 81/17 81/23 82/1 82/18 82/19 82/20 82/24 83/3 83/16 110/11 110/12 110/17 110/17
**Conduct [1]** 8/6
**conducted [1]** 8/19
**conference [1]** 8/24
**Conferencing [2]** 3/20 116/9
**confidence [1]** 112/7
**confirm [2]** 38/16 106/3
**confirming [1]** 39/2
**conform [1]** 110/19
**confused [1]** 19/23
**conjunction [2]** 66/23 85/24
**connected [1]** 116/15
**connection [2]** 16/16 65/23
**CONNORS [2]** 2/20 9/23
**consist [2]** 81/21 82/4
**constantly [2]** 58/23 58/24
**construct [1]** 50/25
**constructed [6]** 39/6 40/1 43/25 45/21 47/7 49/18
**constructing [1]** 39/8
**construction [95]** 1/17 1/22 3/14 6/10 7/6 14/7 14/9 14/10 20/4 23/12 25/25 26/10 27/13 27/16 29/17 36/2 36/6 36/14 36/16 36/20 36/21 37/5 37/11 37/13 37/20 37/21 39/9 39/13 41/20 42/6 43/6 43/23 44/23 46/3 46/7 46/22 47/6 47/9 47/21 48/2 48/6 48/10 49/16 50/18 51/10 51/18 51/20 51/22 52/21 58/25 59/6 60/10 61/14 65/21 66/2 66/8 66/11 67/23 71/4 72/13 72/20 72/22 73/22 73/25 74/8 74/11 74/12 74/15 74/16 74/18 74/20 75/15 75/19 76/23 77/3 78/11 80/13 81/14 83/11 83/13 85/16 86/24 87/4 88/12 88/17 89/17 94/8 94/21 95/9 100/17 101/4 101/6 101/12 108/3 108/19
**consultant [3]** 71/8 92/15 92/22
**Cont [5]** 57/14 68/25 78/5 92/8 112/15
**contact [11]** 50/14 51/18 52/12 52/20 57/25 58/18 75/14 78/22 79/2 99/13 99/13
**contacted [2]** 87/21 99/11
**context [2]** 106/25 107/16
**continually [1]** 40/16
**continuously [2]** 54/6 59/2
**contract [61]** 6/10 7/5 7/5 24/14 31/22 32/20 34/13 35/3 44/22 54/6 54/9 54/18 60/9 61/6 61/8 62/9 62/10 62/10 65/7 66/18 69/7 76/22 77/2 79/17 80/3 80/5 80/10 80/25 81/3 81/3 81/14 81/21 81/24 82/2 82/3 82/6 82/7 82/11 82/20 83/22 86/6 86/10 86/12 86/16 95/22 95/25 99/3 99/12 100/5 100/6 100/8 100/15 105/7 110/8 110/11 110/18 113/3 113/18

**C**

**contract... [3]** 113/19 114/5 115/10
**contracted [5]** 25/11 50/12 89/23 96/9 114/2
**contractor [23]** 6/6 25/10 27/14 49/7 49/24 49/25 59/13 61/13 62/19 66/7 66/10 79/14 82/22 83/23 85/6 85/11 90/4 110/13 110/18 110/21 110/22 113/17 114/2
**contractor's [2]** 80/22 110/13
**contractors [4]** 57/17 84/22 85/5 99/22
**contracts [4]** 78/11 102/16 104/20 110/2
**contractual [1]** 111/2
**contribution [2]** 17/21 18/3
**contributions [1]** 17/23
**control [4]** 23/3 23/5 28/17 48/24
**conversation [6]** 87/7 88/3 88/13 88/15 89/8 92/13
**conversations [15]** 63/2 88/1 88/11 88/20 88/23 89/3 90/13 90/18 91/13 92/10 92/25 93/5 95/8 95/16 109/13
**COO [2]** 31/16 31/18
**coordination [1]** 15/5
**copied [1]** 65/17
**copy [3]** 8/16 82/20 112/16
**corporate [2]** 19/2 19/5
**corporation [5]** 1/7 1/10 1/19 3/8 19/4
**correct [38]** 17/13 19/9 20/14 23/17 24/5 25/1 27/3 27/18 28/7 34/10 34/16 36/11 36/22 38/7 40/13 53/2 54/20 63/14 65/9 70/8 74/3 76/8 79/16 83/8 88/25 95/17 97/25 98/1 98/15 98/21 98/22 99/4 99/9 99/23 104/17 104/21 108/20 117/5
**correction [2]** 117/9 117/14
**corrections [3]** 117/7 117/8 117/11
**cost [4]** 46/3 46/7 46/8 85/10
**Costco [15]** 26/17 26/18 26/22 26/25 27/4 27/5 27/11 27/13 27/16 27/19 28/9 28/14 28/17 70/14 101/1
**costs [1]** 84/22
**could [7]** 10/18 40/17 57/2 76/15 79/13 112/20 113/9
**couldn't [2]** 50/3 62/2
**counsel [5]** 10/16 32/22 34/9 116/14 116/15
**counting [1]** 45/15
**COUNTY [5]** 1/2 22/20 22/23 96/25 118/3
**couple [9]** 21/9 21/12 33/5 71/12 92/6 102/13 106/16 106/19 109/21
**course [1]** 90/21
**court [10]** 1/2 3/2 3/21 10/8 10/11 68/23 114/16 116/6 116/21 117/12
**COVID [1]** 45/23
**CPLR [4]** 8/5 8/19 8/20 8/21
**created [2]** 64/13 64/15
**creation [1]** 63/20
**credit [8]** 24/3 24/10 38/4 38/5 38/13 38/17 38/19 38/20
**critical [1]** 112/4
**crush [1]** 49/20
**Cummingham [1]** 10/2
**CUNNINGHAM [2]** 2/17 2/19
**Cuomo [1]** 55/8
**Cup [1]** 93/16
**curiosity [2]** 95/5 101/23
**current [4]** 17/8 17/10 18/23 37/6
**currently [6]** 18/5 29/9 29/17 55/12 55/13 55/19
**customers [1]** 43/5
**cutoff [1]** 66/8
**cuts [1]** 61/22
**CV [1]** 3/6

**D**

**d/b/a [1]** 3/13
**Dan [1]** 10/5
**DANIEL [1]** 4/12
**date [9]** 11/21 11/22 24/8 28/17 32/20 35/7 35/12 35/15 54/24
**dated [1]** 32/19
**dates [2]** 32/2 35/14
**DAVID [11]** 2/5 9/9 20/19 23/7 40/15 50/7 50/8 55/23 85/19 105/15 107/6
**Davis [3]** 31/14 31/14 31/17
**DAVOLI [3]** 2/12 4/5 9/15
**day [11]** 59/3 90/17 103/3 103/13 103/14 104/4 105/22 106/6 116/18 117/22 118/6
**daylight [1]** 103/18
**deal [3]** 26/23 26/25 39/10
**deals [1]** 57/22
**Dear [1]** 117/4
**deceiving [1]** 45/11
**deceptive [1]** 47/19
**decide [1]** 91/25
**deed [1]** 22/22
**deemed [1]** 8/22
**deep [1]** 66/5
**Defendant [7]** 1/18 1/23 2/7 2/20 4/7 4/10 4/14
**Defendants [7]** 1/11 1/14 2/10 2/14 2/17 3/10 3/15
**Defendants/Third-Party [1]** 1/14
**degree [3]** 13/6 13/12 13/17
**Delaware [1]** 2/21
**delay [4]** 26/12 26/13 26/14 91/18
**demolished [1]** 25/6
**demolishing [1]** 25/9
**department [5]** 92/10 92/11 92/16 92/25 93/5
**depends [1]** 47/5
**deposition [13]** 8/11 8/15 8/18 8/19 8/22 43/13 43/20 56/15 104/8 105/20 117/6 117/6 117/7
**depositions [2]** 8/6 117/5
**describing [1]** 44/6
**Description [2]** 6/3 7/3
**designated [1]** 101/21
**desired [1]** 117/9
**desk [2]** 59/25 60/15
**despite [1]** 98/13
**details [1]** 28/22
**determined [2]** 50/23 51/4
**Determining [1]** 48/19
**develop [1]** 22/10
**developed [1]** 29/11
**development [10]** 1/7 1/19 3/8 20/8 22/20 24/6 24/7 27/12 70/10 97/2
**DIAMOND [1]** 1/9
**Diana [1]** 11/16
**did [117]** 13/2 13/4 13/6 13/9 13/11 13/12 13/12 13/14 14/7 14/7 14/19 14/22 15/12 16/12 16/24 17/14 20/24 21/24 22/16 22/17 23/2 23/20 23/20 24/4 24/12 25/6 25/25 26/11 26/17 27/6 27/8 27/8 27/15 31/19 32/22 34/4 34/12 35/3 39/24 40/4 40/9 42/17 48/24 49/3 49/10 49/23 50/7 52/12 52/19 55/2 57/16 57/17 57/17 57/19 57/19 57/20 58/17 59/4 59/12 59/15 61/19 62/13 62/13 62/22 63/1 68/8 69/10 69/21 71/11 71/20 72/3 72/8 72/12 73/11 78/22 78/25 80/12 82/14 83/10 86/20 87/5 87/6 87/8 87/25 88/10 88/15 88/19 89/25 90/12 90/17 90/18 90/23 91/10 91/13 91/16 92/9 92/15 92/18 93/4 93/25 94/4 95/8 98/4 101/23 102/2 102/15 103/3 103/5 103/8 103/9 104/1 105/7 106/25 109/4 109/8 109/13 110/25
**didn't [14]** 11/20 15/16 28/21 59/5 74/18 75/17 87/17 95/10 95/25 103/24 104/20 105/23 115/5 115/7
**difference [1]** 38/3
**different [5]** 38/8 42/10 46/10 57/21 105/6
**differently [1]** 75/20
**dine [1]** 38/23
**dine-in [1]** 38/23
**direct [1]** 110/1
**direction [2]** 44/15 44/16
**directly [2]** 102/16 105/7
**director [1]** 71/4
**discussion [1]** 64/11
**discussions [2]** 62/23 107/16
**dispute [1]** 86/15
**disruptive [1]** 40/23
**distributed [2]** 18/14 21/19
**DISTRICT [2]** 3/2 3/2
**divvy [1]** 86/2
**do [105]** 11/11 11/24 12/5 12/10 13/9 14/6 15/17 18/1 19/1 19/2 19/4 20/22 21/13 21/15 27/18 28/21 28/22 29/9 29/23 30/3 30/5 30/16 33/16 34/23 35/13 35/14 35/20 35/20 37/20 39/3 39/12 41/15 41/22 41/23 43/11 44/3 49/16 50/6 52/11 53/12 54/15 55/23 56/11 56/22 57/5 57/16 59/2 59/14 59/15 60/10 60/17 61/3 61/5 62/20 63/16 65/11 65/14 67/8 67/11 69/20 69/25 71/13 73/1 73/9 76/13 76/23 77/15 77/17 78/12 79/5 79/22 80/15 80/25 83/3 83/13 83/17 83/22 84/14 84/20 87/23 87/24 91/5 94/7 95/21 95/24 96/21 96/22 97/18 101/18 103/12 103/22 105/18 105/20 107/14 107/19 108/16 110/24 111/18 111/21 111/25 112/24 113/2 114/19 116/8 117/10
**doc [1]** 61/8
**Docket [1]** 3/6
**document [59]** 6/5 6/9 7/5 32/14 48/20 59/20 60/24 61/2 61/3 61/5 61/7 61/12 62/6 62/22 62/25 64/13 64/21 65/3 65/8 65/12 65/18 65/18 65/24 65/25 66/2 66/6 66/13 67/21 70/22 71/19 71/21 71/24 72/2 75/22 75/25 76/4 76/12 76/17 76/18 76/22 76/23 76/25 77/2 77/5 77/7 77/8 77/11 78/8 78/12 79/5 79/11 81/6 81/8 81/12 81/19 82/15 82/16 83/5 83/16
**documents [13]** 40/5 50/22 65/21 76/6 81/21 82/3 82/7 82/8 99/4 99/13 110/9 111/3 113/3
**DOE [1]** 1/10
**does [16]** 18/16 23/14 27/25 33/15 43/23 50/21 69/16 69/17 69/20 69/22 74/24 82/15 94/13 100/6 100/12 100/15
**doesn't [2]** 77/23 101/17
**doing [6]** 14/10 14/25 86/15 88/5 91/4 103/25
**dollars [1]** 38/24
**don't [128]**
**done [7]** 26/5 29/14 59/10 89/18 89/20 89/21 95/19
**door [1]** 45/16
**doorbell [1]** 93/13
**double [1]** 104/13
**doubt [1]** 50/19
**Doug [5]** 72/9 72/14 74/17 74/18 75/7
**Dower [1]** 21/8
**down [13]** 49/21 54/7 59/22 63/7 63/23 64/6 69/6 72/3 87/17 87/19 88/4 91/8 112/21
**drafting [1]** 32/23
**draw [2]** 52/24 67/7
**drawing [11]** 33/11 35/17 64/19 75/21 76/21 77/13 79/4 80/15 83/15 84/13

