UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

CAMERON GROUP, LLC and
HINSDALE ROAD GROUP, LLC,

Plaintiffs,

v.

EILERSON DEVELOPMENT CORPORATION,
AMERISURE INSURANCE COMPANY, and
AMERISURE MUTUAL INSURANCE COMPANY,

Defendants-Third Party Plaintiffs,

v.

SELECTIVE INSURANCE GROUP, INC. d/b/a SELECTIVE
INSURANCE COMPANY OF AMERICA, and
C&D LAFACE CONSTRUCTION, INC.,

Third-Party Defendants.

**Civil Action No.:**
**5:19-cv-00285-LEK-ML**

---

**DEFENDANT SELECTIVE INSURANCE COMPANY OF AMERICA'S**
**MEMORANDUM OF LAW IN SUPPORT OF**
**SELECTIVE'S MOTION FOR SUMMARY JUDGMENT**

---

HURWITZ & FINE, P.C.
Steven E Peiper, Esq.
*Attorneys for Defendant,*
*SELECTIVE INSURANCE COMPANY OF AMERICA*
1300 Liberty
424 Main Street, Suite 1300
Buffalo, New York 14202
(716) 849-8900
sep@hurwitzfine.com

# TABLE OF CONTENTS

Page

TABLE OF AUTORITIES .......... iii

PRELIMINARY STATEMENT .......... 1

STATEMENT OF FACTS .......... 4

The EDC/Laface Contract .......... 7

The Selective CGL Policy .......... 8

The Selective Umbrella Policy .......... 9

The Amerisure CGL Policy .......... 11

The Amerisure Umbrella Policy .......... 13

ARGUMENT .......... 14

POINT I - THERE IS NO ADDITIONAL INSURED COVERAGE FOR CAMERON GROUP, HINSDALE ROAD, OR MOVIE TAVERN THEATRE .......... 14

A. Cameron, Hinsdale and Movie Tavern Theatre Do Not Seek Coverage from Selective CGL .......... 14

B. Cameron, Hinsdale, and Movie Tavern Theatre are Not in Privity of Contract with Laface .......... 15

C. The Eilerson/Laface Contract Does Not Create an Obligation for Laface to Procure Insurance for Cameron, Hinsdale or Movie Tavern Theatre .......... 16

D. There Selective Umbrella Policy is not Triggered in Favor of Cameron, Hinsdale or Movie Tavern Theatre .......... 18

POINT II - THE SELECTIVE UMBRELLA POLICY IS EXCESS TO THE AMERISURE CGL POLICY .......... 19

POINT III - THE SELECTIVE UMBRELLA POLICY SHARES EXPOSURE WITH THE AMERISURE UMBRELLA POLICY ON A RATABALE BASIS ....................21

A. The Selective Umbrella Policy is Limited to $1,000,000 by the terms of the Eilerson/Laface Contract ....................21

B. The Selective Umbrella Policy's Ratable Contribution Rate is 1/11....................24

CONCLUSION....................25

## TABLE OF AUTHORITIES

**CASES:**

*Linarello v City Univ. of New York*, 6 AD3d 192,
774 NYS2d 517 (1st Dept., 2004) ....................................................................15

*AB Green Gansevoort, LLC v Peter Scalamandre & Sons, Inc.*,
102 AD3d 425, 961 NYS2d 3 (1st Dept., 2003) .......................................................15

*Cincinnati Ins. Co. v Harleysville Ins. Co.*, 709 Fed Appx. 71 (2d Cir., 2017).........15, 17

*77 Water Street, Inc. v JTC Painting & Decorating Corp.*,
148 AD3d 1092 (2d Dept., 2017) ....................................................................17

*Trapani v 10 Arial Way Associates*,
301 AD2d 644, 647, 755 NYS2d 396, 398 (2d Dept 2003) .....................................17

*Empire Ins. Co. v Ins. Corp. of New York*,
40 AD3d 686, 836 NYS2d 228 (2d Dept 2007) .......................................................17

*Goss v State University Const. Fund*,
261 AD2d 860, 690 NYS2d 811 (4th Dept. 1999) ...................................................17

*Teichman v Community Hosp. of W. Suffolk*,
261 AD2d 860, 690 NYS2d 811 (4th Dept. 1999) ...................................................18

*Broad Street, LLC v Gulf Ins. Co.*,
37 AD3d 126, 131 (1st Dept., 2006).........................................................................18

*USF&G Co. v Annunziata*, 67 N.Y.2d 229, 232 (1986) ...........................................18

*City Sch. Dist. of Albany v Gen. Star Ins. Co.*,
294 A.D.2d 457, 458, (2d Dept. 2002) ..................................................................18

*Seneca Ins. Co., Inc. v Illinois Nat. Ins. Co.*,
2009 WL 2001565, at *5 (S.D.N.Y. July 9, 2009) ...................................................19

*Home Ins. Co., Inc. v Liberty Mut. Ins. Co.*,
678 F. Supp 1066, 1069 (S.D.N.Y. 1998) ...............................................................19, 20

*Bovis v Great American Ins. Co.*,
65 NY2 369, 373–74 (1985) ....................................................................................20

*Graphic Arts Mut. Ins. Co. v. Bakers Mut. Ins. Co*.,
45 NY2d 551, 558 (1978) ..........................................................................................19, 20

*Sport Rock Intern., Inc. v American Cas. Co. of Reading, PA,*
65 AD3d 12, 17 (1st Dept 2009)...............................................................................20

*E.E. Cruz & Co., Inc. v Axis Surplus Ins. Co.,*
165 A.D.3d 603, 87 N.Y.S.2d 173 [1st Dept., 2018]..................................................23

*Lumbermens Mutual Casualty Company v Allstate Insurance Company,*
51 N.Y.2d 651, 656 (1980). ......................................................................................24

*E.E. Cruz & Co., Inc. v Axis Surplus Ins. Co.,* 165 Ad 3d at 605 *citing*
*Jefferson Ins. Co. of NY v Travelers Indemn. Co.*, 92 NY2d 363 (1998) ...........................24