**D**

drawing... [1] 85/13
drawings [4] 59/8 59/11 81/25 110/20
Drew [1] 12/8
drive [2] 42/12 42/16
drove [1] 91/12
due [3] 26/25 53/13 54/10
duly [1] 9/5
during [28] 26/6 34/13 38/21 42/5 43/6 43/20 48/2 48/5 51/10 51/20 52/21 52/23 54/25 64/11 72/3 72/12 74/8 74/12 74/16 75/9 75/14 83/11 86/20 89/2 93/2 103/20 107/3 107/7

**E**

each [3] 17/21 72/4 101/3
earlier [3] 69/22 74/4 108/11
earshot [1] 89/8
easier [1] 86/11
East [2] 11/9 12/20
economics [2] 13/8 13/8
EDC [42] 1/7 1/19 6/11 9/25 10/19 49/8 49/11 49/14 59/13 59/18 61/13 62/9 62/15 62/18 62/23 63/3 67/5 69/3 69/4 71/16 75/11 75/14 82/22 83/10 83/23 87/2 87/5 87/5 87/9 88/7 90/19 91/21 95/12 95/16 106/9 108/21 109/8 110/4 110/10 111/22 113/25 114/3
EDC's [1] 114/4
education [1] 13/10
effect [1] 8/19
effective [1] 35/12
EHMAN [4] 4/16 10/9 114/14 114/15
eight [1] 18/18
EILERSON [6] 1/7 1/19 2/7 3/8 4/7 10/16
either [6] 31/11 42/12 83/12 84/12 95/3 95/22
Eldred [1] 21/9
electronic [1] 8/24
electronically [1] 8/23
else [14] 11/11 12/17 13/24 16/20 17/6 25/20 28/20 36/23 64/14 73/14 89/2 92/2 94/19 106/15
employed [3] 15/8 25/15 73/7
employee [5] 21/14 72/6 72/14 72/17 116/14
employee-owned [1] 21/14
employees [13] 18/16 31/11 49/11 49/13 63/2 74/7 75/11 78/25 86/21 88/19 92/24 93/4 95/4
employment [4] 15/10 16/12 16/16 94/10
empty [1] 45/12
end [2] 16/21 81/2
ended [1] 16/9
enforceable [1] 81/9
enforcement [2] 52/16 52/20
enforcer [1] 52/9
enlarge [1] 112/24
ensuring [1] 75/2
entire [4] 13/23 14/1 97/17 115/6
entirely [3] 114/23 114/24 115/9
entities [1] 40/19
entitled [3] 83/17 84/14 117/5
entity [1] 22/25
equipment [3] 42/15 44/4 45/5
Eric [3] 17/9 18/8 19/22
ERRATA [3] 116/22 117/6 117/11
ESQ [12] 2/5 2/5 2/9 2/12 2/15 2/19 2/22 2/24 4/5 4/9 4/12 4/16
essentially [1] 23/11
estate [1] 31/16
Etoll [1] 33/12
even [4] 46/4 49/6 51/14 105/23
evening [2] 103/14 103/21
eventually [1] 25/6
ever [14] 47/25 49/5 49/10 81/17 83/10 86/21 88/11 88/19 89/12 92/13 92/15 92/18 110/3 112/16
every [2] 48/7 54/7
everybody [2] 44/21 57/7
everyone [4] 9/12 44/24 81/15 115/18
everyone's [1] 9/8
everything [2] 35/8 102/4
evidence [1] 118/8
exact [1] 91/2
exactly [5] 14/10 14/12 82/12 95/6 107/12
examination [13] 3/19 8/7 8/8 8/12 8/16 8/19 11/2 93/21 96/15 102/9 106/22 109/23 114/13
examined [2] 8/11 8/17
example [1] 43/16
examples [1] 15/3
except [3] 8/6 45/2 94/20
Exchange [1] 4/7
excuse [10] 26/4 33/3 42/25 53/17 55/11 58/12 62/13 63/18 67/24 69/16
executed [1] 64/24
execution [3] 35/7 62/21 62/25
exercised [1] 79/13
exhibit [22] 6/3 9/2 32/4 32/9 43/10 43/21 44/3 44/19 45/6 46/12 47/19 47/19 60/22 63/15 76/12 82/17 105/16 105/20 105/21 107/20 110/7 110/8
Exhibit 3 [4] 105/16 105/20 105/21 107/20
Exhibit 4 [5] 43/21 44/3 44/19 45/6 46/12
Exhibit A [1] 63/15
Exhibit B [1] 32/9
Exhibit C [2] 43/10 76/12
exhibits [2] 43/12 104/7
existence [1] 20/24
expect [1] 102/3
expectation [1] 38/21
expected [2] 74/10 74/14
explain [3] 27/10 34/18 36/2
expressed [3] 90/2 90/6 106/24
extended [1] 46/13

**F**

facade [1] 108/16
face [1] 107/14
facilities [1] 57/4
facility [1] 65/20
facing [1] 108/6
fact [2] 98/23 99/6
failure [1] 8/7
fair [18] 23/2 27/25 28/3 33/24 37/10 40/25 43/3 46/19 47/8 50/22 69/3 97/3 97/12 97/22 98/10 99/14 99/18 100/24
fairly [1] 43/24
fall [1] 45/24
falls [1] 74/22
familiar [5] 30/23 70/25 89/9 89/13 89/16
family [1] 11/12
far [8] 22/15 23/8 35/25 48/19 56/6 65/5 71/18 71/18
fed [1] 111/17
Federal [5] 10/8 10/11 24/2 24/10 114/16
feel [1] 117/7
feels [1] 56/5
feet [1] 109/3
few [6] 30/8 55/25 57/3 93/23 114/10 114/17
few-minute [1] 57/3
Fighting [1] 26/7
figured [1] 101/25
filed [1] 117/6
filing [2] 8/14 117/12
final [2] 16/7 16/19
finalized [2] 31/23 32/20
finance [1] 15/5
financial [1] 56/11
financially [1] 116/16
find [2] 75/6 76/8
finding [1] 28/25
FINE [2] 4/14 10/10
finish [6] 28/22 38/22 47/15 56/19 73/21 109/6
firm [6] 2/3 2/10 4/3 9/16 10/7 10/13
first [18] 14/22 20/24 25/25 26/18 26/21 26/22 29/4 30/10 30/15 60/12 60/16 60/20 65/14 70/22 77/8 94/14 104/12 112/21
Fitness [1] 30/7
five [2] 91/22 92/3
fixturing [1] 66/7
flip [1] 98/23
Floor [1] 4/8
focused [2] 16/22 21/20
foggy [1] 45/23
followed [2] 75/3 81/4
following [7] 90/12 91/8 91/14 91/19 93/4 108/13 108/21
follows [1] 9/6
followup [3] 88/14 93/23 106/16
followups [2] 92/7 114/18
foregoing [1] 116/8
foreman [1] 108/19
forget [1] 98/3
forklift [2] 103/9 106/6
form [28] 6/5 8/7 20/10 23/6 33/20 40/16 46/25 47/2 51/2 53/11 58/20 69/9 78/18 79/8 84/11 85/2 85/18 98/25 105/12 111/5 111/6 113/22 113/24 115/2 115/4 115/11 115/13 117/7
formally [1] 34/4
format [1] 15/17
formation [1] 22/9
forming [2] 14/11 14/12
forms [1] 60/5
forward [3] 72/5 90/22 91/3
founding [3] 17/2 17/3 17/6
four [2] 43/15 45/11
Fourth [2] 1/20 1/23
Fourth-Party [2] 1/20 1/23
frankly [1] 42/13
FRARY [17] 2/14 2/15 9/19 9/20 38/9 43/9 59/20 59/21 63/6 63/22 63/25 96/16 96/17 106/25 107/2 107/5 107/15
free [1] 83/24
frequently [1] 48/9
front [6] 31/25 44/19 45/16 60/25 108/12 109/2
full [6] 11/4 13/18 15/10 15/12 15/13 112/7
full-time [4] 13/18 15/10 15/12 15/13
fully [1] 29/11
funding [8] 23/21 24/4 26/10 35/25 36/3 37/12 39/14 39/24
funds [2] 38/22 39/3
furnished [1] 8/16
furniture [1] 17/24
further [7] 8/9 8/13 8/16 8/18 64/6 114/7 116/13
FUSCO [2] 4/7 10/16

**G**

Gary [1] 10/21
gave [1] 39/22
general [16] 6/9 7/5 27/14 59/13 60/8 67/14 76/22 78/13 81/13 81/16 83/16 90/4 100/21 100/23 110/11 110/16
generally [2] 67/22 69/12

## G


**generated [1]** 59/9
**GERARD [1]** 2/9
**GERBER [4]** 4/10 4/12 10/5 10/5
**Gerry [6]** 9/24 10/20 10/23 10/24 10/25 93/11
**get [18]** 9/8 9/12 13/12 17/24 23/21 24/4 25/6 26/8 30/13 30/17 30/20 31/4 37/25 39/15 45/14 47/21 91/5 95/19
**gets [1]** 101/7
**getting [4]** 12/14 56/6 56/16 100/11
**Giovanni [1]** 89/9
**give [3]** 15/3 111/10 117/9
**gives [1]** 86/6
**glad [1]** 111/15
**gladly [1]** 35/10
**GNC [1]** 47/12
**go [34]** 13/2 15/16 23/7 26/16 33/10 35/9 35/13 35/21 38/8 45/16 47/3 47/14 51/3 53/22 56/19 56/25 58/21 59/14 60/18 60/19 74/11 74/15 75/23 77/19 85/2 95/2 95/4 98/24 103/3 104/16 106/17 109/6 111/7 113/9
**goes [1]** 35/25
**Goethe [16]** 1/25 3/19 9/4 11/6 11/7 15/15 57/15 67/25 78/6 96/9 96/17 96/24 102/11 106/24 117/4 117/20
**going [48]** 13/23 13/25 14/4 15/25 25/22 26/8 26/19 26/21 30/3 30/9 34/23 35/10 41/3 41/15 43/5 43/22 45/25 46/24 47/5 48/14 48/17 48/20 50/6 50/24 52/25 55/16 57/23 59/19 67/7 70/19 72/5 74/4 74/6 75/2 80/22 81/10 90/22 91/3 91/11 94/23 94/25 95/19 103/20 104/16 104/22 106/17 110/6 114/17
**gone [1]** 37/16
**good [4]** 43/16 57/10 97/19 111/9
**got [8]** 26/23 31/6 35/14 56/20 76/2 102/5 104/14 104/15
**governing [1]** 117/5
**Governor [1]** 55/8
**Governor Cuomo [1]** 55/8
**graded [1]** 49/21
**graduate [1]** 13/7
**great [1]** 35/23
**gross [2]** 54/11 54/12
**ground [5]** 15/16 97/2 97/6 97/10 97/24
**group [142]**
**Group's [4]** 43/3 62/10 74/15 85/21
**guess [15]** 9/14 37/3 56/3 56/21 60/13 73/18 73/20 78/11 81/10 82/14 84/2 84/23 88/14 91/17 101/10
**guess my [1]** 56/3
**guy [1]** 96/22
**guys [2]** 95/19 104/15


## H


**had [57]** 15/4 16/19 17/23 17/24 24/6 24/6 24/11 24/14 24/24 26/16 36/14 36/16 36/18 36/23 39/19 40/5 40/10 41/1 41/14 44/15 44/20 44/21 44/25 53/24 54/5 66/6 67/4 72/10 72/10 73/25 79/6 80/6 80/10 80/10 81/2 84/6 84/20 85/15 86/18 87/7 88/3 88/13 88/20 88/22 89/20 89/21 90/6 90/7 92/24 94/7 95/16 104/13 104/19 106/24 108/15 108/16 110/3
**hallways [1]** 15/6
**hand [1]** 116/17
**handing [3]** 86/25 87/4 87/10
**handling [2]** 88/7 88/8
**Hang [3]** 36/8 77/24 112/6
**happened [1]** 87/16
**hard [2]** 30/13 30/17
**has [20]** 23/3 25/14 29/11 37/11 46/12 46/15 46/18 46/18 54/24 56/11 64/10 77/21 85/23 92/2 97/2 97/6 97/20 99/16 111/17 114/4
**Hathaway [2]** 23/22 23/23
**have [179]**
**haven't [1]** 109/16
**having [4]** 9/5 48/15 75/12 92/13
**he [28]** 19/6 19/10 25/14 25/20 25/22 31/15 31/18 40/19 63/23 71/8 71/9 71/16 72/9 72/10 72/10 72/10 72/11 72/17 72/18 72/25 75/19 88/7 90/23 90/25 90/25 91/3 91/3 104/21
**he's [5]** 20/12 50/19 74/22 90/25 91/2
**head [2]** 39/7 74/22
**health [4]** 92/11 92/17 93/1 93/6
**healthy [1]** 88/9
**hear [3]** 50/3 55/17 62/3
**heard [1]** 93/13
**heath [1]** 92/12
**held [1]** 3/22
**HELLER [2]** 4/9 10/15
**Hello [2]** 102/11 114/15
**helpful [1]** 112/25
**here [24]** 15/17 20/13 34/15 37/25 38/3 47/19 54/15 59/24 60/20 65/25 66/13 75/25 77/14 77/15 77/25 81/21 82/16 83/17 86/8 92/7 93/14 100/11 101/24 108/5
**HEREBY [2]** 8/4 116/8
**hereto [1]** 8/4
**high [2]** 13/2 14/21
**Hill [1]** 12/25
**Hill Road [1]** 12/25
**him [5]** 52/22 71/25 85/21 89/12 90/20
**HINSDALE [129]**
**Hinsdale movie [1]** 113/20
**hire [1]** 74/18
**hired [2]** 25/20 27/14
**his [10]** 31/14 31/17 32/17 71/13 72/18 74/23 75/18 83/14 89/8 90/21
**hit [2]** 26/15 54/16
**hold [1]** 23/14
**holding [2]** 1/9 65/19
**HOLDINGS [2]** 1/9 1/13
**home [2]** 11/7 11/24
**honestly [2]** 89/6 91/16
**hope [1]** 98/17
**hopeful [1]** 88/8
**hospital [2]** 68/11 91/1
**HOTEL [1]** 1/9
**house [1]** 29/21
**how [33]** 11/17 12/3 12/5 13/15 14/14 14/17 15/8 18/14 18/16 25/14 28/13 29/8 34/23 37/20 39/25 41/19 46/1 48/19 52/11 53/23 60/24 66/5 66/5 73/11 73/16 81/9 86/14 89/16 90/7 91/7 91/10 95/19 96/1
**however [1]** 13/17
**hundred [1]** 47/22
**HURWITZ [2]** 4/14 10/10