**<u>OTHER:</u>**

Labor Law §§ 241(6) .......................................................................................6

8A Appleman on Insurance,
§ 4909.85, at 453–454 (1981). .........................................................................20

## PRELIMINARY STATEMENT

This memorandum of law is submitted in support of Selective Insurance Company of America's motion under FRCP § 56 for summary judgment seeking a declaration that Selective Insurance Company of America ("Selective") has no obligation to provide a defense, nor indemnification, to the Cameron Group, LLC ("Cameron"), Hinsdale Road Group, LLC ("Hinsdale") and Movie Tavern Theatre ("MTT") relative to a November 5, 2015, incident involving Shaun Atkinson. As explained in more detail below, at the time of the incident Mr. Atkinson was acting within the scope of his employment with C&D Laface Construction, Inc. ("Laface") at a jobsite located at or about 180 Township Boulevard in Camillus, New York.

That jobsite was owned by Hinsdale, and on the date of the incident involving Mr. Atkinson it was being developed as part of a commercial retail plaza. Hinsdale, working through Cameron, had previously entered into an agreement with MTT wherein MTT would take possession of a portion of the parcel under a 25-year lease. MTT would then oversee the construction of a movie theatre, restaurant and bar at the site. As part of the process, MTT retained Eilerson Development Corporation ("EDC") to serve as the general contractor on the project. EDC, by way of contract, retained Laface as the masonry subcontractor.

Importantly, Laface never entered into a contract with Cameron, Hinsdale or MTT. Accordingly, when Cameron and Hinsdale sought additional insured status under Laface's Commercial General Liability with Selective, their tender was rejected due to a lack of contractual privity. As demonstrated below, the additional insured provision in the Selective policy clearly, and unambiguously, requires that the tendering parties (here, Cameron, Hinsdale and MTT) all be in contractual privity with Laface. Where, as here, they are not, Selective's denial was wholly justified and supported by long standing New York law.

Even if the Selective additional insured endorsement did not require privity, there is still no coverage created for Cameron, Hinsdale and/or MTT. At a minimum, the relevant additional insured endorsement required that Laface agree in a written document to name any/all of the three entities as additional insureds. As it pertains to the matter at bar, Laface entered into only one contract for the project. That contract, with EDC, categorically does not contain any reference to Laface securing additional insured status for Cameron, Hinsdale and/or MTT. Where there is no contractual obligation of Laface to procure insurance, it follows Selective's denial as again wholly justified and supported by long standing New York law.

In addition to the Commercial General Liability policy that Selective issued to Laface, the company also issued Laface a Commercial Umbrella policy. That umbrella policy extends additional insured status to any entity qualifying as an additional insured under the Commercial General Liability policy. Because Cameron, Hinsdale and MTT do not qualify under the primary, Commercial General Liability policy, it follows they are also not afforded additional insured status under the Selective Umbrella Policy.

Notwithstanding the fact that Amerisure Insurance Company ("Amerisure") and EDC have engaged in their own protracted litigation with Cameron and Hinsdale, Amerisure and EDC both also attempt to assert claims against Selective on behalf of Cameron, Hinsdale and MTT. Clearly, where they are adverse in this very lawsuit, Amerisure has no standing to pursue these claims. Claims, notably, which are not raised by Cameron and Hinsdale directly. For the foregoing reasons, it is respectfully submitted that Amerisure and EDC's claims involving Cameron, Hinsdale and MTT be dismissed accordingly and an Order issued declaring that Selective has no obligation to provide additional insured status, defense, nor indemnification to any of the three entities relative to the lawsuit filed by Mr. Atkinson.

Unlike the main-party plaintiffs who categorically do not qualify as additional insureds under either policy issued by Selective, EDC does qualify as an additional insured. Indeed, Selective has long acknowledged coverage for EDC under the Commercial General Liability policy issued to Laface, and has been defending EDC's interests under that policy for most of the past three years. Despite the pleadings to the contrary, there is no dispute over EDC's rights to coverage under the Selective Umbrella policy. EDC is being defended, and will be defended through the conclusion of the lawsuit filed by Mr. Atkinson. To the extent Mr. Atkinson is awarded a recovery against EDC, Selective will contribute indemnity payments on behalf of EDC up to its $1,000,000 limit in coverage.

EDC, and its insurer Amerisure, want more. Their position, however, is not supported by the documents in this case or the prevailing precedent. Amerisure argues that its primary policy, the Commercial General Liability policy issued to EDC, should not trigger until after Selective's Umbrella Policy, an excess policy, is exhausted. This argument is devoid of any legal support, and belied by a comparison of the relevant "other insurance" clauses in the two policies. It is respectfully submitted that this Court should have no difficulty in rejecting the baseless position advanced by EDC and Amerisure, and accordingly will be compelled to issue an Order declaring that insofar as EDC's coverage "tower" for this case is concerned, the Selective Umbrella Policy follows only after the exhaustion of all primary policies available -- including the Amerisure CGL Policy.

Having reconciled the appropriate priority of coverage among and between the various policies providing coverage to EDC, the Court is asked to finally address the interplay between the Commercial Umbrella policies issued by Selective and Amerisure, respectively. As this Court will confirm, the "other insurance" clauses in both policies are nearly identical. Under

such circumstances, it is submitted that they must apply at the same time on a ratable basis. The Commercial Umbrella policy issued by Amerisure provides EDC with coverage limits of $10,000,000. However, based upon the terms of the EDC/Laface Contract, the Commercial Umbrella policy issued by Selective provides EDC with only $1,000,000 in coverage limits. Accordingly, in the unlikely event Mr. Atkinson is awarded damages against EDC which exhaust the primary "tier" of coverage (i.e., the Selective and Amerisure CGL policies), it is submitted that Amerisure will owe 10/11 of any payment in the excess level, with Selective contributing 1/11. Again, as demonstrated below, Selective's position is supported by the black letter law of the relevant contract, policies and precedent.