## I


**I'd [5]** 9/11 35/10 41/25 46/9 111/14
**I'll [15]** 9/14 20/10 23/6 27/24 52/18 56/24 64/3 67/24 78/20 81/11 84/13 100/14 110/7 111/14 113/23
**I'm [93]** 11/22 12/14 14/17 15/19 15/25 28/21 33/5 36/25 37/25 38/14 43/19 43/22 44/16 45/13 45/22 45/23 45/23 45/23 46/4 46/24 47/14 50/3 50/6 50/10 53/2 55/12 55/16 55/18 56/7 56/10 56/12 57/20 59/12 59/19 59/24 60/14 60/24 61/19 63/21 64/7 64/19 66/5 66/5 66/6 66/7 67/6 67/7 67/15 67/15 67/19 68/4 68/10 68/20 71/19 72/16 73/4 73/9 74/9 74/13 75/5 80/1 80/11 81/10 83/1 84/9 84/9 85/4 86/13 87/7 88/21 89/24 89/24 91/16 92/20 92/20 93/3 93/15 94/18 96/5 96/7 96/22 98/3 100/10 104/25 105/19 110/6 111/19 112/11 113/14 114/8 114/17 115/5 115/6
**I've [3]** 38/11 50/20 89/12
**i/p/a [1]** 1/13
**IDA [5]** 22/25 97/5 97/10 97/11 98/13
**idea [7]** 22/11 45/8 64/15 78/9 90/4 96/4 103/24
**identification [4]** 9/3 32/9 60/21 82/17
**identify [3]** 32/13 47/13 117/8
**imagine [1]** 85/11
**immediate [1]** 42/18
**immediately [1]** 16/12
**INC [10]** 1/9 1/10 1/10 1/12 1/13 1/13 1/17 1/22 3/13 3/14
**INC/LLC [1]** 1/10
**incentive [1]** 21/11
**inception [3]** 28/15 28/16 37/10
**include [1]** 110/9
**includes [1]** 110/10
**including [4]** 8/6 8/24 70/14 110/11
**incorporated [3]** 81/18 82/3 82/9
**incorporation [1]** 111/3
**Incorrect [1]** 39/21
**independent [1]** 114/20
**Index [1]** 1/5
**indicated [1]** 30/10
**individual [6]** 29/7 88/6 89/10 89/11 90/21 117/12
**industrial [3]** 22/20 97/1 97/5
**information [1]** 12/14
**informed [1]** 91/18
**initial [1]** 90/17
**initially [2]** 23/22 23/24
**inside [1]** 41/11
**insisted [1]** 38/25
**inspections [2]** 95/24 102/21
**inspector [4]** 52/5 52/8 52/13 52/14
**installation [1]** 51/8
**instance [2]** 27/24 100/7
**insurance [10]** 3/8 3/9 3/13 3/13 10/17 68/2 68/7 69/4 69/11 69/18
**intention [1]** 47/17
**interaction [1]** 75/17
**interactions [1]** 86/21
**interested [1]** 116/16
**interfere [3]** 46/21 47/9 47/17
**interference [1]** 47/23
**internships [2]** 15/2 15/3
**introduced [1]** 72/4
**involved [24]** 17/3 17/6 19/7 19/17 19/19 19/24 25/23 27/16 37/1 37/4 37/7 37/12 37/16 37/19 50/17 58/6 58/10 62/18 63/18 63/19 72/21 72/23 87/18 103/9
**involvement [4]** 30/11 30/13 30/17 49/8
**involving [2]** 87/13 107/17
**irrelevant [1]** 56/17
**is [225]**
**is a [1]** 60/23
**is that [1]** 53/5
**issue [1]** 56/4
**issues [1]** 56/7
**it [198]**
**it's [56]** 18/18 20/13 21/25 22/19 22/23 22/25 23/11 32/5 32/11 32/19 33/5 33/7 35/5 35/6 35/7 35/12 36/11 42/14 44/11 44/25 45/6 45/11 45/14 45/15 46/14 49/19 49/20 51/8 53/2 54/6 56/14 59/13 60/23 61/6 61/25 63/10 70/9 73/4 73/20 75/24 76/11 77/1 80/5 80/21 83/16 87/7 96/24 97/7 97/9 98/14 98/18 100/24 101/15 104/16 108/8 110/6
**its [3]** 8/14 69/11 79/13

**I**

**itself [4]** 27/17 39/5 65/3 97/12

**J**

**Jefferson [2]** 2/11 4/4
**Jen [1]** 114/15
**JENNIFER [2]** 4/16 10/9
**Jerry [2]** 70/24 71/5
**Jim [6]** 31/14 31/14 31/15 31/17 32/17 34/12
**JKR [2]** 78/22 79/2
**job [9]** 16/18 16/19 46/6 102/21 102/25 103/19 104/3 105/8 105/22
**Joe [6]** 47/3 50/6 58/21 61/17 96/9 115/3
**JOHN [1]** 1/10
**Johnson [2]** 71/13 71/20
**join [1]** 78/20
**Jonathan [1]** 21/8
**Joseph [5]** 1/25 3/19 9/4 11/6 117/20
**Joynt [2]** 50/16 50/17
**just [68]** 9/7 10/19 12/14 15/19 21/20 26/20 33/19 37/3 38/9 40/18 40/23 44/14 45/22 45/25 49/19 49/20 50/8 55/21 56/5 56/21 56/25 59/21 59/22 60/13 61/24 64/6 65/19 70/9 72/4 72/24 73/10 73/20 76/3 76/8 76/15 77/24 81/15 81/19 85/19 85/19 87/18 87/19 89/19 90/20 92/6 93/23 95/4 95/12 98/10 98/14 100/21 101/4 101/15 101/23 102/12 105/3 106/18 107/22 108/16 109/7 109/10 109/11 109/21 111/3 113/5 114/10 114/17 114/17
**just don't [1]** 72/24

**K**

**keep [3]** 46/18 83/23 93/25
**KEITH [14]** 2/15 9/19 32/3 34/9 64/1 64/3 64/16 96/17 96/21 104/6 105/17 111/17 112/20 113/8
**Keith Frary [1]** 96/17
**Kelley [1]** 17/9
**KELLY [2]** 4/10 10/6
**Kevin [1]** 21/8
**kick [2]** 100/6 100/15
**kind [6]** 15/17 21/10 31/7 65/19 95/4 98/24
**kindly [1]** 117/11
**KNAPP [2]** 2/5 10/12
**know [78]** 14/17 15/23 17/16 18/2 19/22 22/25 23/5 25/21 26/13 29/10 30/3 31/6 31/9 31/15 31/24 34/11 34/23 36/22 37/20 38/9 40/19 41/23 45/10 46/4 46/9 47/20 47/20 52/9 52/10 52/14 53/12 54/22 55/2 55/14 55/21 56/12 56/14 56/18 56/21 62/20 62/24 64/6 64/14 67/19 69/15 71/7 71/9 72/4 77/12 79/22 80/9 80/23 81/9 85/23 85/23 86/13 86/18 87/17 88/8 89/4 89/7 89/23 89/24 93/13 94/7 94/12 94/16 94/23 95/10 95/19 95/21 95/25 96/3 97/7 103/13 103/22 109/14 111/16
**knowledge [6]** 22/19 90/6 90/7 90/10 91/7 114/20
**known [1]** 70/6
**KOWALEWSKI [5]** 2/22 9/22 102/10 102/12 109/25

**L**

**labeled [1]** 45/2
**lack [3]** 98/12 99/9 112/11
**LAFACE [30]** 1/17 1/22 2/21 3/14 6/11 9/23 86/22 89/9 89/14 89/16 89/20 89/21 89/24 90/7 90/8 90/13 90/15 102/12 102/16 105/8 109/15 109/17 110/2 110/4 110/10 110/25 111/23 113/20 114/3 114/4
**laid [1]** 46/14
**Lake [1]** 11/9
**Lake Road [1]** 11/9
**Lan [7]** 50/1 50/4 50/5 50/12 50/14 50/15 57/15
**Lan-Co [7]** 50/1 50/4 50/5 50/12 50/14 50/15 57/15
**land [19]** 22/16 22/17 22/20 22/24 24/8 24/10 24/11 24/12 28/2 28/6 34/22 34/23 35/2 39/11 62/5 77/5 77/14 97/6 97/12
**landed [1]** 26/17
**Landing [1]** 12/15
**language [1]** 38/17
**Larry [5]** 17/8 19/17 19/21 19/21 19/22
**last [9]** 19/6 29/16 31/18 32/18 45/22 45/24 59/22 68/20 103/23
**later [1]** 108/15
**LAW [6]** 2/3 2/10 2/14 4/3 9/16 10/13
**laydown [4]** 42/14 44/5 44/9 105/24
**lead [2]** 23/13 30/7
**learn [1]** 91/10
**learned [1]** 102/25
**lease [39]** 6/7 22/23 27/18 28/5 28/12 28/13 28/23 31/12 31/25 32/4 34/14 34/18 34/19 35/5 35/7 35/9 38/18 40/13 41/3 42/22 48/21 51/7 52/25 54/3 73/21 73/23 73/24 85/25 97/2 97/6 97/10 97/20 97/25 98/17 98/20 98/21 99/12 107/3 107/7
**leased [1]** 34/23
**leases [2]** 43/3 99/21
**leasing [6]** 15/5 16/8 22/5 22/6 34/22 34/25
**leave [1]** 17/14
**left [7]** 19/10 72/10 73/3 74/17 75/7 84/23 108/6
**less [1]** 46/7
**lessee [6]** 62/4 70/24 77/10 77/14 91/17 98/10
**lessees [1]** 43/4
**let [18]** 15/23 28/22 38/9 39/7 39/21 52/18 52/24 64/6 76/8 100/7 100/13 100/13 100/13 100/14 105/5 105/5 105/6 112/3
**let's [9]** 22/18 23/10 60/12 60/19 76/10 76/11 77/19 91/22 98/24
**letter [2]** 38/25 39/2
**level [1]** 21/16
**Liberty [2]** 2/18 4/14
**lift [1]** 109/11
**like [11]** 9/11 11/18 21/14 31/24 35/9 47/11 56/6 59/23 65/19 76/5 106/7
**liked [1]** 105/14
**limit [1]** 44/22
**limited [1]** 8/24
**line [11]** 38/4 38/5 38/8 38/12 38/16 38/18 38/20 60/7 77/16 117/9 117/14
**lined [3]** 29/23 29/25 30/8
**LIPPMAN [2]** 2/7 9/25
**list [1]** 48/7
**listed [8]** 65/11 77/4 77/10 82/7 83/4 83/5 83/16 86/8
**listening [1]** 111/9
**lists [1]** 113/3
**live [1]** 11/24
**LLC [27]** 1/7 1/8 1/8 1/8 1/9 1/9 1/10 2/17 3/3 3/4 4/7 6/7 6/8 20/24 21/6 21/7 21/17 61/10 61/11 77/9 78/14 78/23 79/2 82/21 82/21 98/14 99/8
**LLCs [1]** 65/20
**LLP [3]** 2/10 4/3 4/10
**loan [11]** 23/12 24/6 24/7 24/11 36/6 36/14 36/17 36/21 37/4 37/20 37/22
**located [1]** 22/16
**location [2]** 8/22 103/5
**long [16]** 11/17 13/15 13/17 14/14 14/17 15/8 25/14 28/13 34/23 45/15 47/20 61/25 73/11 73/16 91/7 112/6
**longer [2]** 17/12 112/5
**look [12]** 22/13 41/25 43/13 45/17 46/9 60/12 80/12 81/20 91/23 98/17 110/3 113/5
**looked [1]** 97/21
**looking [13]** 32/10 45/4 59/24 59/25 60/14 60/15 61/8 63/13 65/25 66/13 71/19 82/15 114/19
**looks [1]** 47/11
**lost [4]** 26/15 26/20 26/21 68/20
**lot [15]** 34/20 42/8 43/8 44/7 44/12 44/15 44/18 44/25 45/3 55/23 56/20 56/23 89/18 94/15 108/7
**lunch [1]** 92/1