## STATEMENT OF FACTS

Prior to November 5, 2015, Hinsdale Road Group was a private equity group which was formed to develop a certain parcel of real estate located at or about 180 Township Boulevard in Camillus, New York. (*see* Affirmation of Steven E. Peiper, dated February 26, 2021, **Exhibit B, pg. 22, ¶¶ 8-10**). The site, known as the Township 5 project, is a commercial retail site, and would include, *inter alia*, a Movie Tavern Theatre ("MTT") franchise, a feature tenant. (*see* Affirmation of Steven E. Peiper, dated February 26, 2021, **Exhibit B, pgs. 40, ¶ 25, pg. 41, ¶¶ 1-17**).

The Cameron Group, LLC ("Cameron"), was engaged by Hinsdale Road Group, LLC ("Hinsdale"), to attract and ultimately retain tenants for the Township 5 location. (*see* Affirmation of Steven E. Peiper, dated February 26, 2021, **Exhibit B, pg. 28, ¶¶ 24-25, pg. 29, ¶¶1-3**).As part of this process, Cameron engaged, and ultimately secured, MTT to build a cinema at the Township 5 development site. (*see* Affirmation of Steven E. Peiper, dated February 26, 2021, **Exhibit B, pg. 40, ¶ 25, pg. 30-33**).

Hinsdale remained the owner of the parcel, but MTT was given a 25-year leasehold on the ground. (*see* Affirmation of Steven E. Peiper, dated February 26, 2021, **Exhibit B, pg. 28, ¶¶ 5-15**).

With the lease secured, MTT then retained Eilerson Development Corporation ("EDC") to serve as the general contractor for the build out of the MTT premises. (*see* Affirmation of Steven E. Peiper, dated February 26, 2021, **Exhibit B, pg. 62, ¶¶ 4-12**). EDC, by way of contract dated September 9, 2015, then entered into an agreement with C&D Laface Construction, Inc. ("Laface"), wherein Laface would perform all "Masonry, Cast Stone and Brick Veneer" work at the project site. (*see* Affirmation of Steven E. Peiper, dated February 26, 2021, **Exhibit B, pg. 109-114**).

On November 5, 2015, Mr. Shaun Atkinson was injured when he was struck by a lift being operated by Mr. John Miller (the "incident"). (*see* Affirmation of Steven E. Peiper, dated February 26, 2021, **Exhibits "A" & "E"**). At the time of the incident, Mr. Atkinson was engaged within the scope of his employment with Laface as a brick layer. (*see* Affirmation of Steven E. Peiper, dated February 26, 2021, **Exhibit A, pg. 48, 11-17**). At the time of the incident, Mr. Miller was also employed by Laface and was allegedly acting within the scope of his employment. As a result of being struck by the forklift, Mr. Atkinson was allegedly pulled underneath the machine and sustained significant bodily injuries. (*see* Affirmation of Steven E. Peiper, dated February 26, 2021, **Exhibit A, pg. 43, ¶¶ 5-7**).

By way of a Summons and Complaint filed in and for the Supreme Court of the State of New York, Onondaga County, on May 14, 2018, and bearing Index Number 004808, Mr. Atkinson and his wife, Vanessa Atkinson, commenced a lawsuit against Eilerson Development

Corporation a/k/a EDC, the Cameron Group, LLC, Movie Tavern Theatres, LLC, and Southern Theatres, LLC.[1] (*see* Affirmation of Steven E. Peiper, dated February 26, 2021, **Exhibit E**).

Therein, Mr. and Mrs. Atkinson sought damages as a result of the injuries and life disruptions caused by the events of November 5, 2015, pursuant to Labor Law §§ 241(6) and 200, respectively. (*see* Affirmation of Steven E. Peiper, dated February 26, 2021, **Exhibit E**). Eventually, by way of a Third-Party Action filed in December of 2019, EDC commenced a third-party action seeking contractual indemnification from Laface pursuant to the EDC/Laface Contract. (*see* Affirmation of Steven E. Peiper, dated February 26, 2021, **Exhibit E**).

On or about June 1, 2018, counsel to EDC in the Underlying Action requested additional insured coverage and contractual indemnification from Laface and Selective Insurance Company of America ("Selective"). (*see* Affirmation of Steven E. Peiper, dated February 26, 2021, **Exhibit "F"**). By way of letter dated June 27, 2018, Selective responded to EDC's tender letter and acknowledged that EDC qualified as an additional insured under a certain policy of Commercial General Liability insurance that Selective issued to Laface under policy number S2056307 and having effective dates from December 15, 2014 through December 25, 2015 ("Selective CGL policy"). (*see* Affirmation of Steven E. Peiper, dated February 26, 2021, **Exhibit "G"**). As part of its June 27, 2018 letter, Selective acknowledged that pursuant to the terms and conditions of the Selective CGL policy at issue, Selective would provide primary coverage to EDC for any loss arising out of the Underlying Incident up to its $1,000,000 policy limit. Selective further acknowledged that it would defend EDC's interests, and accordingly, requested that the file be transferred to the Lippman O'Connor firm for future handling.

Upon information and belief, by way of letter dated July 2, 2019, The Hanover Insurance Group also sought additional insured coverage for Cameron/Hinsdale from EDC. (*see*

[1] Upon information and belief, Southern Theatres is the parent corporation of MTT.

Affirmation of Steven E. Peiper, dated February 26, 2021, **Exhibit "H"**). On or about August 3, 2019, Amerisure Insurance ("Amerisure"), as insurer to EDC, rejected the Cameron/Hinsdale tender on the basis that while EDC qualified as an additional insured under the Amerisure CGL policy, all coverage afforded thereunder was excess of any and all other available insurance. (*see* Affirmation of Steven E. Peiper, dated February 26, 2021, **Exhibit "I"**).