**M**

**M1 [2]** 29/19 29/20
**made [6]** 21/9 66/17 87/13 87/15 88/24 117/8
**main [5]** 4/11 24/22 24/23 24/25 26/12
**maintain [2]** 69/10 69/18
**maintenance [2]** 101/14 101/14
**major [1]** 13/8
**make [5]** 8/9 21/15 81/11 84/2 117/7
**makes [2]** 15/18 86/11
**man [2]** 44/4 112/4
**manage [1]** 101/6
**management [10]** 15/6 100/4 100/5 100/6 100/8 100/15 100/22 101/5 101/11 101/20
**manager [18]** 22/6 22/6 72/20 74/11 74/11 74/15 74/18 74/20 75/19 75/20 83/13 83/13 87/22 88/3 88/23 94/8 94/21 95/14
**manager's [1]** 87/23
**managing [1]** 100/19
**MANUFACTURING [1]** 1/10
**many [6]** 12/3 12/5 18/16 29/9 60/24 86/10
**mark [2]** 76/11 117/10
**marked [11]** 6/3 9/3 32/8 43/20 60/21 76/4 82/16 104/7 105/19 107/20 110/7
**marking [1]** 76/16
**married [2]** 11/13 11/17
**materials [5]** 42/15 44/11 83/24 84/3 84/23
**math [1]** 35/13
**may [11]** 8/11 8/19 8/23 12/13 32/19 35/6 86/1 103/11 105/2 112/9 117/8
**May 1st [1]** 35/6
**maybe [3]** 56/8 73/6 75/12
**me [51]** 10/6 11/18 15/3 15/18 15/23 26/4 30/15 31/25 33/3 39/21 42/25 48/7 52/18 52/24 53/2 53/17 55/11 58/12 60/25 62/13 63/19 63/25 63/25 64/6 67/16 67/24 68/12 69/17 76/8 76/13 78/17 90/25 100/7 100/13 100/13 100/13 100/14 105/5 105/6 105/6 106/17 107/10 109/10 111/24 112/3 112/23 115/17 117/22 118/5 118/7 118/9
**mean [34]** 17/16 19/21 21/13 23/5 34/14 38/14 41/24 45/13 49/19 51/20 52/8 56/24 57/21 59/2 59/4 60/15 71/18 73/20 75/5 75/12 80/21 83/2 83/3 85/4 86/12 86/15 89/6 90/10 92/20 92/21 94/13 94/15 101/15 111/13
**means [2]** 8/24 80/24
**medical [7]** 45/20 45/21 46/2 46/6 46/14 70/15 101/3
**meet [3]** 34/12 71/11 83/10
**meeting [5]** 49/5 75/13 87/5 87/9 107/1

**M**

**meetings [8]** 19/3 19/5 48/15 49/3 49/10 71/20 87/1 94/4
**members [7]** 17/12 17/22 21/6 21/7 21/17 24/16 24/17
**membership [2]** 21/18 21/18
**memorable [1]** 96/22
**memorize [1]** 102/4
**memory [3]** 14/17 35/8 97/19
**mentioned [8]** 17/11 34/21 39/17 44/14 45/19 59/18 73/23 74/4
**mentions [2]** 38/4 51/7
**met [12]** 49/13 71/23 71/25 72/3 75/10 89/12 96/19 106/24 107/15 108/18 108/19 108/22
**middle [1]** 103/14
**might [3]** 20/19 33/8 94/22
**million [1]** 66/11
**mine [2]** 77/21 77/22
**minimum [7]** 53/3 53/7 53/12 53/15 53/24 54/7 54/10
**minute [2]** 57/3 68/13
**minutes [3]** 56/1 57/6 93/14
**missed [1]** 10/19
**misspoke [1]** 58/9
**mixed [1]** 70/10
**mixed-use [1]** 70/10
**moment [2]** 67/11 84/17
**money [1]** 39/22
**monies [1]** 53/17
**monitoring [2]** 10/16 94/25
**monthly [1]** 54/8
**months [2]** 73/14 73/15
**more [10]** 15/15 21/2 26/14 39/22 55/24 55/25 56/20 56/23 86/14 108/8
**mortgage [1]** 23/12
**mortgagee [1]** 23/18
**mortgages [1]** 23/14
**Moses [7]** 72/9 72/14 72/21 73/2 73/7 73/11 74/25
**most [3]** 25/7 57/19 90/10
**mostly [1]** 95/18
**mother's [1]** 68/12
**motion [2]** 8/9 8/20
**move [2]** 8/7 8/8
**moved [1]** 72/10
**movie [135]**
**MR [27]** 11/3 11/7 15/15 32/7 57/14 57/15 63/6 63/22 67/25 68/25 78/5 78/6 92/8 93/22 96/16 96/17 96/24 102/10 102/11 106/23 106/24 106/25 107/5 107/17 109/24 112/15 117/4
**Mr. [27]** 18/12 19/6 19/13 19/16 19/19 19/24 24/16 38/9 43/9 59/20 59/21 63/25 70/25 71/3 71/11 71/20 71/23 72/21 73/2 73/7 73/11 74/21 74/25 107/2 107/15 107/16 109/25
**Mr. Adler [1]** 19/24
**Mr. Alderman [2]** 19/6 19/19
**Mr. Atkinson [1]** 107/16
**Mr. Bunnell [1]** 74/21
**Mr. Frary [7]** 38/9 43/9 59/20 59/21 63/25 107/2 107/15
**Mr. Johnson [1]** 71/20
**Mr. Kowalewski [1]** 109/25
**Mr. Moses [5]** 72/21 73/2 73/7 73/11 74/25
**Mr. Passmore [4]** 70/25 71/3 71/11 71/23
**Mr. Valenti [4]** 18/12 19/13 19/16 24/16
**MS [1]** 114/14
**much [8]** 14/8 37/20 46/2 56/5 68/15 86/14 101/18 108/16
**multiple [8]** 14/5 15/1 21/5 21/6 26/7 29/25 30/22 45/12
**MUTUAL [1]** 3/9
**my [40]** 10/7 11/12 13/17 14/17 15/20 16/2 17/8 20/13 20/15 22/19 30/13 30/16 33/19 39/4 53/2 56/3 56/3 59/25 60/15 68/10 68/11 68/21 72/3 80/5 85/19 89/8 91/23 93/14 96/12 96/17 96/24 97/16 101/10 102/11 111/11 112/4 112/11 114/15 115/5 116/17
**my train [1]** 68/21
**myself [4]** 18/7 21/8 32/17 36/22

**N**

**name [13]** 11/5 31/14 31/18 32/18 75/19 75/20 83/14 87/23 94/13 94/14 96/17 102/11 114/15
**names [2]** 12/7 31/10
**NASH [2]** 2/20 9/23
**nature [2]** 40/6 47/6
**nearing [2]** 29/12 29/13
**nearly [1]** 47/22
**necessarily [1]** 102/3
**necessary [2]** 26/10 117/8
**need [11]** 15/21 16/5 26/11 38/8 64/5 68/16 91/5 93/12 93/14 111/10 112/23
**needs [3]** 29/14 85/8 99/11
**negative [1]** 104/13
**negotiation [2]** 38/21 107/4
**negotiations [3]** 31/19 34/13 107/7
**Nelson [2]** 2/24 10/7
**NES [4]** 1/9 1/13 2/18 10/3
**never [3]** 47/17 88/13 106/2
**new [23]** 1/2 2/4 2/8 2/12 2/15 2/18 2/22 3/2 3/22 4/5 4/8 4/8 4/12 4/15 11/9 12/16 12/25 26/22 92/11 101/5 101/6 116/7 118/2
**New York [4]** 11/9 12/16 12/25 92/11
**next [4]** 43/17 43/18 79/12 113/9
**no [99]** 1/5 1/6 3/6 9/2 12/18 12/20 12/21 17/11 18/4 18/10 19/14 19/21 20/1 24/19 24/22 27/17 34/7 40/3 40/24 40/24 41/24 42/12 44/1 44/25 45/8 47/23 48/12 48/12 48/16 49/1 49/5 51/20 51/21 53/14 54/22 55/8 56/22 58/4 62/16 64/15 65/23 69/25 70/2 71/22 73/4 73/4 74/9 78/9 78/24 79/3 79/21 80/14 86/23 87/3 87/24 88/13 88/18 89/12 90/4 90/14 90/16 91/20 92/18 93/3 93/8 94/3 94/6 94/18 94/23 96/3 99/16 100/1 100/13 101/15 101/17 101/25 101/25 102/3 102/18 102/23 103/7 103/8 103/15 103/17 103/24 104/5 104/22 105/9 105/11 109/10 109/16 110/5 112/18 113/19 114/9 114/22 115/8 115/17 117/14
**none [4]** 49/9 65/10 96/9 117/9
**normally [1]** 15/17
**NORTH [1]** 1/12
**NORTHERN [1]** 3/2
**not [102]** 8/8 8/24 11/22 13/14 13/25 19/4 19/4 27/6 27/8 27/8 28/1 28/21 28/22 30/16 33/21 35/14 38/14 40/4 41/22 42/17 44/6 44/7 44/17 45/13 46/4 46/15 46/20 47/9 50/21 51/9 51/12 55/5 55/12 55/18 56/4 56/8 56/10 56/12 56/22 57/9 57/20 58/2 59/4 59/4 59/14 59/15 60/24 62/20 63/21 66/5 66/6 66/7 67/6 67/19 68/8 69/21 69/25 72/16 73/9 74/6 74/9 75/13 78/7 80/11 80/22 81/4 81/17 83/2 83/14 84/4 84/9 85/4 86/14 87/24 88/21 89/25 92/20 92/21 92/23 93/3 94/17 94/18 97/24 98/20 99/2 99/2 99/20 100/2 101/18 102/2 102/3 102/15 103/8 104/16 107/7 108/20 110/7 111/9 112/5 112/5 116/13 117/10
**notarial [1]** 116/17
**Notary [6]** 3/21 8/11 8/12 116/7 117/11 117/25
**note [1]** 33/19
**notes [2]** 91/23 116/10
**notice [2]** 99/8 99/12
**noticed [1]** 50/20
**notification [2]** 33/6 33/20
**now [43]** 16/23 17/10 19/20 19/25 22/19 24/3 25/22 30/9 31/10 32/10 32/17 33/15 37/19 37/23 38/10 42/4 45/18 45/19 45/25 46/11 46/14 48/20 55/6 55/22 60/15 67/14 68/12 73/23 74/20 88/14 92/3 93/15 95/21 97/24 98/17 99/6 99/7 100/11 109/14 110/24 113/8 113/14 113/15
**nowadays [1]** 12/4
**number [14]** 9/11 29/10 37/23 37/24 45/5 46/19 53/14 54/16 54/17 70/13 74/19 80/11 80/11 117/9
**numbers [1]** 46/10

**O**

**O'CONNOR [8]** 2/7 2/9 9/24 9/25 10/20 93/22 109/24 112/15
**oath [1]** 8/22
**object [18]** 8/6 8/8 20/10 23/6 46/24 47/1 51/1 53/11 58/20 78/18 79/8 84/11 85/1 85/18 105/12 111/6 113/23 115/1
**objecting [1]** 40/16
**objection [18]** 8/10 8/10 20/16 33/19 59/17 61/16 66/15 68/3 69/8 78/21 80/20 85/12 85/20 90/24 102/19 105/10 105/13 111/7
**obligation [1]** 73/21
**obligations [4]** 64/10 110/21 111/2 113/17
**observed [1]** 104/3
**obvious [2]** 98/24 101/25
**obviously [2]** 55/5 107/18
**occupancy [1]** 29/16
**occurred [1]** 37/8
**occurring [1]** 102/21
**OCIDA [1]** 22/25
**October [1]** 116/18
**officer [3]** 8/22 52/16 52/20
**OFFICES [1]** 2/14
**oh [8]** 10/21 61/19 61/21 64/3 76/1 77/17 104/24 106/20
**okay [75]** 11/4 13/15 16/2 16/3 16/23 19/12 19/24 20/17 24/15 25/18 25/24 27/7 27/10 28/13 39/7 40/14 43/13 43/19 45/9 46/17 50/20 54/4 56/22 56/24 57/15 59/21 60/17 60/20 61/21 63/5 64/19 67/13 70/19 70/21 75/21 76/19 76/21 77/18 78/10 83/15 83/21 84/19 86/19 91/22 92/6 92/23 93/9 93/12 93/16 94/19 95/1 95/13 95/15 97/11 97/14 98/7 100/3 100/20 100/24 102/14 103/5 103/9 104/24 105/5 106/3 107/13 110/6 111/12 112/16 112/19 113/1 113/7 113/13 113/14 113/15
**old [2]** 14/18 45/25
**Olympic [1]** 2/7
**once [12]** 48/12 48/14 49/22 59/10 74/17 77/7 77/7 93/25 96/19 97/21 98/7 102/25
**one [27]** 2/14 8/10 13/16 21/3 21/22 30/7 43/15 43/17 43/17 43/18 55/2 55/15 55/22 60/7 60/8 60/8 60/10 60/13 60/16 73/6 76/4 80/11 94/24 99/7 104/10 106/5 110/14
**ones [2]** 21/10 21/13
**ongoing [1]** 59/2
**only [2]** 18/18 51/13
**ONONDAGA [4]** 1/2 22/20 22/22 96/25
**Onondaga County [2]** 22/20 96/25
**open [2]** 108/17 109/7
**opened [6]** 26/23 41/23 45/22 45/24 54/23 73/19