**<u>The EDC/Laface Contract</u>**

As part of the Township 5 Project, on September 9, 2015, EDC entered into a subcontract with Laface which provided Laface would "complete all MASONRY, CAST STONE, AND BRICK VENEER work…" At Article Four of that Contract, the parties agreed:

> 4. INSURANCE
>
> 4.1 The Subcontractor shall procure and maintain at the Subcontractor's own expense, during the entire contract time, Liability Insurance is hereinafter specified as:
>
> ***
>
> c. Commercial General Liability shall be provided for a Combined Single Limit of at least $1,000,000 for each occurrence, $1,000,000 Personal Injury and Advertising Liability, $2,000,000 Products and Completed Operations aggregate and $2,000,000 general aggregate. The policy shall contain no restrictions from contractual liability and xcu (explosion, collapse and underground). Contractor shall be named as additional insured, per form CG 20 10 1185 or equivalent. Subcontractor shall maintain Products and Completed Operations Insurance and shall name Contractor as additional insured for at least two (2) years from the date of final payment. Subcontractor's insurance shall be primary and non-contributory so that the Contractor' policy will not respond until the limits under the Subcontractor's policy are exhausted.
>
> d. Commercial Umbrella Liability shall be provided for at least $1,000,000 and shall be as broad as the primary General Liability and Automobile.

> 4.2 Certificates of Insurance, including a copy of the additional insured endorsement, acceptable to Contractor must be provided prior to the Subcontractor commencing any work or ordering any materials. Renewal certificates must be provided no less than 14 days prior to expiration. All Insurance carriers named in the sub contractor's certificate of insurance shall have A.M. rating of A- or better. The Certificates must also contain a provision that coverage afforded under the policies will not be canceled unless at least thirty (30) days prior written notice has been given to Contractor. Contractor shall not make any payment to Subcontractor until proper evidence of Insurance is received. If Subcontractor performs any portion of all of the Work without the required Insurances, Contractor shall deduct the greater of twenty five percent (25%) broken down as follows: 10% for General Liability, 10% for Workers' Compensation, 3% for Automobile Liability and 2% for Umbrella coverage of the Subcontract Sum, or the value of the Insurance premium are solely determined by the Subcontractor's carrier.

(*see* Affirmation of Steven E. Peiper, dated February 26, 2021, **Exhibit "J"**).

## <u>The Selective CGL Policy</u>

Selective issued a Commercial General Liability policy of insurance to Laface under Policy Number S2056307, having effective dates from December 25, 2014 through December 25, 2015, and providing up to $1,000,000 in coverage per occurrence. The policy also included a $2,000,000 limit for aggregate losses. ("Selective CGL Policy"). (*see* Affirmation of Steven E. Peiper, dated February 26, 2021, **Exhibit "K"**).

In relevant part, at Page 5 of Endorsement CG 72 02 12 11, the Selective CGL policy provides the following Additional Insured Endorsement:

> **Blanket Additional Insureds - As Required By Contract**
>
> Subject to the **Primary and Non-Contributory** provision set forth in this endorsement, **SECTION II - WHO IS AN INSURED** is amended to include as an additional insured any person or organization whom you have agreed in a written contract, written agreement or written permit that such person or organization be added as an additional insured on your policy. Such person or organization is an additional insured only with respect to

> liability for "bodily injury" or "property damage" or "personal and advertising injury" caused, in whole or in part, by:
>
> **1.** Your ongoing operations, "your product", or premises owned or used by you; however this provision does not include any architects, engineers, or surveyors with respect to any injury or damage arising out of the rendering or failure to render any professional services by or for you, including:
>
> **a.** The preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; and
>
> **b.** Supervisory, inspection, architectural or engineering activities.
>
> **2.** Your maintenance, operation or use of equipment, other than aircraft, "auto" or watercraft, rented or leased to you by such person or organization. A person or organization's status as an additional insured under this endorsement ends when their contract, or agreement with you for such rented or leased equipment ends. With respect to the insurance afforded to these additional insureds, this insurance does not apply to any "occurrence" which takes place after the rental agreement or equipment lease expires.
>
> The provisions of this coverage extension do not apply unless the written contract or written agreement has been executed (executed means signed by the named insured) or written permit issued prior to the "bodily injury" or "property damage" or "personal and advertising injury".

(*see* Affirmation of Steven E. Peiper, dated February 26, 2021, **Exhibit "K"**).

**The Selective Umbrella Policy**

Selective issued a Commercial Umbrella policy of insurance to Laface under Policy Number S2056307, having effective dates from December 25, 2014 through December 25, 2015, and providing up to $5,000,000 in coverage per occurrence ("Selective Umbrella Policy"). The policy also included a $10,000,000 limit for aggregate losses. (*see* Affirmation of Steven E. Peiper, dated February 26, 2021, **Exhibit "K"**).

At Page 1 of Endorsement CXL 4 04 03, the Selective Umbrella Policy provided the following grant of coverage:

**SECTION I — COVERAGES A. Insuring Agreement**

**1.** We will pay on behalf of the insured the "ultimate net loss" in excess of the "retained limit" that the insured becomes legally obligated to pay as damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages when the "underlying insurance" does not provide coverage or the limits of "underlying insurance" have been exhausted. When we have no duty to defend, we will have the right to defend, or to participate in the defense of, the insured against any other "suit" seeking damages to which this insurance may apply. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury", "property damage" or "personal and advertising injury" to which this insurance does not apply. At our discretion, we may investigate any "occurrence" or offense that may involve this insurance and settle any resultant claim or "suit", for which we have the duty to defend. But:

(*see* Affirmation of Steven E. Peiper, dated February 26, 2021, **Exhibit "K"**).

The Selective Umbrella Policy extended coverage to Additional Insureds at Page 8 of Endorsement CXL 4 04 03 which provided:

**SECTION II — WHO IS AN INSURED**

**A.** Except for liability arising out of the ownership, maintenance, or use of "covered autos":

**5.** Any additional insured under any policy of "underlying insurance" will automatically be insured under this insurance

If coverage provided to the additional insured is required by a contract or agreement, the most we will pay on behalf of the additional insured is the amount of insurance required by the contract, less any amounts payable by any "underlying insurance", subject to **Section III — Limits of Insurance.**

Additional insured coverage provided by this insurance will not be broader than coverage provided by "underlying insurance".