**O**


opening [1] 15/6
opens [1] 101/13
operate [4] 38/23 69/20 69/22 69/25
operating [6] 42/5 54/6 90/11 99/24 100/2 100/19
operation [2] 47/10 54/25
operations [2] 74/22 85/16
operative [1] 82/6
opinion [1] 111/11
opposed [1] 59/24
order [1] 85/22
original [3] 8/14 81/19 82/6
originally [1] 24/4
OSHA [6] 88/11 88/13 88/16 88/20 91/4 102/20
other [41] 8/11 8/23 12/10 17/3 17/11 19/3 19/12 19/15 21/12 24/16 24/24 25/3 26/24 36/18 37/15 37/18 42/5 42/19 42/23 43/11 46/22 47/18 57/17 69/21 69/22 69/23 69/25 70/2 70/16 72/4 72/22 74/6 87/25 89/5 89/21 91/24 94/19 95/3 101/3 106/5 109/13
others [5] 17/5 17/24 30/8 96/3 96/4
our [19] 21/21 24/9 26/15 35/10 36/5 37/6 37/23 38/21 39/16 45/2 47/17 49/23 65/20 89/18 90/4 90/5 90/9 90/11 107/3
ourselves [1] 26/16
out [14] 24/9 26/25 35/5 35/7 40/13 46/14 61/22 75/6 79/14 81/8 100/11 101/23 104/17 110/8
outside [1] 103/18
over [13] 15/16 17/18 23/3 48/24 49/16 49/23 50/13 73/18 75/2 86/25 87/4 87/10 91/23
overall [2] 37/22 100/23
oversee [1] 72/7
owe [2] 54/7 110/25
owed [3] 53/4 53/8 53/25
own [7] 12/10 21/24 28/2 69/11 69/23 70/2 98/14
owned [2] 21/14 23/11
owner [15] 6/6 50/19 62/5 62/6 77/5 77/10 77/14 77/15 84/5 86/7 97/11 110/13 110/19 110/23 113/18
owner's [1] 84/14
owners [3] 78/13 85/6 85/6
ownership [5] 18/12 22/15 23/8 39/16 98/9
owns [3] 22/17 23/9 97/5


**P**


P.C [2] 2/20 4/14
p.m [1] 115/21
pad [12] 39/12 49/16 49/17 49/18 49/19 49/23 50/13 50/18 57/16 73/19 86/25 101/16
pads [1] 57/16
page [36] 5/3 6/3 7/3 32/5 32/6 32/10 32/10 32/11 32/12 33/7 33/11 33/17 33/20 59/22 60/20 60/24 63/15 64/20 64/21 64/22 65/15 70/19 70/23 76/18 77/8 77/13 77/20 77/22 77/23 78/7 78/16 83/17 112/22 113/9 117/8 117/14
Page 19 [2] 33/7 33/17
Page 20 [1] 33/11
Page 26 [1] 32/10
Page 8 [2] 64/21 70/23
pages [3] 33/5 60/25 63/11
paid [3] 53/16 53/20 54/6
painter [1] 93/14
Palisades [2] 16/15 16/18
paragraph [2] 79/10 79/12
parcel [3] 24/22 24/23 24/25
parcels [2] 24/24 25/4
parent [1] 30/25
park [1] 45/10
parking [13] 42/8 42/18 43/8 44/7 44/12 44/15 44/18 45/3 45/3 46/11 46/12 46/15 108/7
part [18] 8/5 13/19 21/17 21/21 22/23 24/10 37/22 39/18 41/13 58/15 67/13 69/2 76/18 82/10 83/22 101/8 101/11 101/19
part-time [1] 13/19
participants [1] 8/23
participate [2] 8/23 62/14
particular [2] 94/17 100/25
particularly [2] 113/9 113/16
parties [6] 8/4 8/18 8/23 78/10 86/18 116/14
partner [3] 17/8 17/10 21/15
Partners [2] 78/22 79/2
party [7] 1/14 1/18 1/20 1/23 58/4 98/20 99/2
passing [2] 75/12 95/18
Passmore [6] 70/24 70/25 71/3 71/5 71/11 71/23
past [1] 77/8
patrons [1] 45/7
Paul [2] 50/16 50/17
paycheck [1] 31/7
paying [1] 55/10
payments [5] 54/8 55/20 66/17 66/19 66/22
Pearl [1] 2/8
people [14] 9/11 17/3 17/11 17/14 21/16 21/20 30/22 45/14 61/23 88/9 89/5 89/7 90/10 94/22
people's [1] 47/18
percent [1] 21/22
percentage [6] 18/11 21/19 21/24 54/12 54/14 54/21
perform [1] 85/15
performed [1] 66/20
performing [1] 67/23
period [9] 14/24 17/18 19/3 26/6 45/24 52/23 72/25 75/7 97/15
periods [1] 75/10
permit [5] 35/15 58/5 59/12 59/16 80/22
person [5] 30/15 52/16 71/11 74/17 118/8
personal [2] 18/2 106/4
personally [5] 12/10 34/12 48/3 49/4 51/17
persons [1] 80/22
PFALZGRAF [1] 2/17
photo [2] 45/11 109/2
photograph [3] 43/23 107/23 108/23
photographs [1] 104/2
physically [1] 8/22
picture [7] 43/24 44/13 44/19 45/4 46/12 47/11 47/25
piece [3] 21/22 44/4 101/4
PILOT [3] 22/24 97/7 97/15
Pitman [1] 31/17
place [5] 4/7 8/21 31/20 38/16 109/9
placed [2] 41/3 51/10
places [1] 14/5
plaintiff [3] 1/20 9/10 10/14
plaintiff's [5] 43/12 43/20 102/22 104/8 105/20
Plaintiffs [5] 1/4 1/14 2/3 3/5 4/3
Plaintiffs' [1] 60/22
plan [4] 50/21 51/24 58/14 86/14
planning [5] 52/4 58/16 58/17 59/7 88/5
please [6] 11/4 38/9 40/17 83/20 117/6 117/10
PLLC [1] 2/3
plot [1] 97/17
point [13] 19/13 23/4 27/15 36/23 54/19 54/21 54/25 55/6 55/10 57/3 87/9 88/16 92/9
portfolio [1] 36/22
portion [3] 68/22 84/7 113/2
position [2] 16/7 72/18
possible [1] 45/6
postgraduate [1] 13/10
pouring [2] 14/12 14/12
practice [1] 8/20
precise [1] 40/18
premises [2] 23/3 28/18
prep [1] 108/2
present [7] 2/24 8/23 47/25 48/5 86/25 89/2 107/5
presently [3] 18/17 24/15 27/19
pretty [5] 14/8 56/16 73/9 80/21 108/16
previously [1] 107/20
primarily [4] 49/15 94/24 95/12 100/18
primary [1] 75/14
principal [2] 17/2 18/8
principals [4] 18/5 21/3 21/5 95/3
prior [14] 37/6 49/15 51/22 62/21 62/25 71/21 71/24 71/25 72/5 86/24 87/4 87/9 88/10 102/21
probably [6] 16/4 43/15 43/15 48/12 69/21 87/7
problem [1] 115/8
procedure [1] 117/5
proceeding [1] 116/9
proceedings [2] 115/20 116/12
process [2] 58/16 62/14
produced [1] 78/10
producing [1] 9/17
products [1] 84/8
professionals [1] 95/22
program [1] 97/7
progress [6] 66/17 66/18 66/22 74/5 94/25 95/3
project [45] 21/20 22/12 26/8 26/22 29/15 36/2 37/13 41/8 52/7 58/3 58/7 58/11 58/13 66/12 68/2 68/7 69/5 69/11 72/7 73/17 74/10 75/20 79/19 79/22 79/23 80/4 80/8 83/13 84/24 85/17 87/22 87/23 88/2 88/3 88/23 91/5 91/8 91/10 91/19 92/14 92/16 93/2 93/6 95/14 102/16
projects [7] 67/23 69/23 69/25 72/22 89/21 90/5 99/17
promises [1] 41/14
proper [1] 23/16
properties [5] 12/10 12/12 23/15 70/16 100/21
property [15] 12/9 29/1 29/8 69/18 69/23 69/24 70/3 70/14 97/3 98/14 100/3 100/9 100/25 101/8 101/15
proposal [3] 63/8 63/16 63/20
proved [1] 118/7
provide [3] 38/25 39/11 39/13
provided [5] 8/5 8/20 66/21 66/22 67/18
providing [4] 36/3 36/5 38/24 64/12
provision [4] 33/23 67/8 79/20 81/4
provisions [1] 33/25
Public [6] 3/21 8/11 8/12 116/7 117/11 117/25
pull [4] 43/10 45/13 104/6 105/16
purpose [12] 18/20 22/8 29/20 29/21 38/4 38/12 38/17 38/18 38/20 41/6 48/17 98/13
purposes [3] 8/20 8/21 99/8
pursuant [15] 8/19 38/2 54/9 62/9 66/10 66/18 67/3 79/5 79/6 79/15 79/17 80/3 80/5 80/25 85/14
purview [1] 74/23
put [4] 32/3 49/21 59/20 111/13
putting [1] 11/18
Pyramid [9] 14/8 14/23 14/25 15/4 15/9 15/13 16/6 16/7 16/16

## Q


**question [32]** 8/6 8/8 10/18 15/21 15/22 15/24 15/25 16/2 20/11 23/7 27/25 37/2 38/10 47/4 52/19 67/14 67/25 68/20 78/19 79/9 80/10 82/14 84/12 88/15 100/14 101/10 104/12 104/18 105/14 111/14 111/20 115/7
**questions [17]** 15/16 15/18 43/1 56/13 85/20 86/10 91/24 92/2 93/23 96/12 102/13 106/12 106/19 114/9 114/11 115/16 115/17
**quick [5]** 91/23 92/7 106/19 113/5 114/17
**quickly [1]** 25/22
**quite [4]** 12/4 63/21 92/20 92/21