(*see* Affirmation of Steven E. Peiper, dated February 26, 2021, **Exhibit "K"**).

Finally, the Selective Umbrella Policy provided the following "Other Insurance" Clause at Page 12 of Endorsement CXL 4 04 13:

**SECTION IV — CONDITIONS**

**H. Other Insurance**

1. This insurance is excess over, and shall not contribute with any other insurance, whether primary, excess, contingent or on any other basis. This condition will not apply to insurance specifically written as excess over this Coverage Part.

   When this insurance is excess, we will have no duty to defend the insured against any "suit" if any other insurer has the duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

2. When this insurance is excess over other insurance, we will pay only our share of the "ultimate net loss" that exceeds the sum of:

   a. The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

   b. The total of all deductible and self-insured amounts under all that other insurance.

(*see* Affirmation of Steven E. Peiper, dated February 26, 2021, **Exhibit "K"**).

## <u>The Amerisure CGL Policy</u>

Amerisure issued a Commercial General Liability policy of insurance to EDC under Policy Number CPP20737370601, having effective dates from December 31, 2014 through December 31, 2015, and providing up to $1,000,000 in coverage per occurrence ("Amerisure CGL Policy"). The policy also included a $2,000,000 limit for aggregate losses. (*see* Affirmation of Steven E. Peiper, dated February 26, 2021, **Exhibit "L"**).

At Page 12 of Endorsement CG 00 01 04 13, the Amerisure CGL Policy provided the following "other insurance" provision:

**Other Insurance**

If other valid and collectible insurance is available to the insured for a loss we cover under Coverages **A** or **B** of this Coverage Part, our obligations are limited as follows:

**a. Primary Insurance**

This insurance is primary except when Paragraph **b.** below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary.

Then, we will share with all that other insurance by the method described in Paragraph c. below.

**b.** **Excess Insurance**

**(1)** This insurance is excess over:

**(a)** Any of the other insurance, whether primary, excess, contingent or on any other basis:

**(i)** That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work";

**(ii)** That is Fire insurance for premises rented to you or temporarily occupied by you with permission of the owner;

**(iii)** That **is** insurance purchased by you to cover your liability as a tenant for "property damage" to premises rented to you or temporarily occupied by you with permission of the owner; or

**(iv)** If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion **g.** of Section **I** —Coverage **A** — Bodily Injury And Property Damage Liability.

**(b)** Any other primary insurance available to you covering liability for damages arising out of the premises or operations, or the products and completed operations, for which you have been added as an additional insured.

**(2)** When this insurance is excess, we will have no duty under Coverages **A** or **B** to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

(*see* Affirmation of Steven E. Peiper, dated February 26, 2021, **Exhibit "L"**).

## <u>The Amerisure Umbrella Policy</u>

Amerisure issued a Commercial Umbrella policy of insurance to EDC under Policy Number CU 20737380402, having effective dates from December 31, 2014 through December 31, 2015, and providing up to $10,000,000 in coverage per occurrence ("Amerisure Umbrella Policy"). The policy also included a $10,000,000 limit for aggregate losses. (*see* Affirmation of Steven E. Peiper, dated February 26, 2021, **Exhibit "L"**).

At Page 12 of Endorsement CG 00 01 04 13, the Amerisure CGL Policy provided the following "other insurance" provision:

> **5. Other Insurance**
>
> **a.** This insurance is excess over, and shall not contribute with any of the other insurance, whether primary, excess, contingent or on any other basis. This condition will not apply to insurance specifically written as excess over this Coverage Part.
>
> When this insurance is excess, we will have no duty under Coverages **A** or **B** to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.
>
> **b.** When this insurance is excess over other insurance, we will pay only our share of the "ultimate net loss" that exceeds the sum of:
>
> **(1)** The total amount that all such other insurance would pay for the loss in the absence of the insurance provided under this Coverage Part; and
>
> **(2)** The total of all deductible and self-insured amounts under all that other insurance.

(*see* Affirmation of Steven E. Peiper, dated February 26, 2021, **Exhibit "L"**).

## ARGUMENT

## POINT I

### THERE IS NO ADDITIONAL INSURED COVERAGE FOR CAMERON GROUP, HINSDALE ROAD, OR MOVIE TAVERN THEATRE

A review of the Cameron/Hinsdale Complaint reveals no claims advanced by either party against Selective in this litigation. That fact, alone, should result in the dismissal of any claims attempted to be advanced by Amerisure and EDC. Moreover, because Laface did not enter into

any contract with Cameron, Hinsdale or MTT, there is no contractual obligation to provide coverage, and the Selective CGL Policy not triggered accordingly. No coverage rights are created under the EDC/Laface Contract because there is no reference to any of these three parties in the operative insurance sections of the Contract. Because there is no coverage under the CGL, it follows no coverage can be afforded under the Selective Umbrella Policy either.

### A. Cameron, Hinsdale and Movie Tavern Theatre Do Not Seek Coverage from Selective CGL

To prosecute a legal proceeding, it is axiomatic that the initiating party has to have standing to assert the claim. Where, as here, there is no unity-in-interest between Cameron/Hinsdale/MTT and Amerisure/EDC, their efforts to seek coverage under the policies issued by Selective must be dismissed. In this case, this simple fact is all the more self-evident where Amerisure/EDC and Cameron/Hinsdale are adverse to each other in the very action where Amerisure seeks to assert claims on their behalf.

Notably, Cameron/Hinsdale do not assert claims for additional insured status against Selective. Amerisure/EDC should not be able to do so in their stead.

### B. Cameron, Hinsdale, and Movie Tavern Theatre are Not in Privity of Contract with Laface

It is uncontroverted that Laface's only contractual connection to the Township 5 development site was the September 9, 2015, contract it entered into with EDC. There is no indication that Laface entered into a contract with Cameron, Hinsdale and/or MTT, and indeed no such contract has ever been produced in this case. Given the language employed in the Selective CGL Policy's additional insured provision, this lack of contractual privity destroys any

claim for additional insured coverage from any of these three entities.