## R


**rather [2]** 40/15 40/17
**reached [1]** 54/24
**reaching [1]** 55/5
**read [21]** 8/14 38/11 67/11 68/19 68/23 83/20 84/17 85/24 104/16 104/22 110/3 110/6 111/4 111/10 111/13 113/11 113/13 113/15 113/25 117/5 117/6
**reading [4]** 110/24 113/14 114/24 115/6
**ready [1]** 87/7
**real [2]** 31/16 114/17
**really [8]** 15/16 18/25 56/10 65/23 75/13 91/23 101/17 101/18
**reask [2]** 100/13 100/14
**reason [2]** 77/22 117/9
**reasons [2]** 99/12 117/14
**recall [31]** 31/21 35/14 36/19 37/7 37/24 41/22 49/5 59/14 62/24 63/4 71/25 72/8 72/21 73/2 75/6 75/18 83/14 87/11 87/23 89/4 89/6 91/16 92/13 93/8 103/11 103/12 105/20 107/11 107/18 108/14 108/23
**receipt [1]** 55/20
**receipts [2]** 54/11 54/12
**received [3]** 53/16 54/11 59/8
**receiving [1]** 66/11
**recess [6]** 57/12 68/17 78/3 92/4 93/18 112/13
**recession [2]** 26/15 27/1
**recessions [1]** 26/7
**recognize [4]** 61/5 76/23 107/14 107/22
**recollection [7]** 34/22 73/5 74/24 95/15 97/16 105/21 106/5
**reconfigured [1]** 46/15
**record [11]** 9/7 9/12 19/2 32/7 76/10 76/11 81/11 88/10 93/7 105/4 116/11
**record's [1]** 76/3
**records [1]** 94/1
**recover [1]** 88/9
**redevelop [1]** 18/22
**redirect [1]** 37/3
**reference [3]** 43/2 81/18 82/10
**referenced [1]** 64/11
**references [1]** 99/6
**referencing [2]** 82/16 83/6
**referred [2]** 62/6 77/15
**referring [1]** 96/6
**refresh [1]** 74/24
**refreshes [1]** 105/21
**regarding [1]** 92/14
**regardless [1]** 75/4
**reinvent [1]** 26/16
**related [4]** 59/6 85/16 114/23 115/9
**relates [2]** 65/8 65/21
**relating [1]** 78/11
**relationship [9]** 22/3 27/10 28/9 59/5 65/5 65/22 66/12 70/5 108/23
**relative [1]** 116/14
**relevant [2]** 12/13 46/5
**remember [49]** 13/16 14/6 14/18 16/21 17/19 18/4 19/10 21/10 21/21 21/25 22/13 24/7 25/10 28/21 28/22 29/7 30/14 30/16 31/13 31/17 31/25 32/17 33/4 36/24 37/23 41/22 41/24 41/25 49/6 51/12 51/14 52/22 53/10 53/14 55/4 65/14 72/9 72/11 72/25 73/13 75/16 87/6 91/2 91/9 96/20 96/21 103/17 106/9 106/25
**remote [1]** 8/23
**remotely [2]** 3/20 116/9
**removal [1]** 84/8
**removed [2]** 25/12 84/4
**rent [11]** 53/4 53/7 53/13 53/16 53/25 54/7 54/10 54/15 54/21 55/10 95/20
**RENTALS [8]** 1/9 1/10 1/12 1/13 1/13 2/17 2/18 10/4
**rep [2]** 31/16 95/12
**rephrase [4]** 15/25 52/18 67/24 69/17
**replace [1]** 74/18
**reporter [4]** 3/21 68/24 116/7 116/21
**represent [6]** 9/20 43/22 43/24 96/18 102/12 114/16
**representative [3]** 71/16 94/9 108/21
**representatives [3]** 90/15 91/14 109/8
**represented [1]** 34/8
**representing [9]** 9/10 9/16 9/23 10/7 10/10 10/13 10/19 20/12 33/12
**represents [1]** 78/13
**reputation [1]** 89/19
**request [2]** 81/11 92/15
**requested [1]** 68/22
**required [3]** 17/21 58/2 69/4
**requirement [3]** 51/13 51/13 51/15
**requirements [4]** 39/25 40/4 40/9 41/2
**reserved [2]** 8/7 8/9
**reside [1]** 11/11
**respect [3]** 25/24 52/25 58/25
**respective [1]** 8/4
**responsibilities [7]** 39/19 85/25 86/2 86/7 86/17 110/22 113/17
**responsibility [3]** 91/21 101/11 114/4
**responsible [12]** 20/7 25/8 27/12 28/24 39/9 59/16 67/25 68/5 68/7 85/10 94/24 114/3
**restaurant [1]** 41/17
**restaurant/bar [1]** 41/17
**restrictions [1]** 45/3
**retained [2]** 59/10 71/10
**retention [1]** 112/12
**return [1]** 117/11
**reverse [2]** 39/10 98/6
**reverts [3]** 39/16 98/4 98/8
**review [2]** 101/23 115/10
**reviewed [2]** 64/7 64/9
**revolving [1]** 38/16
**Richard [2]** 25/14 25/17
**right [35]** 8/6 16/6 34/15 36/13 37/19 41/19 45/5 55/6 55/22 59/8 68/12 68/19 76/19 77/13 79/7 79/13 84/6 84/14 84/21 85/15 86/9 87/12 92/3 99/7 99/22 100/11 102/17 105/24 106/7 106/8 106/11 107/23 109/2 112/22 115/19
**rights [6]** 8/5 85/22 85/23 85/24 86/7 86/17
**ring [1]** 93/13
**RJI [1]** 1/6
**ROAD [110]** 1/8 2/4 3/4 6/7 9/17 11/9 12/25 20/23 21/3 21/6 21/24 22/4 22/5 22/7 22/8 22/21 23/3 23/18 23/21 24/17 25/11 26/5 27/11 28/6 28/25 33/13 34/2 34/5 36/12 36/16 39/6 40/10 40/25 42/20 43/2 43/3 46/20 50/11 50/11 50/12 50/22 51/23 53/4 53/8 53/13 53/15 53/24 54/10 55/11 55/19 57/24 58/8 58/10 58/18 58/22 61/11 62/5 62/10 62/13 62/22 63/19 64/8 64/25 65/6 65/22 66/21 67/4 67/22 68/4 68/8 69/3 69/10 69/17 69/20 69/22 70/4 72/6 72/15 72/17 72/23 73/3 73/10 73/12 73/24 74/7 74/14 77/4 77/9 78/14 78/25 79/6 79/13 79/25 80/3 80/6 81/2 82/21 84/5 84/20 85/7 85/14 85/21 86/3 87/8 88/19 89/22 92/24 96/8 96/8 104/19
**roads [1]** 42/16
**rows [1]** 45/12
**rubbish [3]** 83/24 84/4 84/23
**rules [5]** 8/6 15/16 56/15 110/14 117/5
**runner [1]** 49/20
**running [1]** 91/5
**RUPP [2]** 2/17 10/3
**Russells [1]** 12/15
**RYAN [2]** 4/9 10/15


## S


**safety [9]** 92/10 92/11 92/17 92/25 93/5 94/4 95/22 95/24 110/13
**said [20]** 16/23 17/10 19/21 21/12 24/20 31/24 58/9 61/20 69/6 87/18 88/22 91/3 93/24 100/12 104/20 104/22 108/10 108/19 109/7 109/11
**sales [3]** 54/12 54/13 54/21
**same [10]** 8/18 13/22 14/24 50/7 60/14 105/13 111/7 115/13 116/10 116/16
**SANTACROSE [2]** 2/14 9/20
**satisfactory [1]** 118/8
**satisfy [1]** 95/4
**saw [3]** 91/12 105/22 106/2
**say [31]** 14/9 15/12 23/2 24/23 25/20 27/25 28/16 29/13 31/10 33/15 33/24 37/10 39/21 40/25 42/25 43/4 46/19 47/8 48/21 49/17 50/7 50/23 51/16 52/9 54/5 58/24 69/3 73/24 90/23 96/5 112/3
**saying [2]** 46/18 73/4
**says [15]** 33/16 65/3 65/4 67/12 67/18 70/24 77/14 79/10 79/12 86/6 86/6 86/13 86/13 110/15 113/16
**scanned [1]** 111/23
**scene [1]** 103/16
**school [4]** 13/2 13/23 13/25 14/21
**screen [5]** 41/6 60/23 98/18 99/7 107/20
**scroll [5]** 59/21 63/7 63/23 64/16 112/21
**seal [2]** 116/17 118/16
**sec [1]** 77/24
**second [8]** 36/8 60/8 75/24 76/18 77/24 82/16 83/5 104/10
**seconds [2]** 111/25 112/5
**secretary [2]** 18/23 18/25
**section [14]** 8/19 8/20 79/4 79/6 79/15 79/16 80/16 80/19 83/17 84/14 84/18 113/10 113/11 113/13
**Section 1.9 [2]** 113/11 113/13
**Section 2.3 [1]** 79/15
**secure [2]** 31/12 69/4
**secured [2]** 36/15 36/17
**securing [2]** 68/1 68/7
**see [31]** 33/16 39/21 44/3 44/4 44/5 44/13 44/19 45/12 46/11 47/10 56/8 56/17 59/23 60/13 61/3 63/16 67/8 71/13 74/5 77/15 77/17 80/16 83/17 84/14 85/8 91/23 94/23 103/5 103/9 107/19 113/2
**seeing [1]** 65/14
**seemed [1]** 88/7
**seen [2]** 99/6 112/16
**selected [2]** 48/22 62/11

**S**

**selecting [1]** 48/25
**selection [5]** 30/12 49/7 49/8 62/15 62/18
**SELECTIVE [5]** 3/13 3/13 4/14 10/10 114/16
**sense [1]** 84/3
**sent [1]** 65/18
**separate [4]** 20/19 66/7 76/5 76/7
**serve [1]** 61/13
**service [1]** 46/13
**set [2]** 21/19 114/8
**shaking [1]** 39/7
**shall [7]** 8/8 8/16 8/22 110/15 110/19 110/20 113/16
**shareholders [2]** 19/12 19/15
**SHAUN [2]** 1/3 87/13
**sheet [4]** 42/2 117/2 117/7 117/11
**sheets [1]** 117/8
**shell [10]** 39/14 39/17 39/18 39/20 39/23 39/23 39/24 39/25 41/20 66/3
**shopping [6]** 15/6 18/22 23/16 100/19 100/21 101/21
**short [6]** 57/12 68/17 78/3 92/4 93/18 112/13
**shortly [1]** 87/15
**should [1]** 117/7
**showing [5]** 32/7 43/19 63/15 78/17 105/19
**shown [1]** 60/20
**shows [1]** 42/2
**shut [4]** 87/17 87/19 87/19 91/8
**shy [1]** 13/16
**side [2]** 42/13 108/6
**sign [3]** 8/14 45/6 117/10
**signatory [2]** 99/3 99/20
**signature [13]** 32/6 32/12 60/6 64/20 64/22 70/19 71/14 71/21 77/20 77/22 77/23 78/7 82/5
**signed [8]** 7/5 26/23 26/24 32/13 81/12 81/12 81/17 81/23
**signing [2]** 71/24 72/2
**signs [1]** 45/2
**silence [1]** 61/25
**similar [2]** 28/8 100/4
**since [4]** 22/2 37/10 37/16 54/23
**sir [7]** 11/4 12/19 93/23 96/19 105/19 106/11 112/24
**sit [1]** 44/24
**site [65]** 24/21 29/17 30/14 30/18 30/21 31/5 42/14 43/23 45/17 47/22 48/2 48/10 48/11 48/15 48/18 49/20 49/24 49/25 50/21 51/24 52/12 52/14 58/3 58/14 74/5 74/7 74/11 74/15 75/2 75/4 75/9 80/23 83/10 84/4 84/21 84/23 85/8 86/20 86/25 87/5 87/10 87/16 88/4 88/23 89/7 90/18 92/15 92/21 93/24 94/2 94/5 94/8 94/17 94/20 95/7 95/8 95/11 95/24 102/21 102/25 104/3 105/8 105/22 108/13 108/21
**size [3]** 40/6 40/11 41/2
**Skaneateles [6]** 11/9 12/9 12/15 12/22 12/23 13/3
**smaller [1]** 21/9
**SNYDER [10]** 2/3 2/5 9/9 10/13 11/3 57/14 68/25 78/5 92/8 106/23
**so [92]** 9/11 13/17 13/22 16/5 16/6 19/4 20/3 20/18 20/23 21/15 21/17 21/20 22/21 22/24 24/15 26/4 26/9 26/21 26/22 26/24 27/10 28/11 28/24 31/8 33/24 35/7 35/12 35/15 35/25 36/14 37/2 37/4 37/10 38/10 39/3 39/4 39/17 40/4 40/9 40/25 41/13 41/19 42/16 44/9 44/24 45/4 45/13 49/20 53/21 54/5 54/23 57/15 60/10 60/15 61/23 62/4 63/23 64/19 70/4 70/9 72/4 72/12 73/9 74/24 76/3 76/10 81/15 81/19 82/5 82/14 82/23 85/19 86/5 89/20 90/4 95/2 97/9 99/11 100/24 101/9 101/16 102/15 103/20 105/3 106/2 106/4 107/8 107/11 107/11 107/22 107/22 108/25
**software [1]** 8/24
**sole [1]** 98/13
**some [13]** 17/23 17/23 19/3 21/18 21/18 36/23 40/9 64/10 70/15 77/22 88/22 90/6 100/3
**somebody [2]** 96/10 99/11
**someone [7]** 25/12 25/20 30/19 31/3 36/23 45/10 64/14
**something [11]** 13/24 16/19 28/20 31/15 56/8 69/21 73/14 100/4 100/10 100/11 101/5
**sometime [1]** 35/16
**sometimes [2]** 61/22 61/25
**somewhere [2]** 26/3 73/15
**sophisticated [1]** 107/10
**sorry [26]** 10/22 28/21 36/25 45/23 47/14 50/3 50/10 61/19 66/5 67/15 67/15 68/4 68/10 68/20 74/13 80/2 93/15 96/5 96/7 98/3 100/10 104/25 109/6 111/19 112/11 115/5
**sounds [1]** 76/5
**SOUTHERN [12]** 1/8 2/15 9/21 30/23 31/3 31/8 31/11 53/17 71/8 95/23 96/18 111/2
**space [2]** 47/23 51/5
**spaces [1]** 45/12
**speak [1]** 55/16
**spec [1]** 49/22
**specific [4]** 45/1 75/6 81/5 100/20
**specifically [18]** 30/15 30/19 31/9 41/7 52/5 52/10 52/15 52/23 55/15 59/5 59/15 67/16 67/24 70/5 71/9 87/6 95/10 108/8
**specification [1]** 49/22
**specifications [3]** 81/25 110/16 110/20
**spelled [3]** 35/5 35/7 40/13
**spells [2]** 81/8 110/8
**spend [1]** 35/10
**spoke [1]** 88/7
**spoken [1]** 109/16
**spot [1]** 11/18
**stage [1]** 42/15
**staging [2]** 42/14 45/18
**stand [3]** 55/12 55/14 55/18
**standard [4]** 6/5 60/4 61/6 98/25
**standing [1]** 44/5
**stands [2]** 55/19 55/22
**start [14]** 9/15 14/19 14/22 15/12 15/18 16/24 18/3 22/11 22/18 23/10 26/2 35/3 60/16 73/6
**started [9]** 13/21 16/14 16/23 17/20 17/24 18/19 21/23 31/21 37/9
**starting [1]** 91/11
**state [8]** 1/2 3/22 11/4 74/13 92/11 116/7 117/9 118/2
**stated [6]** 26/20 58/15 80/2 80/9 83/12 109/16
**statement [11]** 20/9 28/3 37/3 47/16 53/5 61/15 62/7 70/11 74/25 84/25 109/6
**states [6]** 3/2 60/25 71/19 78/16 79/16 85/8
**stationed [1]** 95/11
**steel [1]** 108/17
**stenographic [1]** 116/10
**stepfather's [1]** 68/11
**STEPHEN [3]** 2/12 4/5 33/12
**stepped [1]** 109/3
**steps [1]** 45/15
**Steve [3]** 9/15 20/14 57/1
**STEVENSON [1]** 1/9
**still [15]** 18/8 19/17 37/18 38/6 55/9 69/17 97/8 97/9 98/18 98/18 103/18 103/19 103/19 107/19 113/19
**STIPULATED [4]** 8/4 8/13 8/16 8/18
**stone [1]** 49/21
**stop [3]** 63/24 79/7 104/9
**stopped [2]** 79/15 94/22
**stored [1]** 44/11
**storm [1]** 100/11
**straightforward [1]** 80/21
**Street [4]** 2/8 2/11 4/4 4/11
**strictly [1]** 115/7
**strike [4]** 8/7 8/8 42/4 100/7
**structure [3]** 27/21 38/25 57/21
**structures [4]** 25/3 25/9 25/12 42/10
**stuff [1]** 56/11
**sub [1]** 90/5
**subcontract [11]** 6/11 99/21 110/4 110/9 110/14 111/4 111/22 112/17 113/3 114/18 115/9
**subcontractor [3]** 90/3 110/15 114/3
**subcontractors [2]** 87/2 99/17
**submission [2]** 58/7 58/12
**submit [2]** 59/14 110/7
**submitted [2]** 58/5 59/11
**Subscribed [1]** 118/5
**substance [2]** 95/16 117/7
**such [3]** 8/9 15/22 117/10
**Suffield [1]** 13/3
**SUGARMAN [3]** 2/10 4/3 9/15
**SUHLER [1]** 1/8
**suit [2]** 39/11 98/6
**Suite [5]** 2/11 2/21 4/4 4/11 4/15
**summer [1]** 45/22
**summers [2]** 14/16 14/24
**supervise [1]** 80/13
**supervisor [6]** 79/18 79/23 79/24 80/4 80/7 80/12
**supplemental [2]** 110/12 110/17
**supplied [1]** 95/22
**supposed [3]** 41/10 73/17 79/18
**SUPREME [1]** 1/2
**sure [48]** 9/14 15/19 19/18 20/21 25/19 30/10 33/5 37/25 38/12 38/14 44/17 44/18 45/13 46/4 55/12 55/18 56/10 57/20 60/24 63/9 63/21 63/24 64/7 64/18 66/5 66/6 66/7 67/6 67/17 67/19 72/16 73/9 76/19 78/1 80/11 83/2 84/9 84/13 85/4 86/14 87/7 91/16 92/20 92/21 92/21 94/18 103/21 106/20
**surprised [1]** 103/7
**surrounding [2]** 42/13 42/17
**suspension [1]** 67/9
**sweeping [1]** 15/6
**switched [1]** 36/24
**sworn [4]** 8/11 9/5 117/22 118/5
**Syracuse [10]** 2/4 2/12 4/5 12/19 12/20 12/21 13/11 13/13 13/15 14/4