New York Courts have routinely refused to extend additional insured status to parties with whom the named insured did not enter into a contract. *Linarello v City Univ. of New York*, 6 AD3d 192, 774 NYS2d 517 (1st Dept., 2004); *AB Green Gansevoort, LLC v Peter Scalamandre & Sons, Inc.*, 102 AD3d 425, 961 NYS2d 3 (1st Dept., 2003). As explained by the Court in *AB Green Gansevoort, LLC*, the language of an additional insured endorsement must be "restricted to its plain meaning." The Appellate Division in that case went on to note that the policy at issue provided:

> The policy stated, in pertinent part, that an organization is added as an additional insured "when you and such ... organization have agreed in writing in a contract or agreement that such ... organization be added as an additional insured on your policy.

Importantly, the reasoning and holding of the Appellate Division has been adopted by the Second Circuit. *Cincinnati Ins. Co. v Harleysville Ins. Co.*, 709 Fed. Appx.71 (2d Cir., 2017). In that case, the Second Circuit noted that New York insurance law instructs us that "[w]hen determining whether a third party is an additional insured under an insurance policy, a court must ascertain the intention of the parties to the policy, as determined from within the four corners of the policy itself." *Id.* Because the named insured in that case did not enter into a contract with the entities seeking coverage, the Second Circuit unequivocally held there was no contractual privity between the parties and accordingly applied the language of the additional insured endorsement as written. *Id.*

This is the precise language employed by the Selective CGL Policy at issue in this case. The language provides:

> **Blanket Additional Insureds - As Required By Contract**
> Subject to the **Primary and Non-Contributory** provision set forth in this endorsement, **SECTION II - WHO IS AN INSURED** is amended to

> include as an additional insured any person or organization whom you [Laface] have agreed in a written contract, written agreement or written permit ***that such person or organization be added as an additional insured on your policy. Such person or organization is an additional insured only with respect*** to liability for "bodily injury" or "property damage" or "personal and advertising injury" caused, in whole or in part, by:

(emphasis supplied).

Again, there is no basis to conclude that Cameron, Hinsdale or MTT entered into a contract with Laface. Thus, where all three are foreign to only a contract involving Laface (the EDC/Laface Contract), it follows that their respective claims for additional insured status fail.

**C. The Eilerson/Laface Contract Does Not Create an Obligation for Laface to Procure Insurance for Cameron, Hinsdale or Movie Tavern Theatre**

A party seeking additional insured status under a policy of insurance bears the burden of establishing that it so qualifies for coverage. To do so, as in the current instance, the party seeking coverage must establish that it qualifies pursuant to the terms of the policy at issue. Where, as here, the policy in question contains an "additional insured via written agreement" clause, the party seeking coverage must also establish that it actually requested to be added as an additional insured in order for coverage to attach.

As noted above, the Selective CGL Policy only provided additional insured coverage where Laface agreed to provide insurance in a "written contract, written agreement or written permit." However, in the current instance, no one ever requested, in writing, that Cameron, Hinsdale or MTT be named as an additional insured under the Selective Policy. As such, no additional insured coverage ever attached.

It has been long established that a construction contract cannot be interpreted as requiring the procurement of additional insured coverage **unless such a requirement is expressly and**

**specifically stated**. *See 77 Water Street, Inc. v JTC Painting & Decorating Corp.*, 148 AD3d 1092 (2d Dept., 2017); *See also Cincinnati Ins. Co. v Harleysville Ins. Co.*, 709 Fed. Appx.71 (2d Cir., 2017); *Trapani v 10 Arial Way Associates*, 301 AD2d 644, 647, 755 NYS2d 396, 398 (2d Dept 2003); *Empire Ins. Co. v Ins. Corp. of New York*, 40 AD3d 686, 836 NYS2d 228 (2d Dept 2007); *Goss v State University* Const. Fund, 261 AD2d 860, 690 NYS2d 811 (4th Dept, 1999).

In the current instance, the contract executed between EDC and Laface contained the following insurance clause:

> Commercial General Liability shall be provided for a Combined Single Limit of at least $1,000,000 for each occurrence, $1,000,000 Personal Injury and Advertising Liability, $2,000,000 Products and Completed Operations aggregate and $2,000,000 general aggregate. The policy shall contain no restrictions from contractual liability and xcu (explosion, collapse and underground). Contractor shall be named as additional insured, per form CG 20 10 1185 or equivalent. Subcontractor shall maintain Products and Completed Operations Insurance and shall name Contractor as additional insured for at least two (2) years from the date of final payment. Subcontractor's insurance shall be primary and non-contributory so that the Contractor' policy will not respond until the limits under the Subcontractor's policy are exhausted.

Upon review of this document, it is clear that at no point does EDC require Laface to procure insurance which explicitly names, or otherwise provides, additional insured status to Cameron, Hinsdale or MTT. Given the strict construction afforded to insurance procurement clauses, such an obligation may not be read into the EDC/Laface Contract.

### D. <u>The Selective Umbrella Policy is not Triggered in Favor of Cameron, Hinsdale or Movie Tavern Theatre</u>

It is axiomatic that an insurer is entitled to rely upon the express terms as they are set forth in a policy of insurance. *Teichman v Community Hosp. of W. Suffolk*, 87 NY2d 514, 520

(1996); *see also Broad Street, LLC v Gulf Ins. Co.*, 37 AD3d 126, 131 (1st Dept., 2006). Indeed, where the terms of an insurance policy are clear, said terms must be afforded their "plain and ordinary meaning." *USF&G Co. v Annunziata*, 67 N.Y.2d 229, 232 (1986); *City Sch. Dist. of Albany v Gen. Star Ins. Co.*, 294 A.D.2d 457, 458, (2d Dept. 2002). Where the meaning is plainly understood on its face, Courts have advised that "a policy's language may not be disregarded in order to find an ambiguity where none exists." *City Sch. Dist. of Albany*, 294 A.D.2d at 458 (holding that the plain language of an endorsement did not provide coverage for the insured's claim); s*ee also USF&G Co. v Annunziata*, 67 N.Y.2d at 232.