**T**

**T5 [1]** 1/9
**take [15]** 31/20 56/2 57/2 67/11 68/12 68/15 73/17 77/24 84/17 91/22 91/25 92/3 104/2 111/24 113/5
**taken [8]** 3/20 57/13 68/18 75/2 78/4 92/5 93/19 112/14
**takes [1]** 28/17
**Taking [1]** 29/16
**talked [2]** 52/22 100/25
**talking [5]** 20/20 25/19 61/23 70/4 106/10
**tank [1]** 65/19
**tasked [1]** 100/18
**TAVERN [133]**
**Tavern's [1]** 34/25
**telephone [1]** 8/23
**tell [2]** 87/21 109/8
**telling [1]** 56/12
**ten [2]** 15/11 57/6
**tenant [12]** 15/5 26/18 26/22 29/23

## T

**tenant... [8]** 30/12 35/17 38/2 38/5 38/13 38/15 39/12 44/22
**tenants [17]** 26/11 26/16 26/20 26/21 26/24 28/25 29/9 29/22 29/25 30/3 42/19 42/20 42/23 46/19 55/14 55/21 99/17
**tend [1]** 90/10
**term [7]** 28/13 35/13 35/15 40/18 54/3 98/12 99/9
**terminate [6]** 67/5 67/12 67/16 67/18 67/20 81/3
**termination [1]** 67/9
**terms [5]** 34/18 34/20 35/3 66/8 110/16
**testified [2]** 101/24 102/24
**testifies [1]** 9/6
**testimony [6]** 8/7 8/8 68/23 114/23 115/6 115/8
**testing [2]** 14/17 22/19
**than [7]** 8/12 21/2 40/15 40/17 46/7 94/19 112/5
**Thank [19]** 20/21 35/23 36/10 40/20 40/24 43/16 55/8 57/11 64/4 64/5 76/20 82/13 93/10 96/12 102/6 106/12 106/14 109/19 114/6
**thanks [2]** 10/21 105/15
**that [356]**
**that's [33]** 20/6 20/15 29/17 33/20 36/13 43/14 44/6 45/11 46/16 47/14 63/12 66/25 69/6 73/4 78/16 79/10 79/16 80/9 88/14 93/9 99/8 101/5 101/7 102/5 104/22 105/23 106/3 106/12 107/9 108/20 109/18 115/14 115/18
**theater [8]** 9/21 9/21 41/7 41/16 100/9 100/16 101/2 113/20
**THEATERS [16]** 1/8 1/8 2/15 6/8 30/24 31/4 31/8 31/12 61/10 71/8 77/9 96/18 96/19 97/21 98/10 110/25
**their [22]** 12/7 31/7 31/12 31/16 35/15 39/2 39/15 41/13 42/14 42/14 42/15 44/23 45/14 51/4 52/11 52/11 54/10 54/12 55/5 66/9 73/21 95/4
**them [35]** 14/16 14/19 15/21 16/9 16/18 18/22 24/4 24/7 25/7 27/8 27/9 30/7 30/14 30/17 30/20 31/21 34/20 36/18 36/19 39/22 45/22 45/25 49/16 49/23 55/13 56/17 57/19 57/20 59/16 71/10 75/18 75/20 88/5 91/18 92/14
**then [31]** 12/24 13/18 19/18 20/23 21/9 22/2 22/22 22/23 23/24 24/14 35/13 49/22 50/12 54/15 56/19 56/19 59/11 60/7 65/18 82/14 85/9 91/24 97/6 97/20 98/8 104/21 107/8 107/11 107/11 111/14 117/11
**there [74]** 11/11 17/3 17/5 17/20 18/11 19/12 19/15 21/2 21/3 21/5 21/6 22/18 23/10 24/16 24/21 24/23 25/3 25/19 26/3 26/24 29/23 29/25 30/19 33/10 37/4 37/7 37/15 37/18 42/5 42/8 42/12 42/16 44/5 44/12 44/13 44/14 44/16 45/19 46/11 47/11 48/8 48/14 51/9 51/12 51/16 52/5 53/3 70/20 71/14 72/3 72/6 72/25 74/25 77/16 78/7 79/18 79/22 81/12 89/5 89/5 89/6 91/18 93/25 94/24 95/21 98/14 99/24 100/3 100/8 101/17 103/25 109/11 111/13 112/22
**there's [27]** 9/10 21/18 30/8 34/20 44/25 47/23 49/21 50/20 52/8 57/21 59/25 60/4 60/6 61/24 65/10 65/23 70/13 76/5 94/15 99/7 100/5 101/2 101/3 101/16 101/17 101/17 113/19
**therefor [2]** 117/9 117/14
**these [9]** 42/25 46/19 60/3 60/6 85/20 86/5 86/16 99/17 117/8
**they [72]** 21/16 23/25 24/2 27/14 28/5 28/12 31/6 31/6 31/7 31/8 31/9 31/10 31/22 35/14 36/18 36/18 38/16 38/22 38/25 39/2 39/12 39/12 39/15 39/23 40/9 41/10 41/14 42/15 42/17 42/20 44/11 44/23 44/24 45/8 45/15 48/19 48/25 50/23 51/5 51/5 52/10 52/11 54/6 54/15 55/2 57/16 57/16 57/19 57/19 57/20 59/12 59/16 62/5 66/6 73/25 73/25 75/20 81/16 81/17 87/19 88/5 90/5 91/5 99/13 99/20 101/6 103/24 104/20 108/15 108/16 109/10 109/11
**they're [14]** 24/3 28/8 30/25 45/25 46/10 55/5 76/7 81/19 82/9 90/3 90/9 90/9 91/4 99/20
**They've [1]** 89/18
**thing [1]** 50/7
**things [1]** 82/4
**think [50]** 13/21 15/10 15/14 16/4 18/18 19/17 21/9 22/24 25/21 33/7 39/5 43/10 43/14 43/18 45/24 54/14 56/15 57/20 58/9 60/5 63/10 66/25 69/6 70/2 70/23 72/16 75/24 77/21 85/22 89/12 91/12 93/9 93/11 96/11 96/25 97/21 98/23 100/24 102/5 104/14 104/14 104/14 104/15 104/22 106/18 108/14 108/15 109/10 109/18 115/18
**thinking [1]** 112/4
**Third [2]** 1/14 1/18
**Third-Party [1]** 1/18
**this [142]**
**this one [1]** 60/8
**THOMAS [2]** 2/19 17/10
**those [29]** 12/12 14/8 17/14 20/19 25/3 25/6 25/9 25/12 32/2 42/17 42/23 43/4 43/5 43/11 45/6 45/14 46/21 54/25 57/18 75/10 82/4 84/8 85/10 85/23 86/2 89/2 95/7 96/11 113/6
**thought [3]** 25/18 68/21 107/3
**threw [1]** 25/18
**through [11]** 26/7 35/9 35/11 35/13 36/5 36/15 36/17 58/16 59/12 69/14 97/6
**Throughout [1]** 54/3
**ticket [1]** 54/12
**Tim [1]** 17/9
**time [49]** 13/9 13/18 13/19 13/23 13/23 14/2 14/24 15/10 15/12 15/13 17/18 19/3 19/6 19/13 23/4 24/21 26/6 27/2 27/15 32/25 35/10 37/17 45/23 48/7 52/23 55/10 56/4 56/5 57/3 68/15 72/8 72/25 73/18 73/19 74/8 75/6 75/10 75/17 87/9 88/16 92/9 93/17 95/20 103/12 103/14 103/22 108/12 108/24 109/15
**Time's [1]** 25/22
**times [1]** 71/12
**timetables [2]** 74/1 75/3
**timing [1]** 36/24
**titled [1]** 67/8
**today [7]** 9/18 22/18 101/24 114/19 114/23 114/25 115/7
**together [2]** 77/10 77/15
**told [7]** 15/20 16/5 20/6 87/16 87/19 90/25 109/10
**Tom [4]** 10/1 17/8 18/7 21/8
**ton [1]** 75/17
**too [2]** 14/18 107/9
**took [6]** 13/17 13/17 15/7 24/8 109/9 116/9
**top [1]** 35/10
**total [2]** 37/23 54/13
**touch [2]** 58/23 58/24
**toward [3]** 110/21 110/22 113/16
**towards [1]** 113/18
**Towers [1]** 2/7
**town [16]** 51/14 51/15 51/16 51/17 51/24 52/2 52/6 52/8 52/16 52/19 57/25 58/8 58/14 58/19 58/23 59/11
**township [32]** 20/8 22/10 22/11 22/16 23/4 23/9 23/15 25/24 26/1 26/19 29/8 29/11 29/15 37/11 41/7 42/10 42/19 46/13 46/17 46/23 57/17 69/11 69/16 69/16 69/18 69/24 70/6 70/10 97/17 97/18 100/23 101/9
**Township 5 [3]** 29/15 46/23 101/9
**track [1]** 42/2
**train [1]** 68/21
**trans [1]** 72/10
**transcript [5]** 8/14 116/11 117/10 117/11 117/12
**transition [1]** 37/8
**trial [2]** 3/19 8/9
**true [1]** 116/11
**try [3]** 40/17 40/18 40/23
**trying [3]** 31/4 38/3 47/21
**Tucker [1]** 12/25
**turned [4]** 49/16 49/23 50/13 73/18
**turnover [2]** 49/15 49/17
**twisted [1]** 104/15
**two [16]** 12/6 14/8 19/23 20/13 21/22 25/20 40/19 46/10 47/24 60/3 68/13 76/5 76/7 80/12 111/24 112/5
**two-minute [1]** 68/13
**two-percent [1]** 21/22
**type [3]** 94/4 100/3 102/20
**typically [5]** 44/22 44/23 59/13 90/3 103/23