As noted above, the Selective Umbrella Policy extended coverage to Additional Insureds at Page 8 of Endorsement CXL 4 04 03 which provided:

> **SECTION II — WHO IS AN INSURED**
>
> **A.** Except for liability arising out of the ownership, maintenance, or use of "covered autos":
>
> **5.** Any additional insured under any policy of "underlying insurance" will automatically be insured under this insurance
>
> If coverage provided to the additional insured is required by a contract or agreement, the most we will pay on behalf of the additional insured is the amount of insurance required by the contract, less any amounts payable by any "underlying insurance", subject to **Section III — Limits of Insurance.**
>
> Additional insured coverage provided by this insurance will not be broader than coverage provided by "underlying insurance".

Pursuant to Section II – Who is an Insured, the Selective Umbrella Policy only provides coverage for those entities who qualify as additional insureds on "underlying insurance." Because neither Cameron, Hinsdale, nor MTT qualify as an additional insured on the Selective CGL Policy, they are likewise not entitled to coverage under the Selective Umbrella Policy.

**POINT II**

**THE SELECTIVE UMBRELLA POLICY IS EXCESS TO THE AMERISURE CGL POLICY**

When evaluating priority of coverage, a policy that identifies itself as primary must pay out its entire limit first, followed then by policies that were intended to be excess. *See Seneca Ins. Co., Inc. v Illinois Nat. Ins. Co.*, 2009 WL 2001565, at *5 (S.D.N.Y. July 9, 2009) ("The language of the Seneca Policy's 'other insurance' clause . . . does not change the outcome here. (citation omitted). Under New York law, 'an excess "other insurance" clause will not render a policy sold as primary insurance . . . excess to a true excess or umbrella policy sold to provide a higher tier of coverage . . . ." (quoting *Home Ins. Co., Inc. v Liberty Mut. Ins. Co.*, 678 F. Supp 1066, 1069 (S.D.N.Y. 1998)).

In determining whether policies cover the same risk, and apply at the same level, courts are required to consider "the purpose each policy was intended to serve as evidenced by both its stated coverage and the premium paid for it, as well as upon the wording of its provision concerning excess insurance. *State Farm Fire & Cas. Co. v. LiMauro*, 65 NY2 369, 373–74 (1985). This requires "a functional analysis to separate lines of insurance, and an insurance policy should be read in light of the role it is to play." *Graphic Arts Mut. Ins. Co. v. Bakers Mut. Ins. Co.*, 45 NY2d 551, 558 (1978). It is only where it is determined that multiple policies cover "the same risk" because each "was sold to provide the same level of coverage," then "priority of coverage (or, alternatively, allocation of coverage) among the policies is determined by comparison of their respective 'other insurance' clauses." *Sport Rock Intern., Inc. v American Cas. Co. of Reading, PA*, 65 AD3d 12, 17 (1st Dept 2009).

Here, we do not need to perform a comparison of the "other insurance" provisions because the Amerisure CGL Policy and the Selective Umbrella Policy do not cover the same risk

at the same level. *See Home Ins. Co., Inc. v Liberty Mut. Ins. Co.*, 678 F. Supp 1066, 1069 (SDNY 1998)("New York courts have consistently found that an umbrella policy is not required to contribute to the payment of a settlement until all other applicable policies have been exhausted regardless of the wording of those policies' 'other insurance' clauses."). The Appellate Division's discussion in *Bovis v Great American Ins. Co*. is further instructive. In that case, the Court discussed umbrella policies explaining that "[a]n umbrella insurance policy provides the insured with 'final tier ... coverage at a premium reduced to reflect the lesser risk to the insurer.'" "[U]mbrella coverages ... are regarded as true excess over and above any type of primary coverage, excess provisions arising in regular policies in any manner, or escape clauses" 8A Appleman on Insurance, § 4909.85, at 453–454 (1981).

In this case, the Amerisure CGL Policy clearly provides coverage at a primary level. By its terms, the Amerisure CGL Policy applies as excess only where the EDC is an additional insured on another primary policy. Thus, accordingly, the Amerisure CGL Policy, by its terms, provides coverage to EDC that is excess of the Selective CGL Policy. However, by those same terms, the Amerisure CGL Policy, by its terms, provides coverage to EDC that is primary to the Selective Umbrella Policy.

## POINT III

## THE SELECTIVE UMBRELLA POLICY SHARES EXPOSURE WITH THE AMERISURE UMBRELLA POLICY ON A RATABLE BASIS

### A. The Selective Umbrella Policy is Limited to $1,000,000 by the terms of the Eilerson/Laface Contract

Insofar as the EDC qualifies as an additional insured under the Selective Umbrella Policy, it is submitted that the Court must still review and ascertain the scope and amount of coverage afforded under that policy. As noted above, Courts are instructed to apply the clear and

unambiguous language of the Policy (*see* Point I(d), *supra*). When that process is undertaken here, it becomes clear that EDC's available coverage is limited to $1,000,000 pursuant to the terms of the EDC/Laface Contract.

The Selective Umbrella Policy provides very clear instruction on the amount of coverage offered to an additional insured. Specifically, at Page 12 of Endorsement CXL 4 04 03, the Selective provided:

> **SECTION II — WHO IS AN INSURED**
>
> **A.** Except for liability arising out of the ownership, maintenance, or use of "covered autos":
>
> **5.** Any additional insured under any policy of "underlying insurance" will automatically be insured under this insurance
>
> ***If coverage provided to the additional insured is required by a contract or agreement, the most we will pay on behalf of the additional insured is the amount of insurance required by the contract,*** less any amounts payable by any "underlying insurance", subject to **Section III — Limits of Insurance.**
>
> Additional insured coverage provided by this insurance will not be broader than coverage provided by "underlying insurance".