## U

**unaware [1]** 89/25
**under [10]** 22/22 24/14 29/17 33/6 64/21 74/23 85/25 94/9 110/14 114/4
**underlying [1]** 22/24
**underperforming [1]** 18/21
**understand [12]** 15/23 15/24 27/23 38/3 39/5 47/4 53/19 53/22 62/2 84/12 85/19 115/7
**understanding [12]** 20/5 20/13 34/19 35/4 39/4 41/21 53/3 65/4 73/16 80/6 80/18 96/24
**understood [1]** 16/2
**unfit [2]** 80/22 80/23
**Uniform [1]** 8/6
**Union [3]** 13/5 24/3 24/10
**UNITED [6]** 1/10 1/12 1/13 2/17 3/2 10/3
**University [2]** 13/11 14/4
**unless [1]** 45/14
**unnumbered [1]** 32/11
**unsatisfactory [1]** 84/5
**unsigned [1]** 81/5
**until [3]** 101/12 101/16 103/23
**up [32]** 29/23 29/25 30/8 32/3 33/5 43/10 47/19 55/16 56/18 56/19 59/20 64/16 72/10 80/2 83/18 84/15 84/21 85/9 85/9 86/2 91/5 91/11 93/11 98/18 98/23 99/7 100/12 100/20 104/7 104/15 105/16 111/13
**upon [1]** 40/10
**Upstate [5]** 45/20 45/21 46/2 46/6 46/14
**us [4]** 38/15 54/7 64/10 96/9
**use [8]** 27/6 40/17 44/15 50/23 51/5 51/6 57/4 70/10
**used [7]** 8/19 24/1 24/2 24/9 27/5 91/3 108/20
**using [2]** 44/18 59/8
**usually [1]** 21/19

## V

**vague [1]** 73/5
**Valenti [8]** 17/8 17/11 18/7 18/12 19/13 19/16 21/8 24/16
**various [3]** 43/3 43/4 94/22

V

**VENESSA [1]** 1/3
**verbal [1]** 16/5
**Vermont [1]** 72/11
**VERONIS [1]** 1/8
**very [11]** 30/13 30/17 47/19 50/21 56/6 57/10 60/19 88/8 104/12 111/9 114/10
**via [2]** 3/20 116/9
**video [3]** 3/20 8/24 104/2
**violate [1]** 44/24
**virtually [1]** 8/11
**visit [1]** 72/3
**visits [3]** 86/20 94/2 95/8
**vs [5]** 1/5 1/15 1/21 3/6 3/11

W

**wait [1]** 15/20
**waiting [1]** 62/1
**waived [1]** 8/15
**waiver [1]** 8/9
**walk [1]** 35/9
**walls [1]** 14/13
**want [19]** 15/18 20/19 25/20 35/21 40/22 40/23 48/7 56/5 56/21 59/23 60/11 60/13 60/17 67/11 75/23 86/11 95/20 105/2 113/5
**wanted [2]** 45/14 106/3
**was [256]**
**wasn't [5]** 23/23 25/19 25/23 31/17 103/20
**waste [3]** 83/24 84/3 84/8
**way [10]** 15/22 45/11 45/15 47/20 60/1 81/16 105/6 106/5 107/9 113/25
**we [139]**
**we'll [4]** 57/8 60/16 86/5 91/25
**we're [15]** 9/16 30/7 56/6 56/15 59/23 60/14 61/7 61/25 65/19 66/13 70/4 82/16 100/10 101/9 107/22
**we've [6]** 35/6 55/13 55/20 64/11 96/19 99/6
**week [3]** 48/13 48/14 93/25
**weekday [1]** 103/20
**weekly [2]** 74/5 95/7
**welcome [3]** 96/13 102/7 109/20
**well [36]** 11/25 14/19 23/11 23/25 25/22 26/13 26/20 27/24 34/21 41/11 48/9 49/19 50/21 56/3 57/18 58/12 60/5 64/10 70/15 82/24 82/25 88/6 88/8 89/23 90/20 94/18 96/22 97/4 97/7 100/7 101/14 103/7 112/3 112/10 112/24 113/25
**well-being [2]** 88/6 90/20
**went [10]** 48/12 59/7 66/6 74/7 88/4 93/24 102/24 103/16 105/25 108/12
**were [79]** 12/23 12/23 13/15 13/22 13/23 14/3 14/3 14/10 14/14 14/25 15/8 16/6 17/2 17/3 17/5 19/15 24/23 25/3 25/19 26/9 26/19 26/21 26/24 27/15 31/3 31/4 31/6 31/7 31/8 31/22 32/22 36/5 38/24 40/10 41/10 41/14 42/5 42/19 45/15 47/25 48/5 48/10 48/14 48/15 48/19 48/25 51/5 51/5 51/9 52/3 52/10 58/15 59/16 64/12 66/17 66/25 68/21 75/3 75/9 83/6 84/4 85/22 86/25 87/12 88/5 88/24 89/5 89/5 89/7 90/5 93/24 95/7 95/21 95/24 103/24 104/7 108/10 108/10 109/25
**weren't [1]** 30/10
**west [3]** 2/11 4/4 108/8
**what [131]**
**what's [6]** 32/8 60/20 67/19 67/21 105/19 105/24
**whatever [2]** 15/7 111/11
**when [86]** 13/20 13/20 14/9 14/19 14/22 15/12 15/12 17/14 17/20 18/19 19/6 19/10 19/21 20/20 20/24 21/12 21/15 21/23 22/15 22/16 22/17 23/1 23/20 23/20 23/20 24/3 24/12 24/23 25/25 26/15 28/16 29/13 31/4 31/10 31/19 31/21 31/22 31/22 32/22 34/14 35/3 35/14 36/24 37/8 39/14 41/19 41/23 42/25 44/21 45/13 45/21 47/7 48/5 48/14 49/13 49/15 49/17 50/7 51/16 52/9 54/5 58/24 61/23 65/6 67/22 68/4 70/4 72/8 72/11 72/18 72/25 73/2 74/25 75/9 87/12 91/12 93/24 96/5 100/6 100/12 100/15 104/3 104/15 107/12 108/10 108/12
**where [32]** 8/22 12/23 13/2 14/3 22/16 39/11 42/9 42/15 43/24 44/6 44/11 44/13 44/22 44/24 45/2 51/4 55/12 55/14 55/18 55/18 55/21 60/17 66/8 68/21 72/16 75/23 80/9 106/5 108/18 108/22 109/9 113/15
**Whereupon [10]** 9/2 9/4 57/12 68/17 68/22 78/3 92/4 93/18 112/13 115/20
**whether [10]** 37/8 51/9 58/2 74/6 78/6 91/25 92/23 103/13 104/19 105/21
**which [14]** 15/17 26/16 30/3 36/17 48/24 50/23 55/3 60/10 60/10 64/20 76/15 81/22 85/11 85/25
**while [4]** 13/18 14/3 19/11 95/7
**who [77]** 10/19 17/6 18/5 18/23 21/2 21/7 21/10 21/20 21/21 22/13 22/17 23/9 23/24 25/8 25/10 25/16 26/24 27/4 27/12 27/12 29/4 29/7 30/6 30/10 30/15 31/6 31/6 31/9 32/13 32/16 32/25 33/2 33/4 36/3 36/19 39/8 43/5 44/14 44/15 44/18 44/20 45/8 49/6 49/18 49/25 50/8 50/14 50/14 52/1 52/9 57/17 59/14 61/8 61/8 62/17 64/15 66/18 67/23 67/25 68/6 69/14 71/3 71/5 75/14 75/16 83/10 84/22 87/18 87/21 88/20 89/1 90/3 94/19 96/6 106/9 108/21 118/8
**who appeared [1]** 118/8
**who's [4]** 9/12 11/15 36/8 114/2
**whole [2]** 15/20 64/11
**whom [4]** 8/12 79/24 79/24 107/5
**whose [1]** 22/11
**why [9]** 11/18 12/13 45/10 45/13 46/4 57/9 64/8 65/17 73/4
**wife [1]** 11/15
**Wild [7]** 44/8 44/13 44/20 45/7 45/16 47/12 47/22
**will [10]** 8/18 15/24 20/22 20/22 40/21 59/14 85/10 105/18 111/24 112/4
**Wings [7]** 44/8 44/14 44/20 45/7 45/16 47/12 47/23
**withdraw [1]** 100/14
**Withdrawn [1]** 115/8
**within [29]** 23/9 23/15 23/16 25/25 26/19 29/4 29/8 33/25 38/13 38/17 40/5 41/3 41/7 41/15 42/10 42/19 46/13 46/17 46/22 52/19 54/18 57/16 61/12 62/6 75/25 77/5 77/10 86/18 89/8
**without [1]** 8/17
**witness [8]** 8/11 8/13 8/17 9/5 9/18 32/8 43/19 116/17
**Wood [2]** 32/17 34/12
**word [2]** 108/20 117/9
**words [1]** 91/2
**work [14]** 14/7 14/9 66/19 73/11 79/7 79/14 79/15 80/23 81/16 89/18 89/20 89/21 105/8 110/15
**workday [1]** 103/22
**worked [11]** 14/8 14/16 30/13 30/17 30/20 31/9 31/12 31/13 31/14 31/16 51/23
**workers [1]** 44/23
**working [12]** 13/18 13/22 13/25 14/3 14/22 31/3 52/3 55/13 55/21 71/5 91/4 94/9
**works [2]** 57/7 90/4
**would [71]** 25/11 26/14 33/11 35/15 35/22 42/4 43/4 43/5 43/25 45/10 46/6 46/20 49/13 50/17 50/20 51/17 51/22 53/4 53/8 53/13 53/16 53/20 54/5 54/11 56/21 57/23 57/25 58/4 63/18 63/19 64/8 64/13 66/18 66/23 67/3 71/9 71/23 72/4 73/20 74/10 74/14 75/1 75/4 75/10 78/7 80/3 84/2 84/2 85/11 85/14 88/9 90/7 91/17 91/17 91/20 94/20 95/2 95/4 98/7 99/13 101/19 101/25 103/22 107/15 108/5 108/18 108/22 109/14 111/10 112/2 112/25
**would you [1]** 75/10
**wouldn't [2]** 101/10 102/3
**wrong [2]** 53/2 104/23

Y

**yards [1]** 47/22
**yeah [33]** 15/14 17/25 20/12 33/22 34/3 35/22 37/14 41/5 52/18 54/14 58/12 61/6 61/24 61/24 62/8 65/13 65/16 67/15 68/14 72/16 82/23 83/5 85/4 88/4 95/6 95/18 96/23 97/4 101/7 101/16 103/19 105/23 112/9
**year [7]** 13/6 16/10 16/24 45/25 54/7 55/2 55/3
**years [7]** 11/23 15/11 25/21 28/15 54/25 73/14 74/19
**Yep [2]** 20/21 33/9
**yes [112]** 11/12 11/14 12/1 12/11 13/11 16/17 18/13 20/6 20/16 23/19 25/5 25/13 26/23 27/3 27/20 28/4 28/10 29/3 29/25 30/25 32/15 32/21 32/24 33/14 33/18 34/14 34/17 35/19 37/6 37/14 37/18 40/8 40/20 41/5 41/9 41/12 41/18 42/7 42/21 42/24 43/7 44/11 47/14 48/4 48/23 49/12 51/4 51/5 51/6 51/25 53/6 54/15 61/4 61/20 62/8 62/12 63/17 64/23 65/1 66/16 66/25 67/10 69/6 69/13 69/19 70/12 70/18 71/1 71/15 72/24 76/14 76/24 77/6 77/17 77/17 80/17 81/7 83/7 83/9 83/19 83/25 84/16 89/15 94/11 97/4 97/4 97/13 97/19 97/23 98/11 98/16 98/19 99/5 99/10 99/15 99/19 100/5 100/18 101/7 101/9 101/22 101/22 103/1 103/4 104/11 107/21 107/25 108/4 108/8 113/4 113/12 115/12
**YORK [20]** 1/2 2/4 2/8 2/12 2/15 2/18 2/22 3/2 3/22 4/5 4/8 4/8 4/12 4/15 11/9 12/16 12/25 92/11 116/8 118/2
**you [467]**
**you'd [1]** 35/9
**you're [32]** 14/17 20/20 22/19 27/23 36/11 39/7 44/17 46/16 47/21 53/19 53/23 53/23 56/17 56/18 63/12 71/6 77/8 78/16 81/5 82/15 84/9 85/20 86/9 86/9 93/11 96/13 102/7 108/6 109/20 114/19 114/24 115/5
**you've [1]** 113/15
**your [71]** 11/4 11/7 11/15 11/24 13/6 15/19 16/4 16/7 16/16 16/18 17/10 18/2 18/23 19/7 20/4 20/7 30/11 32/25 33/11 34/19 34/22 35/3 35/17 37/2 38/10 39/7 41/21 49/8 49/25 50/14 50/22 52/24 53/22 62/9 62/9 64/19 64/22 65/4 67/7 73/16 74/24 74/25 75/14 75/21 76/21 77/13 79/4 80/10 80/15 80/18 83/15 84/13 85/13 86/20 91/7 94/2 94/20 98/18 105/21 107/20 109/6 111/14 112/8 113/19 114/23 115/7 115/8 115/9 117/5 117/6 117/7
**yourself [1]** 83/20