(emphasis supplied)

Thus, pursuant to the additional insured provision at issue, EDC's coverage under the Selective Umbrella Policy will not pay more than the amount required in the Contract. When one reviews the EDC/Laface Contract, it is clear that Laface was only required to provide $1,000,000 in Commercial General Liability coverage (which it did) and $1,000,000 in Commercial Umbrella coverage. For ease of reference the EDC/Laface Contract provided:

> 4.1 The Subcontractor shall procure and maintain at the Subcontractor's own expense, during the entire contract time, Liability Insurance is hereinafter specified as:
>
> ***

c. Commercial General Liability shall be provided for a Combined Single Limit of at least $1,000,000 for each occurrence, $1,000,000 Personal Injury and Advertising Liability, $2,000,000 Products and Completed Operations aggregate and $2,000,000 general aggregate. The policy shall contain no restrictions from contractual liability and xcu (explosion, collapse and underground). Contractor shall be named as additional insured, per form CG 20 10 1185 or equivalent. Subcontractor shall maintain Products and Completed Operations Insurance and shall name Contractor as additional insured for at least two (2) years from the date of final payment. Subcontractor's insurance shall be primary and non-contributory so that the Contractor' policy will not respond until the limits under the Subcontractor's policy are exhausted.

d. ***Commercial Umbrella Liability shall be provided for at least $1,000,000 and shall be as broad as the primary General Liability and Automobile***

(emphasis supplied)

Accordingly, when the Selective Umbrella Policy language is read in conjunction with the EDC/Laface Contract, it is obvious that the Selective Umbrella Policy only provides the contractually required $1,000,000 in coverage to EDC. There is no ambiguity or confusion about what the policy and the contract say and, as such, they must be afforded their plain and ordinary meanings.

There is support for Selective's position. Indeed, this Court is respectfully directed to the Appellate Court's fairly recent decision of *E.E. Cruz & Co., Inc. v Axis Surplus Ins. Co.* (165 A.D.3d 603, 87 N.Y.S.2d 173 [1st Dept., 2018]). In that case, National Casualty Company and Everest National Insurance Company both issued Commercial Umbrella policies under which E.E. Cruz was insured. *Id.* at 605. The Everest policy, issued to E.E. Cruz as a named insured, provided excess coverage of up to $10,000,000. *Id.* On the other hand, E.E. Cruz qualified as an additional insured under the National policy which also provided up to $10,000,000 in excess

coverage. However, the National policy (as is the case here) provided that its liability limit for additional insureds was limited by application of language which provided "the most we will pay on behalf of the additional insured is the amount of insurance required by the contract, less any amounts payable by [the underlying insurance]." *Id.* In that case, the relevant contractual language only required that E.E. Cruz be provide with $2,000,000 in CGL coverage. Because the "underlying policy" provided coverage for the first $1,000,000, National's exposure was limited to the second million as required by the contract.

The language employed by the Selective Umbrella Policy is identical to the language reviewed by the Appellate Division in the *E.E. Cruz* case. In addition, the relevant contract in both *E.E. Cruz* and the case at bar required that named insured provide up to $2,000,000 in coverage limits for the putative additional insured. Thus, just as in *E.E. Cruz*, the Selective Umbrella Policy is limited to $1,000,000 in compliance with the terms of the policy language and the EDC/Laface Contract.

**B. <u>The Selective Umbrella Policy's Ratable Contribution Rate is 1/11</u>**

Having established the amount of coverage available to EDC under the Selective Umbrella Policy, the last step in the analysis is determining when/how the two policies share the risk. Here, there can be no dispute that the Selective Umbrella Policy and the Amerisure Umbrella Policy have identical "other insurance" provisions and cover the same risk.

In such situations, the Court of Appeals has opined "[t]he general rule is, of course, that where there are multiple policies covering the same risk, and each generally purports to be excess to the other, the excess coverage clauses are held to cancel out each other and each insurer

contributes in proportion to its limit amount of insurance." *Lumbermens Mutual Casualty Company v Allstate Insurance Company*, 51 N.Y.2d 651, 656 (1980). Where, as here, the policies cover the same risk they are "required to 'contribute in the proportion their policies bear to the limit of coverage at that level'." *E.E. Cruz & Co., Inc. v Axis Surplus Ins. Co.*, 165 Ad 3d at 605 *citing Jefferson Ins. Co. of NY v Travelers Indemn. Co.*, 92 NY2d 363 (1998).

Having resolved that the Selective Umbrella Policy provides coverage of up to $1,000,000 to EDC. By its plain terms, the Amerisure Umbrella Policy provides up to $10,000,000 in coverage. Thus, the ratable proportion is 1/11 of any exposure assumed by the Selective Umbrella Policy and 10/11 of any exposure assumed by the Amerisure Umbrella Policy. It is this precise formula that the Appellate Division applied in the *E.E. Cruz* case, and this Court should adhere to Appellate Division's direction in the matter at bar.

## CONCLUSION

For the foregoing reasons, it is respectfully submitted that this Court must issue an Order declaring that Selective Insurance Company of America does not have a duty or obligation to defend, nor indemnify, Cameron Group, LLC, Hinsdale Road Group, LLC or Movie Tavern Theatre as additional insureds under either the Commercial General Liability Policy or the Commercial Umbrella policy it issued to C&D Laface Construction, Inc.

In addition, it is further requested that this Court also issue an Order declaring the Selective Excess Policy as excess over any and all coverage available to Eilerson Development Corporation under the Ameisure CGL Policy.

Finally, this Court is respectfully requested to issue a declarative Order indicating that Eilerson Development Corporation's coverage under the Selective Umbrella Policy is limited to

$1,000,000, and further that the Selective Umbrella Policy and the Amerisure Umbrella Policy will share, ratably, any exposure in excess of the primary coverage.

DATED: Buffalo, New York
February 25, 2021

Respectfully submitted,

HURWITZ & FINE, P.C.

By:________________________________

Steven E. Peiper, Esq.
*Attorneys for Defendant*
*SELECTIVE INSURANCE COMPANY OF AMERICA*
1300 Liberty Building
424 Main Street
Buffalo, New York 14202
(716) 849-8900
sep@hurwitzfine.com